David R. Isola, Esq., SBN 150311
Doyle Graham, Esq., SBN 217033
ISOLA LAW GROUP, LLP
405 West Pine Street
Lodi, California 95240
Telephone: (209) 367-7055
Facsimile: (209) 367-7056
e-mail: disola@isolalaw.com
e-mail: fdgraham@isolalaw.com

Attorneys for Plaintiff, QUANTUM LABS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

(San Jose Division)

| | |
|---|---|
| QUANTUM LABS, INC., a Colorado corporation, <br><br> Plaintiff, <br><br> v. <br><br> MAXIM INTEGRATED PRODUCTS, INC., a Delaware corporation, TUNC DOLUCA, an individual, <br><br> Defendants. | CASE NO. <br><br> COMPLAINT FOR: <br><br> 1. COST RECOVERY AND DECLARATORY RELIEF — 42 U.S.C. §9607(a) AND §9613(f)(1); <br> 2. ABATEMENT OF IMMINENT AND SUBSTANTIAL ENDANGERMENT PURSUANT TO RCRA--42 U.S.C. §6972(a)(1)(B); <br> 3. FRAUD — INTENTIONAL MISREPRESENTATION OF MATERIAL FACTS; <br> 4. FRAUD — INTENTIONAL CONCEALMENT OF MATERIAL FACTS; <br> 5. NEGLIGENCE AND NEGLIGENCE PER SE; <br> 6. CONTINUING PRIVATE NUISANCE; <br> 7. WASTE; <br> 8. TRESSPASS; <br> 9. CIVIL PENALTIES — CALIFORNIA HEALTH & SAFETY CODE § 25359; <br> 10. DECLARATORY RELIEF; and, <br> 11. BREACH OF CONTRACT <br><br> DEMAND FOR JURY TRIAL |

Plaintiff, QUANTUM LABS, INC., a Colorado corporation ("Plaintiff") for its Complaint herein alleges as follows:

## NATURE OF THE ACTION

1.     This action is brought in response to multiple concerted acts of deceit perpetrated on Plaintiff by MAXIM INTEGRATED PRODUCTS, INC., a Delaware corporation ("Maxim") at its highest management levels, including TUNC DOLUCA, Chief Executive Officer, (collectively, "Defendants").

2.     Consistent with its long history of Occupational Safety and Health Administration ("OSHA") violations, Maxim devised a scheme to conduct unlawful operations at Plaintiff's facility to avoid contaminating its own premises, to avoid exposing its own employees to known carcinogens released incident to its unlawful operations, and to avoid fines and penalties for its failure to comply with and California Health & Safety Code §252249, et seq. ("Proposition 65") and other statutory and regulatory federal and state requirements and standards.

3.     Through acts of deceit, Defendants deliberately caused Plaintiff to be burdened with the consequences of hazardous waste released incident to Maxim's operations at Plaintiff's facility, including cobalt metal powder and cobalt oxide. To induce Plaintiff to permit Maxim to install and operate their equipment at Plaintiff's facility, Maxim represented to Plaintiff orally and in writing that Maxim would use, store, and dispose of only certain, pre-designated chemicals and solvents at the Plaintiff's facility.

4.     Defendants knew but concealed from Plaintiff that Maxim intended to use and would use, handle, store and dispose of cobalt metal powder and cobalt oxide while performing operations at Plaintiff's facility. Maxim's misrepresentations and concealments of material fact concerning its intended use of cobalt on Plaintiff's property were deliberate and intentional.  Had Maxim disclosed to Plaintiff the fact that it intended to use, store, handle and dispose of the known carcinogen cobalt

/ / /

metal powder and cobalt oxide, or warned Plaintiff of same, Plaintiff never would have permitted Maxim to undertake any operations at Plaintiff's facility.

5.      Maxim contaminated Plaintiff's facility and exposed everyone on site to the carcinogens cobalt metal powder and cobalt oxide. Maxim's own test results from Plaintiff's facility show cobalt-related contamination at concentrations up to 100-times higher than permissible levels, yet Maxim did nothing more than deny the consequences of its unlawful activities, and delay the process of decontamination for more than 3-years after abandoning Plaintiff's facility.

6.      Plaintiff's efforts to have Maxim voluntarily step-up and accept responsibility for exposing individuals to cobalt metal powder and cobalt oxide and for contaminating Plaintiff's facility, including extensive email correspondence, attorney correspondence, and face to face meetings, have been met with nothing but inaction and attrition by Maxim, leaving Plaintiff no alternative than to file the present complaint.

## PARTIES

### A.  Plaintiff

7.      Plaintiff, QUANTUM LABS, INC., is a Colorado corporation that maintains its principal place of business in San Jose, California. Plaintiff is the assignee of all rights title and interest in the December 17, 2012 agreement titled "Research and Development Support Services Agreement" entered among Maxim Integrated Products, Inc. and Hyperion Group, Inc. ("RDSSA"). During the times referenced in this Complaint, QUANTUM LABS has operated and continues to operate a business at the premises known as APN # 23711061 in the City of San Jose, Santa Clara County, California. ("Plaintiff's Facility").

### B.  Defendants

8.      Defendant, Maxim, is a Delaware corporation qualified to do business in California, and maintains its principal place of business in San Jose, California.

9.      Defendant, TUNC DOLUCA  ("DOLUCA") is the CEO of Maxim.  On

1    information and belief, DOLUCA resides and works in the County of Santa Clara.

2         10.    At all times relevant herein, each of the Defendants was the authorized

3    agent of each of the other remaining Defendants, and in engaging in the conduct

4    alleged herein acted within the course and scope of such agency.

5                         **JURISDICTION AND VENUE**

6         11.    This court has exclusive jurisdiction over the subject matter of this

7    action pursuant to 42 U.S.C. § 9607 and 9613(b), 28 U.S.C. § 1331.

8         12.    Venue is proper in this judicial district pursuant to 42 U.S.C. § 9607 and

9    9613(b), 28 U.S.C. § 1391(b) and (c), and because the claims arose in the Northern

10   District of California.

11        13.    The state law claims alleged in this complaint are related to the federal

12   claims pursuant to 28 U.S.C. § 1367(a) and fall within the court's supplemental

13   jurisdiction.

14                   **ALLEGATIONS COMMON TO ALL COUNTS**

15        ***A. Maxim's Fraudulent Concealment of its Intent to Use Cobalt***

16        14.    Maxim contacted HTE Labs (a sister company to Plaintiff) in July 2012

17   inquiring about "lab space rental."

18        15.    Maxim's CEO, Tunc Doluca, approved Maxim's plans for Plaintiff's

19   Facility based on a Maxim internal e-mail dated September 28, 2012 titled, "FW:

20   Tunc Approval – Deposition tools for the Inductor Program," which stated:

21        We are indeed leasing a ready facility, called HTE Labs. The one we

22        are leasing is located about 3 miles from Maxim X3. They also supply

23        to the military. As we discussed in the meeting this makes them more

24        IP secure for us, because they know how to handle such work. The

25        facilitization is to prepare the space they are renting for our tools. To

26        facilitize the Maxim warehouse was going to cost $1.1M. HTE Labs

27        was the cheapest of about 8 working facilities that we and Maxim

28        personnel visited. The $150k is a total budgetary cost for both tools

and the work and payments will spread over 3 quarters, (Q2,13 : Q1, 14). For example, they need to extend water and gas line to the locations where we are placing the tools. They will need to add power because our tools will utilize 20KW for each gun to Maximize dep rate. They will supply gas cabinets for our pure gases, etc. They also need to add all our items to their permitting, etc. I think this is very reasonable. Because we are using the labs, we are also saving the expense of purchasing and installing 2 wet benches and metrology tools. HTE will make available these wet benches for our own use at no cost.

16.     At the time negotiations were occurring between Maxim and Plaintiff for Maxim's use of Plaintiff's Facility, Maxim was the assignee of rights under Patent # 9023422 for "High Rate Deposition Method of Magnetic Nanocomposites," which is a process for manufacturing highly specialized silicon wafers coated with a thin film of cobalt.

17.     The silicon wafer coating process under Patent No. 9023422 calls for solid cobalt to be evaporated by an electron beam and deposited on the silicon wafer(s) in what is known as a "hearth evaporator."

18.     In 2012 while negotiations were occurring for Maxim's use of Plaintiff's Facility, Plaintiff had no knowledge of Maxim's rights under Patent No. 9023422, and nor did Plaintiff have knowledge that Maxim intended to use Plaintiff's Facility for the cobalt-based process described in Patent No. 9023422.

19.     The terms and conditions for Maxim's rental of Plaintiff's Facility to conduct its satellite operation occurred over the course of approximately 6 months, from July to December 2012. The agreement called for Plaintiff to provide Maxim with approximately 1,500 square feet of non-contiguous space, (which was later changed to contiguous space based on Maxim's insistence), to provide Maxim with access to certain of Plaintiff's equipment, and to permit Maxim to bring its own

1   equipment and tools into the facility.

2      20.    Included in the equipment that Maxim was permitted to bring into

3   Plaintiff's facility was an electron beam evaporator manufactured by "Temescal,"

4   which would eventually be used for purposes of evaporating solid cobalt based on the

5   process described in Patent No. 9023422.

6      21.    The list of gases, chemicals, and solvents to be used incident to Maxim's

7   satellite operation was also negotiated and agreed on by the parties--Maxim disclosed

8   its intent to use the following materials at Plaintiff's Facility:

9          GASES

10
11         He 99.999        for cryopumps
12         N2 99.999        process gases
           O2 99.999        process gases
13         N2/H2  99.999    process gases

14         DI WATER and DRY COMPRESSED AIR
15         INORGANIC CHEMICALS

16
17         Sulfuric acid
           Nitric acid
18         Hydrochloric acid
           HF acid 49%
19         Phosphoric acid
20         Hydrogen Peroxide
           KOH 40% will use KOH pellets instead to make the solution in house
21      standard HTE Labs procedure
22         Ammonium Fluoride
           Ammonium Hydroxide
23
24         ORGANIC CHEMICALS
25
           Poly vinyl alcohol
26         EDTA
27         Glycerol

28

SOLVENTS
IPA
Acetone
Methanol
PR stripper

22.     Maxim's list of materials to be utilized at Plaintiff's Facility did not identify cobalt.

23.     Maxim intentionally concealed from Plaintiff that cobalt would be brought on to Plaintiff's Facility given that the entire purpose behind Maxim's satellite operation was to conduct manufacturing operations pursuant to Patent No. 9023422 which called for the use of cobalt.

24.     In furtherance of its fraudulent efforts to maintain secrecy regarding its intended operations at Plaintiff's Facility, in October 2012 while negotiations for the rental of Plaintiff's Facility where ensuing, Maxim's CEO, Tunc Doluca, required Plaintiff to enter into a Non-Disclosure Agreement regarding Maxim's use of Plaintiff's Facility.

25.     In reliance on Maxim's verbal and written representations, and without any knowledge that Maxim was concealing its intent to use cobalt at Plaintiff's Facility, on December 17, 2012 the parties signed the RDSSA.

26.     The RDSSA stated that Maxim's intent was "to engage Supplier [Plaintiff ] to provide research and development support services in the field of semiconductor manufacturing technologies," with Maxim acknowledging "that the end results and use of the research and development support services is not to be used for any unlawful purpose."

27.     The RDSSA required that Maxim, its subcontractors, and suppliers observe and comply "with all material laws" with respect to the use of Plaintiff's Facility, and Maxim agreed that if any construction or alterations of Plaintiff's Facility were necessary to accommodate Maxim's operations, Maxim would comply

with all legal applicable requirements.

28.     The RDSSA required that Plaintiff amend its environmental permits to reflect Maxim's disclosed chemicals, solvents and gases to be used incident to Maxim's satellite operation, however, cobalt was not included in any of Plaintiff's amended environmental permits because Maxim fraudulently concealed from Plaintiff the fact that cobalt would be used.

29.     The RDSSA stated that Plaintiff would provide Research & Development services to Maxim that included "thin film vacuum deposition, annealing, photolithography, wet etching, test and measurements support," all "dependent solely on Maxim's input and equipment." However, in furtherance of its fraudulent efforts to conceal the true nature of its operations at Plaintiff's Facility, Maxim never sought Research & Development services from Plaintiff.

30.     The RDSSA stated that Maxim would provide Plaintiff with written, specific instructions for work to be performed by Plaintiff on Maxim's behalf "in the form of mutually agreed run travelers that shall contain equipment specific process card." However, in furtherance of its fraudulent efforts to conceal the true nature of his operations at Plaintiff's Facility, Maxim never provided Plaintiff with any instructions for work to be performed on Maxim's behalf.

31.     The RDSSA provided that Maxim would pay for the "cost of consumables and direct materials (i.e. gases, DI water and dry compressed air, inorganic and organic chemicals and solvents) per Exhibit C," and Plaintiff was responsible for purchasing, storing and disposing of the consumables and direct materials for Maxim's use.

32.     In furtherance of its fraudulent efforts to conceal the true nature of its operations at Plaintiff's Facility, Maxim purchased its own consumables and direct materials, save and except for some gases that Plaintiff purchased per the RDSSA.

33.     Maxim ordered cobalt pellets directly from a supplier and had them shipped to Plaintiff's Facility for use in its satellite operation without the Plaintiff's

knowledge.  Upon information and belief, Plaintiff states that Maxim ordered a minimum of 100 kg. of cobalt pellets for use at Plaintiff's Facility.

34.     Notwithstanding Maxim's false and fraudulent representations to Plaintiff to the contrary, Maxim's true intent in entering into the RDSSA, as revealed by its conduct, was to conduct dangerous and unlawful operations utilizing cobalt at a location not owned by Maxim.

### B. Cobalt Found in Routine Wastewater Sample Reveals Maxim's Fraud

35.     By approximately April 2014, Maxim had installed its equipment for its satellite operation, (informally referred to as "Lab M," as distinguished from Plaintiff's "Lab Q"), and the original 1,500 square feet of space rented by Maxim was expanded to approximately 2200 ft.$^2$ of contiguous space. As of approximately April 2014, Maxim's satellite operation was fully functional.

36.     In June 2014, routine sampling of wastewater discharged from Plaintiff's Facility conducted pursuant to San Jose Water Pollution Control District Self-Monitoring requirements revealed the presence of cobalt in the wastewater.

37.     Cobalt is a listed carcinogen under California law and requires heightened and complex disclosures and warnings, all of which Maxim chose to ignore.

38.     Environmental laws and regulations distinguish between cobalt in its solid form versus cobalt metal powder and cobalt oxide. Cobalt metal powder and cobalt oxide are listed as carcinogens ("Chemicals known to the State to Cause Cancer or Reproductive Activity") by the State of California Environmental Protection Agency Office of Environmental Health Hazard Assessment, pursuant to California Health and Safety Code § 252249, et seq. ("Proposition 65") and have been so categorized since 1992.

39.     Plaintiff was confounded by the presence of cobalt in wastewater coming from Plaintiff's Facility. On the other hand, the presence of cobalt in wastewater coming from Plaintiff's Facility was expected by Maxim given Maxim's

1    use of cobalt incident to its satellite operation.

2         40.    The Minimum Risk Level ("MRL") for cobalt exposure according to the

3    Centers for Disease Control – Agency for Toxic Substances & Disease Registry is

4    0.001mg/m³ for inhaled air.  The MRL is an estimate of the daily human exposure to

5    a hazardous substance that is likely to be without appreciable risk of adverse, non-

6    cancer health effects over a specified duration of exposure.

7         41.    On top of its acts of fraudulent concealment regarding its use of cobalt at

8    Plaintiff's Facility, Maxim failed to observe required industrial hygiene practices

9    which caused cobalt metal powder and cobalt oxide to be dispersed throughout

10   Plaintiff's Facility.

11        42.    Even after Maxim's use of cobalt was revealed, Maxim continued to

12   seek to deceive Plaintiff by claiming that the levels of exposure were within

13   acceptable limits whereas Maxim had information in its possession indicating that the

14   cobalt metal powder and cobalt oxide levels were well in excess of accepted limits.

15        C. *Maxim Abandons Plaintiff's Facility*

16        43.    On or around June 2015, Maxim made the decision to shut down the

17   satellite operation at Plaintiff's Facility. By the end of September 2015, all personnel

18   connected with the Maxim's satellite operation at Plaintiff's Facility had left the

19   company.

20        44.    In or around September 2015, Maxim informed Plaintiff that it was

21   considering renewing the RDSSA, but that it was likely that Maxim would spin off

22   its satellite operation to a new company ("NewCo"), while retaining an interest of

23   approximately 20%.

24        45.    In or around September 2015, Maxim first disclosed to Plaintiff that

25   conducting manufacturing operations pursuant to Patent No. 9023422 was the true

26   purpose of Maxim's satellite operation at Plaintiff's Facility.

27        46.    The two Maxim employees that had secured Patent No. 9023422 were

28   trying to raise approximately $6 million in funding so that NewCo could take over

the Maxim Project.  These revelations confirmed what Maxim tried so hard to conceal through its fraudulent actions and Non-Disclosure Agreement, specifically that the use of cobalt was the key to the Maxim's satellite operation conducted at Plaintiff's facility.

47.     NewCo's efforts to take over Maxim's satellite operation included not only securing the necessary funding, but also obtaining exclusive licenses to a number of patents from Maxim, procuring the equipment used in Maxim's satellite operation, and seeking an assignment of the RDSSA to rent Plaintiff's Facility. These efforts were summarized in a Series A Preferred Term Sheet negotiated between NewCo and Maxim as of September 15, 2015.

48.     As of November 2015, NewCo representatives were trying to convince Plaintiff to allow an assignment by Maxim to NewCo of the RDSSA such that NewCo could assume Maxim's satellite operation at Plaintiff's Facility.

49.     NewCo represented to Plaintiff that if NewCo did not secure funding by April 2016, "Maxim will decommission all tools, remove all Maxim owned facilities and tools, decontaminate lab and return premises to Quantum labs."

50.     NewCo's efforts to assume Maxim's satellite operation at Plaintiff's Facility failed primarily because NewCo's refused Maxim's demand that NewCo assume liability stemming from the undisclosed use of cobalt in Maxim's satellite operation at Plaintiff's Facility.

51.     After the efforts to have NewCo assume Maxim's satellite operation failed, Maxim notified Plaintiff of its intent to remove the contaminated equipment and requested a date for the removal.

52.     Plaintiff replied to Maxim advising that closing the satellite operation would be complex,  involving not only the decontamination of the equipment prior to removal, but also closing the permits previously opened by Maxim with the City of San Jose, including completing the ADA improvements required by the City of San Jose.

53.     Plaintiff insisted that Maxim comply with all the procedures and regulations in place for the removal of the contaminated equipment, including notifying all environmental agencies of its intent. Although Plaintiff is not aware that Maxim made any such notifications, Maxim did abandoned its plan to remove the equipment without prior decontamination.

### D. Maxim's Own Test Results Reveal Unacceptable Cobalt Contamination

54.     In December 2014, Maxim conducted sampling for cobalt inside of Plaintiff's Facility using a "wipe" methodology; the sampling revealed cobalt dust at levels as high as 980 parts per billion, nearly 100 times in excess of what Maxim's internal guidelines deemed to be a safe level.

55.     Maxim shared the results with Plaintiff of cobalt sampling at Plaintiff's Facility taken on or around January and April 2015 by Maxim's consultant, HPM Systems. These results revealed cobalt contamination at concentrations 10 to 100 times higher than those allowed by CAL/OSHA.

56.     The first actual meeting between Maxim, Plaintiff, and Plaintiff's counsel occurred on December 7, 2015, wherein Maxim's Environmental Health and Safety engineers made claims that Maxim performed cobalt testing every two weeks while its satellite operation was running but to this day has failed to share such data, if it actually exists.

57.     In or around January 2016, after having effectively abandoned the contaminated equipment on Plaintiff's Facility, Maxim provided a short presentation titled "Maxim Labs Analysis of Cobalt Measurements" authored by Tim Warren, EHS Director ("Warren Presentation").

58.     Plaintiff obtained an Environmental, Health, and Safety Audit from certified industrial hygienist, Aero-Environmental Consulting, Inc. to assess the extent and consequences of Maxim's unlawful use of cobalt on Plaintiff's premises. As part of its investigation, Aero-Environmental Consulting reviewed both the HPM Systems report and the Warren Presentation.

59.     The audit performed by Aero-Environmental Consulting revealed that HPM Systems did not collect a sufficient number of samples to evaluate employee exposure potential and cross contamination. Specifically, Maxim failed to collect air samples outside Lab M or from the office areas, and Maxim failed to collect wipe or air samples of the exhaust ventilation and other equipment and areas where Maxim conducted its cobalt operations.

60.     According to Aero-Environmental Consulting, the sampling procedure used by HPM Systems was not in accordance to NIOSH 9100 Manual of Analytical Methods that requires an "S" wiping procedure in several directions as well as along the perimeter of the square.

61.     The Aero-Environmental Consulting audit concludes that the HPM Systems work was deficient in that air samples should have been collected as an 8-hour Time-Weighted-Average versus the arbitrary collection period that was used.

62.     The Aero-Environmental Consulting audit noted that the air sampling by HPM Systems was conducted following a weekend cleaning-decontamination of walls and during very little activity in the lab while the vacuum chamber cobalt was not open.  The air sampling was not conducted during "normal operations" such as opening of vacuum chamber and loading of wafers or when new cobalt charge is added or filament is changed or shields replaced.

63.     The Aero-Environmental Consulting audit notes that HPM Systems claimed "all areas appear clean and free of visible particulate," yet HPM Systems' own data demonstrated that even after "decontamination procedures," Cobalt dust still was detected in wipe samples at Plaintiff's Facility.

64.     The Aero-Environmental audit noted that the discussion section of HPM Systems' report states that all work practices and housekeeping were generally adequate to maintain cobalt contamination below the Maxim standard which is in direct contradiction to the results actually obtained by HPM Systems.

/ / /

65.     The Aero-Environmental Consulting audit included a review of the Warren Presentation and identified 13 discrepancies and errors.

66.     The Warren Presentation claimed that cobalt is "very safe as solid," which is false given that in an industrial/commercial facility cobalt is classified as a Carcinogen-Group 2B by the International Agency for Research on Cancer Carcinogenic Classification.

67.     The Warren Presentation denied that cobalt dust can ignite on contact with air or oxygen, and that particles may form explosive mixtures in the air, which is a direct contradiction to the National Institute for Occupational Health and Safety warnings and protocols for cobalt use in an industrial setting.

68.     The Warren Presentation claimed that the Cal/OSHA Personal Exposure Limit ("PEL") for cobalt is 0.083 ppm, which is the equivalent to 0.2 mg/m³, where in fact the actual Cal/OSHA PEL 0.02 mg/m³, which is 100 times more stringent than the Warren Presentation indicates.

69.     Aero-Environmental pointed out that the presence and use of the Temescal electron beam evaporator contradicts the Warren Presentation's claim that "cobalt was only used in metal form and not vaporized."

70.     The use of cobalt in the Temescal electron beam evaporator created nanoparticles of cobalt and micro particles of cobalt dust that were deposited on all surfaces inside the vacuum chamber.

71.     The Aero-Environmental audit also pointed out that the Warren Presentation claimed that "effective cleaning protocols were established" for cobalt dust, but no indication is given as to what these protocols were.

72.     The Warren Presentation stated that "PPE [Personal Protective Equipment] was used in the lab and personnel were trained in proper lab protocol…". However, there is no indication that Maxim had a Respiratory Protection Program in place, if PPE fit testing was conducted on any of the workers, if medical surveillance was conducted as part of this PPE Program, or if 8 – hour Time-Weighted – Average

personnel exposure monitoring was conducted to determine the appropriate level of PPE the employees should have worn.

73.     The Warren Presentation indicated that all air samples were below the Cal/OSHA PEL.  However two samples were 71 and 54 ppb.  71 ppb corresponds to a level of 0.17 mg/m3 which is almost 10 times higher than the Cal/OSHA PEL of 0.020 mg/m3.

74.     The Warren Presentation indicated that the "10 ppb wipe surface limit is an extremely conservative recommendation," which contradicts the industry standard set forth by the Brookhaven National Laboratory of 2 ug/100cm2 for Equipment Release.

75.     The Warren Presentation indicated that "lab workers were wearing PPE as observed and practicing proper hygiene."  However, it is clear from photographic evidence that lab employees were not wearing any respiratory protection whatsoever.

76.     The Warren Presentation claimed that there were essentially "restricted areas," which is contradicted by the fact that Maxim designed and constructed one of its cobalt operational areas ("clean room") such that the soft walls did not extend all the way to the floor and air was pushed vertically from the ceiling towards the floor and allowed to escape the clean room from the gap between the floor and the soft wall so that cobalt dust was unimpeded to make its way into the rest of Plaintiff's Facility exposing Plaintiff's employees and visitors to cobalt dust.

77.     Neither the Warren Presentation nor any other information shared with Plaintiff by Maxim indicates there was any investigation done in the Wafer Scrubber area where excess loose cobalt particles was removed from the wafers.  The scrubber in this area uses brushes and high pressure water jets. This creates a mist that contains cobalt particles that can potentially migrate into other areas of the lab and cross-contaminate surfaces and equipment.

78.     Neither the Warren Presentation nor any other information shared with Plaintiff by Maxim indicates there was any investigation done in the Hyprez Wafer

Diamond Lapper and Polisher area where wafers containing cobalt and other metals were polished.  During this process, jets of diamond particles are aimed at the work surface and can generate mist of water vapor that can contain metal dust.

79.  Neither the Warren Presentation nor any other information shared with Plaintiff by Maxim indicates there was any investigation done in the Maintenance Area where cobalt dust is visible embedded on the surface of what used to be a white polypropylene table top.  In the Maintenance Area, cobalt-contaminated components of the vapor deposition process were cleaned, repaired, and replaced including shields, filaments, charges, and crucibles.

80.  The Warren Presentation makes reference to three (different) sampling events: (a) May, 2014-Surface Wipe Sampling; (b) December 2014-Pre-Decon Surface Wipe Sampling; and, (c) December 2014 Post-Decon Air Sampling.

81.  Plaintiff received only one sampling report from Maxim that contained no chain-of-custody information, photographs, or other indication that sampling, if any, was conducted pursuant to proper protocols. There was never a representative for Plaintiff present at any of Maxim's alleged sampling events, which calls into question the veracity of the results.

82.  Although still unwilling to acknowledge the contamination its operator caused and the steps necessary to remediate the contamination, Maxim agreed to be present during testing done in November 2017 by SafeBridge Consultants, Inc., retained by Plaintiff. The results of the tests, performed in the presence of Mr. Tim Warren, and shared with Maxim, showed cobalt contamination several hundred times in excess of permissible concentrations.

### E. Maxim Ignored Worker Safety Requirements

83.  The Aero-Environmental audit concludes that based on the information reviewed, it appears that Maxim did not have the required Chemical Hygiene Plan for its operations at Plaintiff's Facility, nor is it evident that all the Personnel Training requirements mandated by Cal/OSHA were completed or fulfilled.

84.     Cal/OSHA's applicable PPE [Personal Protective Equipment] requirements for operations such as those undertaken by Maxim at Plaintiff's Facility should have been at a minimum a Level C protection, which includes hard-hat, chemical resistant steel toed boots, gloves, poly coated Tyvek, and a full face air purifying respirator with appropriate cartridge configuration based on the anticipated chemical hazard. No such safety measures were ever implemented by Maxim.

85.     NIOSH standards for operations such as those undertaken by Maxim at Plaintiff's Facility should have included medical surveillance of the personnel working with cobalt, consisting of an annual physical and an exit medical surveillance program. Other than testing one employee once, Maxim never provided Plaintiff with any indication that proper medical testing protocols were being followed.

### F. Maxim's Actions Were Malicious, Intentional and Unlawful

86.     At all relevant times, Maxim intended to use cobalt at Plaintiff's Facility and did use cobalt at Plaintiff's Facility, yet Maxim failed to contact Cal/OSHA in writing in advance of using cobalt.

87.     At all relevant times, Maxim intended to use cobalt at Plaintiff's Facility and did use cobalt at Plaintiff's Facility, yet  Maxim failed to obtain the required permits related to the use of cobalt from Cal/OSHA, the City of San Jose Fire Department, the Bay Area Air Quality Management District, and California Department of Toxic Substances Control.

88.     At all relevant times, Maxim intended to use cobalt at Plaintiff's Facility and did use cobalt at Plaintiff's Facility, yet  Maxim failed to post Proposition 65 warning signs at Plaintiff's Facility.

89.     At all relevant times, Maxim intended to use cobalt at Plaintiff's Facility and did use cobalt at Plaintiff's Facility, yet Maxim failed to provide Plaintiff with a Material Safety Data Sheet ("MSDS") for cobalt, or keep one on site. On the other hand, Maxim did maintain a thorough income complete collection of all MSDS at

Plaintiff's Facility for chemicals/materials used incident to its operations, thus further illustrating Maxim's intent to deceive Plaintiff with respect to its use of cobalt.

90.     At all relevant times, Maxim intended to use cobalt at Plaintiff's Facility and did use cobalt at Plaintiff's Facility, yet Maxim failed to perform safety training and enforce safety rules relating to cobalt.

91.     At all relevant times, Maxim intended to use cobalt at Plaintiff's Facility and did use cobalt at Plaintiff's Facility, yet Maxim failed to enforce basic safety precautions such as consistent use of respirators.

92.     California Code of Regulations, Title 8, Section 5203 "Carcinogen Report of Use Requirements" imposed an affirmative duty on Maxim to report the use of cobalt in writing to the Chief of the Division of Occupational Safety and Health within 15 days of that initial use. The writing should have included, among other things, a brief description of each process or operation that creates exposure to regulated carcinogen, and an identifying description of where the use of a regulated carcinogen is located in the workplace.

93.     In addition to the written reporting, Maxim had a duty to post a copy of the applicable written report of use, temporary worksite notification, and emergency report where the regulated carcinogen is in use or other appropriate location where the posting is conspicuous to affected employees. The report was to be posted until the use no longer takes place at the worksite. Upon information and belief Plaintiff states that Maxim did not notify OSHA as required by the regulation, nor did it post the required written report of use.

94.     Maxim contracted with an outside company to perform cleaning of its electron beam evaporator. Those workers were allowed access by Maxim without any warning of the presence of cobalt, and allowed to proceed with scraping deposition of cobalt powder off the evaporator's shields, without proper safety gear.

/ / /

/ / /

95.     When Plaintiff photographed the cleaning crew working without any protective gear, Maxim, rather than showing concern for the health of the cleaning personnel, demanded an explanation as to why Plaintiff was photographing its personnel and equipment. Maxim's reaction to the photographing was again consistent with its intention to conceal the true nature of its operations.

96.     Maxim's complete disregard for worker safety at Plaintiff's Facility is consistent with Maxim's operations at other facilities. Over the years, Maxim had a history of approximately 13 OSHA violations, 8 complaints, 1 fatality and 2 serious accidents in a number of states, including California, Oregon, Texas, and North Carolina.

### G. Abandoned Tenant Improvements
#### 1. Maxim converted the R&D contract into a 3 year lease

97.     After signing the RDSSA, Maxim sought to change the nature of the contract to limit Plaintiff's in its satellite operation and obtaining exclusive control over Lab M. Internal emails between Maxim personnel referred to Lab M as "our rental area."

98.     The original agreement for lab space rental did not provide Maxim with contiguous lab space, and when Maxim requested not only more space, but also contiguous space, Plaintiff agreed to move some of its own equipment in storage to accommodate Maxim.

99.     As of December 2016, Maxim's satellite operation continued to be monitored by Maxim's internal security team. Maxim and its agents exercised complete control over and had 24/7 access to operate the clean room, equipment and facilities installed and dedicated to Maxim's satellite operation.

### H. Maxim Embarked On Complex Tenant Improvements

100.   Over the 16 months after signing the contract, between January 2013 through April 2014, Maxim was involved in extensive tenant improvements at Plaintiff's Facility.

101.   During the third quarter of 2013, Maxim continued its efforts to complete the tenant improvements by hiring COBE Construction, Inc. as its general contractor. On or around December 2013 COBE and its subcontractor, Jet Mechanical, Inc. moved to secure permits from the City of San Jose. The following details were provided by Maxim and its subcontractor to the City of San Jose:

> "This project consists of installing a modular clean room within an existing lab and installing equipment within the new clean room module. Also, included will be installing two new toilets, exterior ADA site upgrades to be performed to meet accessible path of travel requirements."

102.   Maxim opened permits for 6 different upgrades: electric, plumbing, mechanical, building, hazmat, and fire. In addition, the City of San Jose insisted on a special inspection requirement.

103.   Maxim completed only 2 of the 6 opened permits. The City of San Jose inspectors signed off on the plumbing permit on August 29, 2014, and on the mechanical permit on August 7, 2015. Maxim abandoned all the remaining permits.

104.   The fact that COBE and its subcontractor disclosed Maxim's name in relation to the permits caused frustration to Maxim as expressed in emails from the team running Maxim's satellite operations.

105.   A request by the City of San Jose Fire Department for a list of chemicals in use by Maxim caused delay in securing the permits needed for the tenant improvements. Maxim never reported the use of cobalt to any government agencies with oversight over the use of chemicals listed as carcinogens such as cobalt metal powder and cobalt oxide.

106.   Permit issues continued to cloud Maxim's tenant improvements. Plaintiff continuously made efforts to address this issue with Maxim. Despite knowledge of the open permits on its tenant improvements, Maxim decided to ignore the pending permits as it was deciding to shut down the entire Maxim project, which left Plaintiff straddled with the burden of the open permits.

107.   The permits left open and incomplete by Maxim must be addressed or the City of San Jose will take action against Plaintiff's property. Closing these permits requires time and financial efforts on the part of the Plaintiff.

### FIRST CLAIM FOR RELIEF
### CERCLA Sections 9607 and 9613
### (Against All Defendants)

108.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

109.   The Quantum Labs Site is a "facility" within the meaning of 42 U.S.C. section 9601. Defendants and each of them, are "persons" within the meaning of 42 U.S.C. section 9601. The cobalt-related contaminants in and around the Quantum Labs Site are "hazardous substances" within the meaning of 42 U.S.C. section 9601.

110.   Under sections 9607 and 9613 of CERCLA, Plaintiff seeks recovery and contribution, respectively from Defendants for all past, present and future response costs incurred in response to the releases of hazardous substances affecting the Plaintiff's Facility. Defendants are operators, transporters, and arrangers for disposal of hazardous substances at Plaintiff's Facility, and are responsible pursuant to 42 U.S.C. section 9607(a) for the release of hazardous substances into the environment. Each Defendant is jointly and severally liable for the contamination pursuant to 42 U.S.C. section 9607(a).   42 U.S.C section 9613(f)(1) provides in pertinent part:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

111.   Plaintiff has incurred, and will continue to incur, response costs as defined by 42 U.S.C. section 9601(25), including costs of investigation, removal and remedial costs, in the investigation and abatement of the releases and threatened releases of hazardous substances from Plaintiff's Facility. All or a portion of the response costs incurred and to be incurred by Plaintiffs are the result of contamination caused to Plaintiff's Facility by acts and omissions of the Defendants.

112.   The costs incurred, or to be incurred, by Plaintiff in connection with the investigation and remediation of Plaintiff's Facility are necessary costs of response consistent with the provisions of CERCLA and the National Contingency Plan.

113.   Plaintiff continues to incur response costs and other costs in connection with the investigation and remediation of Plaintiff's Facility as a result of ongoing efforts to remediate and remove the hazardous substances from the environment.

114.   Each Defendant is jointly and severally liable for all or part of the past, present, and future costs of response, including, without limitation, investigation and remediation expenses, oversight costs and interest, resulting from the release or threat of release by them, of hazardous substances in connection with Plaintiff's Facility.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CLAIM FOR RELIEF
## RESOURCE CONSERVATION and RECOVERY ACT
### (Against Maxim)

115.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

116.   Plaintiff has given the requisite Notice of Endangerment pursuant to RCRA § 7002 (b)(2)(B) to Maxim.

/ / /

117.   Plaintiff has suffered and continues to suffer an injury in fact, i.e., a concrete and particularized, actual or imminent, invasion of a legally protected interest in the use and enjoyment of Plaintiff's Facility due to the cobalt contamination caused by Maxim.

118.   Plaintiff is informed and believes and thereon alleges that the injury in fact set forth in paragraph 117 above is likely to be redressed by this Court's granting of the relief requested by Plaintiff herein.

119.   Maxim has contributed and/or is contributing to the handling, storage, treatment, transportation, or disposal of solid waste at Plaintiff's Facility, which may present an imminent and substantial endangerment to health and the environment until completely abated.

120.   Plaintiff has demanded that Maxim immediately and at its sole cost, abate the imminent and substantial endangerment set forth above.

121.   This Court has authority pursuant to 42 U.S.C. §6972(a) to order both mandatory preliminary and permanent injunctive relief requiring Maxim to take all action necessary to investigate and abate the imminent and substantial endangerment to health and the environment which may exist at Plaintiff's Facility.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### THIRD CLAIM FOR RELIEF
### FRAUD — INTENTIONAL MISREPRESENTATION
### OF MATERIAL FACTS
### (Against All Defendants)

122.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

123.   Beginning in or about October 2012 and continuing through the end of 2016, Defendants engaged in a continuous course of fraudulent conduct under which, through a series of knowingly false statements of material fact, they (a) sought to induce and did induce Plaintiff to permit Maxim to conduct its satellite operation at Plaintiff's Facility and (b) sought to and did avoid detection of Maxim's wrongful and

unauthorized use of cobalt in conducting its satellite operation.

124.    Defendants' false statements of material fact to Plaintiff which were made to induce them to permit Defendants to perform the Maxim Project included the following:

(a)      In October-December 2012, in meetings, telephone calls, emails, literature concerning the Maxim Project, and in circulated drafts of the RDSSA, Defendants falsely represented to Plaintiff that the only gases, chemicals and solvents to be purchased, used, stored and/or disposed of by Maxim conducting the Maxim Project were the following:

GASES
He 99.999          for cryopumps
N2 99.999          process gases
O2 99.999          process gases
N2/H2 99.999       process gases

DI WATER and DRY COMPRESSED AIR

INORGANIC CHEMICALS
Sulfuric acid Nitric acid
Hydrochloric acid
HF acid 49% Phosphoric acid
Hydrogen Peroxide
KOH 40%
Ammonium Fluoride
Ammonium Hydroxide

ORGANIC CHEMICALS
Poly vinyl alcohol EDTA
Glycerol
SOLVENTS
IPA
Acetone Methanol PR stripper

///

125.   In October - December 2012, in meetings, telephone calls, Maxim literature concerning the Maxim Project, emails and drafts of the RDSSA, Defendants represented that in performing the Maxim Project, and in particular, using, handling and disposing of potentially harmful gases, solvents and chemicals, Maxim was experienced and knowledgeable in, and would ensure that Maxim and its agents would take, all necessary and appropriate safety, containment and disposal procedures to prevent contamination of Plaintiff's Facility and exposure of Plaintiff and its employees, customers, vendors and visitors to potentially harmful or toxic substances.

126.   In October - December 2012, Defendants represented to Plaintiff, in meetings, telephone communications, emails, Maxim promotional literature, and descriptions and drafts of the RDSSA that in pursuing and completing the Maxim Project, Maxim would comply with all applicable federal and state requirements and standards and obtain all required work and building permits.

127.   During Maxim's pursuit of occupancy and control over Plaintiff's Facility, Maxim continued to represent to Plaintiff that only the specified chemicals, solvents and gases -- not cobalt – would be used, handled and disposed of by Maxim. Maxim represented to Plaintiff that it was conducting the Maxim Project in accordance with industry safety standards and protocols, and that Maxim had complied with and was complying with all laws, regulations and permit requirements applicable to the activities to be conducted at Plaintiff's Facility.

128.   In reliance on the foregoing representations of material facts by Defendants to Plaintiff, Plaintiff permitted Maxim to conduct and control the Maxim Project at Plaintiff's Facility. Such reliance by Plaintiff was foreseeable and reasonable.

129.   All of the foregoing representations of material facts by Defendants to Plaintiff were false when made. The true facts are that Defendants knew that Maxim intended to use, would be using and did use, handle, release, disseminate and dispose

of cobalt in carrying out the Maxim Project. In so doing, Maxim violated applicable safety requirements, regulations and protocols. Plaintiffs are informed and believe and thereon allege that Defendants intended that Maxim avoid the adverse consequences of using cobalt by transferring the Maxim Project to Plaintiff's Facility.

130.   Defendants intended that Plaintiff rely on Defendants' false representations and concealed from Plaintiff Defendants' wrongdoing and the falsity of their representations.

131.   Plaintiff did not discover or have a reasonable basis to suspect that Defendants had made false representations of material facts to Plaintiff until January 2016 after Maxim had completed the Maxim Project and Plaintiff was allowed access to the areas within Plaintiff's Facility previously controlled by Maxim. Prior to that date, Plaintiff was denied access to those areas by Maxim.

132.   As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff has suffered substantial damages to their business, Plaintiff's Facility in excess of the jurisdictional minimum of this Court, the precise amount of which shall be determined according to proof at trial.

133.   In perpetrating the fraud alleged herein, Defendants acted with malice, fraud, oppression and wanton disregard of the interests and rights of Plaintiff. Punitive and exemplary damages therefore should be assessed against Defendants.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## FOURTH CLAIM FOR RELIEF
## FRAUD — INTENTIONAL CONCEALMENT OF MATERIAL FACTS
### (Against All Defendants)

134.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

135.   As alleged above, beginning in October 2012 and continuing to the present, Defendants have concealed from Plaintiff material facts, including that Maxim intended to and knew it would use, handle and dispose of cobalt in

performing the Maxim Project, and that Maxim did in fact use, handle, release, emit, and dispose of cobalt on Plaintiff's Facility in performing the Maxim Project.

136.   Defendants had a duty to disclose these material facts to Plaintiff because a special relationship of trust and disclosure existed by and between Defendants, on the one hand, and Plaintiff, on the other hand. This special relationship existed because, among other things, Defendants knew that their use, handling, disposal, and dissemination of cobalt materials at Plaintiff's Facility would directly and immediately affect Plaintiff to its serious detriment.

137.   Moreover, Plaintiff is informed and believes and thereon allege, as stated above, that Defendants knew of the toxic propensities of cobalt and that cobalt had been categorized by the California EPA as a cancer causing substance. Thus, Defendants knew that they had an affirmative duty to warn and disclose to Plaintiffs that Maxim intended to use and in fact did use, handle and dispose of cobalt in connection with the Maxim Project.

138.   Defendants' obligation arose not only by virtue of the special relationship between the parties, but also due to the statutory duties of warning and disclosure set forth in California Health & Safety Code § 252249, et seq. Further, having disclosed to Plaintiff some of the chemicals, solvents and gases that Maxim would be using and did in fact use on the Maxim Project at Plaintiff's Facility, and knowing that Plaintiff reasonably would rely on such disclosures, Defendants had a duty to disclose all of the substances it intended to use and did use in connection with the Maxim Project, including the carcinogen cobalt.

139.   Notwithstanding this duty to warn and disclose, Defendants intentionally withheld and concealed from Plaintiff all of these material facts. Such intentional concealment constitutes a fraud against Plaintiff.

140.   Had Plaintiff known of the true facts concealed by Defendants, Plaintiff never would have allowed Maxim to carry out the Maxim Project at Plaintiff's Facility, and Plaintiff would not have suffered the injuries for which they seek redress

in this action.

141.   Plaintiff did not know or have any reason to suspect that Maxim had fraudulently concealed these material facts from Plaintiff until January 2017, after Maxim had discontinued the Maxim Project and the RDSSA had expired. Prior to that time, Defendants continued to misrepresent and affirmatively conceal from Plaintiff Maxim's cobalt use and activities, and Maxim exercised complete control and dominion over the facilities devoted to the Maxim Project.

142.   Defendants' fraudulent concealment of material facts from Plaintiff has directly and proximately caused Plaintiff serious injury and damages, in excess of the jurisdictional minimum of this Court, the precise amount of which shall be determined according to proof at trial.

143.   Defendants' fraudulent concealment of material facts was knowing, deliberate, fraudulent, malicious and oppressive, and thus warrants the imposition of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

### FIFTH CLAIM FOR RELIEF
### NEGLIGENCE AND NEGLIGENCE PER SE
### (Against Maxim)

144.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

145.   Maxim 's release, deposit and emission of the hazardous substances, wastes and contamination at Plaintiff's Facility were committed as a result of the negligence and careless actions, inactions and omissions and the reckless conduct of Defendant, in its generation, transportation, storage, disposal and arranging for the transportation, storage and disposal of hazardous cobalt substances to, within and on Plaintiff's Facility, and in its actions, inactions, omissions and reckless conduct in failing to develop, maintain and follow procedures and policies for the proper use,

handling, storage, disposal and arranging for the use, handling, and disposal of these hazardous substances at Plaintiff's Facility.

146.   Defendant's actions and omissions in improperly and illegally using, without warning, and generating, transporting, storing, disposing of and/or arranging for the use, disposal, transportation, storage and commission of hazardous waste, substances and other contaminants at Plaintiff's Facility constitute and give rise to violations of applicable environmental laws, including but not limited to, California Health and Safety Code § 25189.5, et seq. As such, the actions and inactions and omissions of Defendant were negligent per se as such actions violate express statutory provisions prohibiting such conduct and activity.

147.   Defendant owes Plaintiff a duty to warn of Defendant's intended use, disposition and release of toxic and hazardous chemicals and contaminants in connection with the Maxim Project, and had a duty to exercise reasonable care according to industry standards with respect to the use, disposal, handling, transportation and release of these toxic chemicals and contaminants in order to avoid contamination and potential harmful exposure thereto. By the conduct, in actions and omissions described hereinabove, Defendant breached that duty.

148.   As a direct and proximate result of the negligent and reckless actions, inactions and omissions of Defendant, Plaintiff has suffered and will continue to suffer substantial damages in excess of the jurisdictional minimum of this Court, the precise amount of which shall be determined according to proof at trial.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

### SIXTH CLAIM FOR RELIEF
### CONTINUING PRIVATE NUISANCE
### (Against Maxim)

149.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

/ / /

150.   Defendant's unauthorized and wrongful release of hazardous substances and contaminants and other waste materials into and on Plaintiff's Facility have resulted in a condition that is offensive to the senses and is an obstruction to Plaintiff's free use of Plaintiff's Facility, and an interference with Plaintiff's rightful use and enjoyment of Plaintiff's Facility.

151.   As a direct and proximate result of the actions, inactions and omissions of Defendants, a continuing nuisance exists and continues to exist at Plaintiff's Facility, resulting in damages to Plaintiff on a daily basis with each release and/or threatened release of hazardous substances and contaminants and migration of same, from surfaces previously controlled by Maxim and through transmission to the air of Plaintiff's Facility. Insofar as the injuries and damages resulting from Defendant's contamination cannot be abated, this nuisance is permanent, with permanent damages and injuries suffered by Plaintiff.

152.   As a direct and proximate result of the action, in actions and omissions of Defendant, Plaintiff has suffered and will continue to suffer substantial damages, in an amount in excess of the jurisdictional limit of this Court, the precise amount of which to be determined according to proof at trial.

153.   Plaintiff has requested and continues to seek to have Defendant herein abate the nuisance, but Defendant has failed and refused to do the same, causing the nuisance to continue to exist and damage Plaintiff. Defendant's failure to timely mitigate, through assessment, investigation, monitoring, treatment, removal and remediation, of the hazardous cobalt substances, waste and contamination from Plaintiff's Facility will further increase the damage and injuries Plaintiff have and will continue to incur. Therefore, Plaintiff prays that a mandatory and/or prohibitory injunction, both preliminary and permanent, be issued, requiring Maxim to stop and abate said nuisance and to perform any and all actions necessary to remediate, clean up, assess, investigate, remove, monitor and treat the hazardous substances and conditions contaminating Plaintiff's Facility.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

### SEVENTH CLAIM FOR RELIEF
### WASTE
### (Against Maxim)

154.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

155.   As a direct and proximate result of Defendant's unauthorized and wrongful use, storage, handling and disposal and releases of toxic cobalt substances on and within Plaintiff's Facility and the contamination resulting therefrom to said premises, Defendant has committed waste at Plaintiff's Facility and rendered a substantial part of Plaintiff's Facility unfit for use or occupancy, resulting in a severe diminution in the use and marketability of Plaintiff's Facility.

156.   Maxim, rather than using Plaintiff's Facility in accordance with its representations to Plaintiff or in accordance with its contractual undertakings pursuant to the RDSSA, instead used Plaintiff's Facility for the illegal and unauthorized use, storage and disposal of toxic and hazardous cobalt substances and waste.

157.   The damage and waste inflicted on Plaintiff's Facility by Defendant is far in excess of the damage and wear to the subject premises that may be expected from the reasonable use and ware from the operations to be conducted by Defendant in accordance with the terms and conditions of the Maxim Project.

158.   As a direct and proximate result of the waste inflicted by Defendant at Plaintiff's Facility, Plaintiff has suffered and will continue to suffer serious and substantial damages in excess of the jurisdictional minimum of this Court, the precise amount to be determined according to proof at trial. Said damages include, but are not limited to amounts Plaintiff has incurred and will incur in the investigation, assessment, monitoring, treatment, removal and/or remediation of the subject contaminants wrongfully introduced and released by Defendant at Plaintiff's Facility,

the diminution in value of Plaintiff's Facility, the loss of use and loss of rent from use of the subject premises.

159.   Plaintiff further prays that a mandatory and/or prohibitory injunction be issued requiring Defendant to remedy the waste they have caused and inflicted upon Plaintiff's Facility, and to perform any and all actions necessary to assess, investigate, remove, remediate, treat, monitor and/or cleanup the hazardous substances, waste and contamination from Plaintiff's Facility, and to remedy the waste committed by Defendant during and as a result of its operations at Plaintiff's Facility.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## EIGHTH CLAIM FOR RELIEF
## TRESSPASS
### (Against Maxim)

160.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

161.   Plaintiff's Facility is Plaintiff's property, and Plaintiff is a "person" within the meaning of California trespass law, including Cal. Civ. Code § 3346 and Cal. Civ. Proc. Code § 733. 43.

162.   Maxim committed trespass by intentionally, willfully, and maliciously causing cobalt dust and cobalt oxide to be dispersed throughout Plaintiff's Facility.

163.   Maxim had no legal authority to disperse cobalt dust and cobalt oxide throughout Plaintiff's Facility.

164.   Maxim's conduct was the sole factor in causing cobalt dust and cobalt oxide throughout Plaintiff's Facility.

165.   Pursuant to Cal. Civ. Code § 3346 and Cal. Civ. Proc. Code § 733, Maxim is liable to Plaintiff for all damages stemming from Maxim's unpermitted and unlawful acts of dispersing cobalt dust and cobalt oxide throughout Plaintiff's Facility.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

### NINTH CLAIM FOR RELEIF
### CIVIL PENALTIES PURSUANT TO CALIFORNIA
### HEALTH & SAFETY CODE § 25359.7
### (Against Maxim)

166.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

167.   Defendant was the occupant, controller and operator of the premises within Plaintiff's Facility who knew or had reasonable cause to believe that it had released or caused to be released hazardous and/or toxic substances during the Maxim Project, and thereafter.

168.   Defendant, although knowing and/or having reasonable cause to believe of the existence of releases of hazardous substances at Plaintiff's Facility, failed to provide written notice of the same to Plaintiff as required by law, pursuant to California Health & Safety Code Section 25359.7. Defendant further violated these laws by failing to investigate, assess, remove and remediate the hazardous substances, wastes and contamination in question.

169.   Defendant had actual or constructive knowledge of the presence or the release of a material amount of hazardous substances and of hazardous substances that were required to be reported to state or local agencies pursuant to state and federal law but knowingly and willingly failed to provide such notice to such agencies and failed to provide the notices as required by Health & Safety Code Section 25359.7 to Plaintiff.

170.   Plaintiff is informed and believes and thereon alleges that Defendant has committed multiple violations of Health & Safety Code Section 25359.7 subjecting Defendant to civil penalties in the amount of $5,000 for each violation, all of which are due and payable to the Plaintiff herein, as will be shown in accordance with proof at the time of trial.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

### TENTH CLAIM FOR RELIEF
### DECLARATORY RELIEF
**(Against All Defendants)**

171.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

172.   An actual controversy exists between the Plaintiff and Defendants herein in that Plaintiff contends and Defendants deny that Defendants caused, are responsible for toxic and hazardous contamination at and in Plaintiff's Facility, and under Federal and State law must perform and pay for all costs and damages that have been incurred or to be performed in the repair, investigation, assessment, monitoring, treatment, removal, remediation and cleanup of the hazardous substances, wastes and contamination at Plaintiff's Facility.

173.   Plaintiff therefore requests that the Court issue a judicial determination, declaration, and judgment setting forth the Parties' rights and obligations as necessary and appropriate in order to avoid a multiplicity of actions and in order for the respective Parties to ascertain their rights and duties with respect to Plaintiff's claims alleged herein.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

### ELEVENTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
**(Against Maxim)**

174.   Plaintiff hereby incorporates by reference each and every allegation and/or assertion set forth above as though fully set forth herein.

175.   Pursuant to the terms of the RDSSA, Maxim was only permitted to utilize those chemicals, gases, and solvents specifically disclosed to Plaintiff. Maxim intentionally failed to disclose its intended use of cobalt at Plaintiff's Facility, thereby

breaching the terms of the RDSSA.

176.   Pursuant to the terms of the RDSSA, all activities conducted by Maxim at Plaintiff's Facility were to be conducted in accordance with all applicable local, state, and federal laws. Maxim breached the terms of the RDSSA by failing to secure the required permits to handle cobalt at Plaintiff's Facility.

177.   Pursuant to the terms of the RDSSA, all activities conducted by Maxim at Plaintiff's Facility were to be conducted in accordance with all applicable local, state, and federal laws. Maxim breached the terms of the RDSSA by failing to provide workers being exposed to cobalt with the proper PPE.

178.   Pursuant to the terms of the RDSSA, all activities conducted by Maxim at Plaintiff's Facility were to be conducted in accordance with all applicable local, state, and federal laws. Maxim breached the terms of the RDSSA by failing to conduct air sampling in Plaintiff's Facility to ensure occupants were not being exposed to excessive amounts of cobalt.

179.   Pursuant to the terms of the RDSSA, Maxim was required to adhere to all local, state, and federal laws relating to any improvements made by Maxim to Plaintiff's Facility. By failing to properly complete improvements at Plaintiff's Facility for which permits were opened with the City of San Jose, Maxim has breached the RDSSA.

180.   As the result of Maxim's breach of the RDSSA as set forth above, Plaintiff has been damaged.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## PRAYER FOR RELIEF

Plaintiff in this action seeks the following relief from Defendants:

1. For general, compensatory and consequential damages according to proof;

2. For the reimbursement and recovery of all response costs incurred or to be incurred by Plaintiff in connection with the release or threatened release of

hazardous substances, wastes and contamination on Plaintiff's Facility;

3. For punitive and exemplary damages;

4. For civil penalties pursuant to California Health & Safety Code § 25359.7;

5. For a preliminary and permanent injunction requiring Defendants to remediate, clean up, abate, remove and rectify all contamination and release of hazardous substances at Plaintiff's Facility;

6. For attorneys' fees and costs;

7. For a judicial determination and declaration setting forth the Parties' respective rights, obligations and duties; and,

8. For such other and further relief this Court deems just and proper.

Dated: December 18, 2018          ISOLA LAW GROUP, LLP


                                  By:/s/ DAVID R. ISOLA_____
                                     DAVID R. ISOLA
                                  Attorneys for Plaintiff, QUANTUM LABS, INC.



## REQUEST FOR JURY TRIAL

Plaintiff, QUANTUM LABS, INC., hereby demands a trial by jury.

Dated: December 18, 2018          ISOLA LAW GROUP, LLP


                                  By:/s/ DAVID R. ISOLA_____
                                     DAVID R. ISOLA
                                  Attorneys for Plaintiff, QUANTUM LABS, INC.