MICHAEL J. IOANNOU (SBN 95208)
 michael.ioannou@ropers.com
DANIEL P. MCKINNON (SBN 234749)
 daniel.mckinnon@ropers.com
KEVIN W. ISAACSON (SBN 281067)
 kevin.isaacson@ropers.com
ROPERS MAJESKI PC
333 W. Santa Clara St., Suite 910
San Jose, CA 95113
Telephone: 408.287.6262
Facsimile: 408.918.4501

Attorneys for Defendant and Counter-Claimant
MAXIM INTEGRATED PRODUCTS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| QUANTUM LABS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MAXIM INTEGRATED PRODUCTS, INC., <br><br> Defendant. <br><br>———————————————————— <br><br> AND RELATED COUNTER-CLAIM. | Case No. 5:18-cv-07598-BLF <br><br> **JOINT NOTICE OF COMPLETION OF CLEANUP, JOINT NOTICE OF SETTLEMENT AND [PROPOSED] ORDER TO VACATE DATES AND DEADLINES** <br><br> Courtroom 3, Fifth Floor <br> Judge: Hon. Beth Labson Freeman <br><br> Trial Date: September 26, 2022 |

WHEREAS, all parties in the present action, Hyperion Group, Inc. ("Hyperion"), Quantum Labs, Inc. ("Quantum Labs") and Simon Planck a/k/a Serban Porumbescu ("Mr. Porumbescu") (Hyperion, Quantum, and Mr. Porumbescu are referred to collectively as the "Quantum Parties") and Maxim Integrated Products, Inc. ("Maxim") participated in a first mediation session with Justice James Lambden (Ret.) of ADR Services, Inc., on February 19, 2021, and participated in a second mediation session with Justice Lambden on June 30, 2021;

WHEREAS, at the second mediation session on June 30, 2021, the Parties agreed to a Memorandum of Understanding (the "MOU") concerning the removal and decontamination of

1  equipment from the facility at issue in this Action located at 2108 Bering Drive, Suite B, San

2  Jose, CA 95131 ("Suite B"), as well as the decontamination of Suite B (collectively the "Cleanup

3  Project") by third-party service providers. Belfor Environmental, Inc., ("Belfor") and Advanced

4  Chemical Transport, Inc., dba ACTenviro ("ACT");

5     WHEREAS, following the execution of the MOU at the June 30th mediation, the parties

6  worked with their contractors to plan for all aspects of the Cleanup Project, including the

7  clearance standard, adjustments to services by each contractor, changing waste disposal from

8  Belfor to ACT, and adjusting the list of equipment that would be removed from Suite B;

9     WHEREAS, the parties also included an additional contractor, Aero-Environmental

10  Consulting ("Aero"), for Mr. Jorge I. Vizcaino, CIH, to provide industrial hygiene services. Mr.

11  Vizcaino was conferred the credential of Certified Industrial Hygienist in 2010 by the Board for

12  Global EHS Credentialing;

13     WHEREAS, after receiving input from multiple industrial hygienists, the parties agreed

14  that the clearance standard for the equipment and Suite B would be the previously used

15  "equipment release" standard of 2 μg/100cm$^2$ (the "Clearance Standard") set by the Brookhaven

16  National Laboratory for use when transferring equipment to the public, as recommended by Mr.

17  Vizcaino in Aero's report dated September 1, 2021, a copy of which is attached hereto as **Exhibit**

18  **A**. Specifically, Aero confirmed "[t]he 2011 [Brookhaven National Laboratory] Cobalt Free

19  Release Level is 2 μg/100cm$^2$ and . . . based on the goals and scope of this decontamination,

20  chemicals of concern (cobalt), and general business historical activities at this facility, I believe

21  that the most stringent clearance standard of 2 μg/100cm$^2$ should be used and incorporated into

22  the sampling strategy and verification";

23     WHEREAS, on November 8, 2021, the parties entered into an amendment to the MOU

24  (the "Amended MOU") which is attached hereto as **Exhibit B**;

25     WHEREAS, the Amended MOU incorporated multiple changes to the Cleanup Project as

26  described above, including the additional services of Aero and the Clearance Standard, as well as

27  the updated list of Maxim's equipment that would be removed from Suite B;

28     WHEREAS, as part of the MOU and Amended MOU, Maxim, without admitting any

ROPERS MAJESKI | A Professional Corporation San Jose

4886-5886-9534.1

- 2 -

1  responsibility or liability, agreed to advance all costs of the Cleanup Project to reach the

2  Clearance Standard, which the parties' contractors estimated to be $529,892 with the MOU and

3  $713,405 in the Amended MOU, under a full reservation to recover all amounts advanced;

4       WHEREAS, the parties presented the Amended MOU to the Court by way of stipulation

5  on November 9, 2021 (Dkt. No. 122) along with a request to stay discovery and continue dates in

6  this Action;

7       WHEREAS, after the parties' response to the Court's request for clarification, the Court

8  issued an Order Granting in Part and Denying in Part the parties' stipulation concerning the

9  Amended MOU and Cleanup Project on November 15, 2021 (Dkt. No. 125);

10       WHEREAS, following the Court's November 15, 2021 Order, the parties' contractors

11  commenced the Cleanup Project in November 2021;

12       WHEREAS, the implementation of the Cleanup Project required several changes in scope

13  and also a change in the industrial hygiene service provider (with Aero replaced by Peak

14  Environmental Health and Safety Engineering LLC ("Peak")), all of which increased the Cleanup

15  Project cost by more than $400,000 in order to achieve the Clearance Standard of $2\mu g/100cm^2$

16  throughout Suite B, including the office area, giving a total project cost of over $1.1 million.

17  Belfor's Change Orders 001 through 014 adding to the scope of the Cleanup Project are attached

18  hereto as **Exhibit C**. Peak's quotes adding to the scope of the Cleanup Project are attached hereto

19  as **Exhibit D**;

20       WHEREAS, per the terms of the Amended MOU, Maxim agreed to advance all costs for

21  all changes recommended by the parties' contractors, which included several rounds of cleaning

22  to reach the Clearance Standard, , removal of cobalt contaminated Maxim's owned Temescal

23  exhaust fan from the roof deck which sampled above the Clearance Standard, and even the

24  removal of all carpeting in Suite B, as well as a substantial portion (approximately 850 sq. ft.) of

25  contiguous carpeted area in the neighboring Suite A which shares a common area with Suite B.

26  Attached as **Exhibit E** is an approximate diagram of the carpeted area of Suite A and Suite B

27  where all carpeting was replaced;

28       WHEREAS, throughout the Cleanup Project, Aero and Peak conducted several rounds of

- 3 -

ROPERS | A Professional Corporation
MAJESKI | San Jose

1  surface and/or air sampling for cobalt and provided reports of their sampling results.  Attached as

2  **Exhibit F** are the sampling reports issued by Aero and Peak during the Cleanup Project;

3      WHEREAS, Peak's sampling confirmed that all of the production area was below the

4  Clearance Standard on February 2, 2022, all of the common area was below the Clearance

5  Standard on February 23, 2022, all HVAC systems were below the Clearance Standard on March

6  2, 2022, and "[n]o detectable concentrations of airborne cobalt dust were observed within Suite A

7  or B at any time during the restoration activities";

8      WHEREAS, following completion of all cleaning and sampling, Peak issued a Final

9  Report dated April 7, 2022, which is attached hereto as **Exhibit G**, that confirms that "[s]urfaces

10 in each area of Suite B (i.e., Mezzanine, Production Areas, Production Support Areas, Common

11 Area, and HVAC Systems) have been cleaned and verified to contain cobalt dust in

12 concentrations below the [Clearance Standard]."

13     WHEREAS, as part of the Cleanup Project, all of Maxim's equipment (including

14 additional pieces identified during the Cleanup Project) which is identified in Exhibit J was

15 prepared for transport by Belfor and transferred to ACT at Suite B's roll-up door;

16     WHEREAS, one piece of Maxim's equipment, a solvent sink, has an attached $CO_2$ fire

17 suppression system, the removal of which requires a permit from the City of San Jose;

18     WHEREAS, Belfor has engaged ACE Fire Equipment & Service Co. ("Ace") to

19 disconnect the attached $CO_2$ fire suppression system and Ace submitted a permit application to

20 disconnect the fire suppression system which permit was approved by the City of San Jose on or

21 around May 7. 2022;

22     WHEREAS, Maxim's solvent sink has been wrapped and prepared for transportation and

23 Belfor and Peak have confirmed that there will be no need for further cleaning and sampling after

24 removal of the solvent sink in its wrapped condition;

25     WHEREAS, the Parties and Belfor have confirmed the removal of the solvent sink from

26 June 2-5. 2022, including the transfer to ACT and all other related work;

27     WHEREAS, the City of San Jose completed the final inspection for the removal of the

28 solvent sink on June 7, 2022;

ROPERS MAJESKI
A Professional Corporation
San Jose

4886-5886-9534.1                    - 4 -                    Joint Notice of Completion of Cleanup, Joint
Notice of Settlement and [Proposed] Order to
Vacate Dates - Case No. 5:18-CV-07598-BLF

WHEREAS, ACT has maintained possession of Maxim's equipment at its facility, has cleaned the surfaces of all of Maxim's equipment, and has provided cobalt sampling results confirming all equipment surfaces are below the cobalt Clearance Standard; which are attached hereto as **Exhibit H**;

WHEREAS, ACT will clean the surfaces of the solvent sink and provide cobalt sampling results confirming the solvent sink's surfaces are below the cobalt Clearance Standard, which the Parties anticipate will be completed within thirty (30) days;

WHEREAS, ACT has arranged for the proper disposal of hazardous waste collected as part of the Cleanup Project, including all of Maxim's chemicals and materials, including cobalt pellets, and cobalt targets remaining at Suite B, all material removed from Suite B during the Cleanup Project (e.g. carpet, tables, etc.), all cleaning byproduct collected by Belfor during the cleaning of Suite B, and all cleaning byproduct collected by ACT during the cleaning of Maxim's equipment;

WHEREAS, ACT has confirmed that all waste disposal has been accomplished in accordance with all statutory and regulatory requirements, including the use of Uniform Hazardous Waste Manifests which are or will be available through the California Department of Toxic Substances Control's Hazardous Waste Tracking System (https://hwts.dtsc.ca.gov) listing Maxim as the generator under two temporary California State Hazardous Waste Identification Numbers, CAC003150518 and CAC003166804;

WHEREAS, the parties agree that the only remaining tasks from the Cleanup Project is the cleaning by ACT of the solvent sink from Suite B and its and the issuance of the insurance policy described in the Amended MOU;

WHEREAS, the parties are working with the insurance broker to complete the application for the insurance policy described in the Amended MOU, with Quantum being the first named insured with Hyperion, Maxim, and Analog Devices, Inc. as additional named insureds and Maxim paying the full cost of the premium for the insurance policy;

WHEREAS, the Parties anticipate that the insurance policy will be issued within the next seventy-five (75) days;

4886-5886-9534.1

- 5 -

Joint Notice of Completion of Cleanup, Joint Notice of Settlement and [Proposed] Order to Vacate Dates - Case No. 5:18-CV-07598-BLF

ROPERS MAJESKI

A Professional Corporation San Jose

1    WHEREAS, the parties held a third mediation session on April 11, 2022, with Justice

2  Lambden which was conducted in-person at ADR Services' San Francisco location;

3    WHEREAS, the parties agreed the third mediation session would be a "global" session

4  addressing all claims in the present Action, all claims raised in the proceeding in the Superior

5  Court for the State of California, County of Santa Clara, Case No. 21CV387496 (the "State

6  Action"); which include claims by Mr. Porumbescu and his spouse, Michelle Porumbescu,

7  against Maxim for Strict Liability for Ultrahazardous Activity, Negligence, Intentional Infliction

8  of Emotional Distress and for Loss of Consortium, and all other known and unknown claims the

9  parties may have;

10    WHEREAS, at the third mediation session, an agreement was reached (the "Mediator's

11  Proposal") between Hyperion, Quantum Labs, Mr. Porumbescu, Mrs. Porumbescu, and Maxim to

12  settle and release all known and unknown claims, including, without limitation, all claims in the

13  present Federal action, as well as all claims in the State Action and covenanted not to assert or

14  bring any claims against each other or any third parties related to any claims in the present action

15  or the State Action or the facts and circumstances alleged therein;

16    WHEREAS, a copy of the signed Mediator's Proposal is attached as **Exhibit I**;

17    WHEREAS, the parties have agreed to submit a further Joint Notice of Completion and

18  Request for Dismissal to dismiss this case with prejudice after the solvent sink has been removed

19  from Suite B and its cleaning completed by ACT, and after the insurance policy described in the

20  Amended MOU has been issued, all of which the parties anticipate will be completed within the

21  next seventy-five (75) days;

22    WHEREAS, 42 U.S.C. § 6972 grants this Court the authority to "restrain any person who

23  has contributed or who is contributing to the past or present handling, storage, treatment,

24  transportation, or disposal of any solid or hazardous waste" which "may present an imminent and

25  substantial endangerment to health or the environment";

26    WHEREAS, (1) Aero's recommendation of the "most stringent" Clearance Standard for

27  cobalt at Suite B (**Exhibit A**), (2) Peak's Final Report confirmation that "[s]urfaces in each area

28  of Suite B . . . have been cleaned and verified to contain cobalt dust in concentrations below the

4886-5886-9534.1                - 6 -                Joint Notice of Completion of Cleanup, Joint
                                                                 Notice of Settlement and [Proposed] Order to
                                                                 Vacate Dates - Case No. 5:18-CV-07598-BLF

ROPERS | MAJESKI | A Professional Corporation | San Jose

1  [Clearance Standard]" (**Exhibit G**), and (3) ACT's sample results showing Maxim's equipment is

2  below the Clearance Standard (**Exhibit H**) collectively confirm that there is no condition related

3  to cobalt at Suite B or with Maxim's equipment which "may present an imminent and substantial

4  endangerment to health or the environment" above $2\mu g/100cm^2$;

5  THEREFORE, the parties stipulate and respectfully request that the Court find that based

6  upon (1) Aero's recommendation of the "most stringent" Clearance Standard for cobalt at Suite B

7  (**Exhibit A**), (2) Peak's Final Report confirmation that "[s]urfaces in each area of Suite B . . .

8  have been cleaned and verified to contain cobalt dust in concentrations below the [Clearance

9  Standard]" (**Exhibit G**), and (3) ACT's sample results showing Maxim's equipment is below the

10  Clearance Standard (**Exhibit H**) there is no condition related to cobalt at Suite B or with Maxim's

11  equipment which "may present an imminent and substantial endangerment to health or the

12  environment."

13  The parties further stipulate and respectfully request that the Court (1) vacate all pending

14  dates and deadlines in the present action, and (2) grant the parties  thirty (30) days, until July 9,

15  2022, to submit a further Joint Notice of Completion and Request for Dismissal to dismiss this

16  case with prejudice

17  IT IS SO STIPULATED.

18  Dated: June 9, 2022

    LEX OMNI Law Office

19

20  By: _____

21      MICHELLE PORUMBESCU
    Attorneys for Plaintiff and Counter-
    Defendant QUANTUM LABS, INC. and
    Counter-Defendants HYPERION GROUP,

22  **June 21, 2022**
    INC. and SERBAN PORUMBESCU

23  Dated: May _____ 2022

    ROPERS MAJESKI PC

24

25  By: /s/ Kevin W. Isaacson
    MICHAEL J. IOANNOU

26      KEVIN W. ISAACSON
    Attorneys for Defendant and Counter-
    Claimant MAXIM INTEGRATED

27      PRODUCTS, INC.

28

4886-5886-9534.1

Joint Notice of Completion of Cleanup, Joint
Notice of Settlement and [Proposed] Order to
Vacate Dates - Case No. 5:18-CV-07598-BLF

ROPERS MAJESKI | A Professional Corporation | San Jose

1    I, Kevin W. Isaacson, hereby attest that concurrence in the filing of this document has

2    been obtained from each of the other signatories to this document.

3    Dated: June 21, 2022                    ROPERS MAJESKI PC

4

5                                            By:  /s/ Kevin W. Isaacson
                                                 KEVIN W. ISAACSON
6                                                Attorneys for Defendant and Counter-
                                                 Claimant MAXIM INTEGRATED
7                                                PRODUCTS, INC.

8                                **[PROPOSED] ORDER**

9        IT IS HEREBY ORDERED that the parties' stipulation is GRANTED.

10   Dated:_____

11

12                                           _____
                                             BETH LABSON FREEMAN
13                                           JUDGE, UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4886-5886-9534.1

- 8 -

Joint Notice of Completion of Cleanup, Joint
Notice of Settlement and [Proposed] Order to
Vacate Dates - Case No. 5:18-CV-07598-BLF

# EXHIBIT A




# REVIEW OF INDOOR SURFACE COBALT DECONTAMINATION STANDARDS

## *PREPARED FOR:*

**MICHELLE PORUMBESCU, ESQ.**
**LEX-OMNI.COM**
**(408) 236-2033 X 2**

## *PREPARED BY:*

**AERO-ENVIRONMENTAL CONSULTING**
**JORGE VIZCAINO, CIH 9814**
**1426 VIA ISOLA**
**MONTEREY, CA 93940**
**PHONE: (831) 277-5831**

**SEPTEMBER 1, 2021**





# TABLE OF CONTENTS

## Contents

1.0  INTRODUCTION ........................................................................................................... 3
2.0  FINDINGS AND CONCLUSIONS ........................................................................... 3
3.0  LIMITATIONS ............................................................................................................ 5

List of Attachments

Appendix A        *Professional Certifications*




## 1.0  INTRODUCTION

Aero-Environmental Consulting (AEC) was retained by Michelle Porumbescu, Esq. with LEX OMNI Law Office (hereafter client) to conduct a professional expert witness review of our Gordon & Rees-Quantum Labs-EHS Audit conducted on June, 2016 as well as a review of indoor surface cobalt decontamination standards.

According to the information we received from Michelle Porumbescu, the goal of this review was to determine if the clearance decontamination standard, which we recommended in our 2016 EHS report to be 2µg/100cm$^2$ based on the Brookhaven National Laboratory (BNL) standard was accurate, based on the fact that different clearance criteria exist in the industry.

## 2.0  FINDINGS AND CONCLUSIONS

Our findings and conclusions for this indoor surface cobalt decontamination standards review are as follows:

1. What is the purpose of this decontamination: 1) Protect the General Public? 2) Protect Current Workers? 3) Protect Future Workers, 4) Protect Property Owner, 5) What sort of clean-up standard are we looking for?  _____

2. The American Conference of Governmental Industrial Hygienists (ACGIH) has given cobalt a classification of A3, confirmed animal carcinogen with unknown relevance to humans, and established an 8-hour time-weighted average (TWA) of 0.02 mg/m$^3$ for occupational exposure (ACGIH 2000). The California Occupational Safety and Health Administration (Cal/OSHA) has promulgated an 8-hour permissible exposure limit (PEL) of 0.02 mg/m$^3$, and the National Institute for Occupational Safety and Health (NIOSH) recommends an 8-hour TWA of 0.05 mg/m$^3$ (NIOSH 2001). IARC (2001b) reports that cobalt and cobalt compounds are possibly carcinogenic to humans (Group 2B), based on sufficient evidence for cobalt metal and cobalt oxides and limited evidence for cobalt chloride and cobalt sulfate.

3. The routes of exposure to Cobalt metal dust includes inhalation, dermal, and ingestion exposure, which can lead to acute or chronic toxicity.

4. Surface Contamination Clearance Standards include: 1) Zero Tolerance Approach, 2) Comparative Approach, and 3) Regulatory Approach

5. The 2011 BNL "Free Release" Surface Contamination Clearance Standard of 2µg/100cm$^2$ is based on the fact that Cobalt is considered a carcinogen by the American Conference of Governmental Industrial Hygienists (ACGIH), this clearance standard should be as close as possible to the analytical lab Limit of Detection (LOD), and it is not found naturally in the environment. This is the clearance decontamination standard, we recommended in our 2016 EHS report.

6. The "Comparative" Standard approach is based on 29 CFR 1910/8 CCR 5198 (h) (1), which indicates that "All surfaces shall be maintained as free as practicable of accumulations of surface contamination". This "Comparative" standard is based on removal of contamination





compared to "clean" areas. This standard applies to metals such as Lead, Arsenic, Cadmium, and Cobalt. In my opinion, "clean areas" for cobalt would be surface areas with "no detectable" (ND) concentrations of cobalt, and therefore the "Zero Tolerance" ($2\mu g/100cm2$ clearance standard) approach should be the goal for surface decontamination.

7. The Surface Contamination Clearance Standard, "Regulatory Approach", would also include the Department of Energy (DOE), Brookhaven National Laboratory (BNL) 2011 standard. This standard, describes two (2) clearance levels. The "housekeeping" or internal level for cobalt is 30 $\mu g/100cm^2$, and the "Free Release" 2011 BNL Value is 2 $\mu g/100cm^2$. We firmly believe that this should be the surface contamination clearance standard that should be used for decontamination at the Quantum Labs facility, based on 1) the fact that cobalt is considered a carcinogen, and 2) "clean areas" for cobalt would be surface areas with "no detectable" (ND) concentrations of cobalt.

8. The OSHA Technical Manual (OTM) describes the use for a "housekeeping" standard based on a standard breathing rate of 10 $m^3$ and an Occupational Exposure Limit (OEL) for cobalt of 0.02 $mg/m^3$. This can then be applied to a given area, such as 100 $cm^2$. This standard is based on the possibility of a worker potentially being over-exposed if they were to touch a surface with cobalt contamination. This surface "housekeeping" standard would be derived by the following mathematical formula: Maximum "allowable" dose=0.02 $mg/m^3$ x 10/$m^3$/day=0.2 mg/day, followed by a determination of the surface "housekeeping" standard=0.2 mg/100 $cm^2$=200 $\mu g/100cm^2$. This method was adopted by the BNL IH75190 surface contamination policy, but I believe this standard does not apply to this decontamination as this is just a "housekeeping" or internal standard. In addition, the question arises as to whether we can apply inhalation (OELs) to dermal exposures, since the method of exposure is completely different.

9. The 2011 BNL Cobalt Free Release Level is 2 $\mu g/100cm^2$ and we believe that this is the surface contamination clearance level that should be used for decontamination at this facility, based on the carcinogenic properties of cobalt described above.

10. I believe that the hierarchy of guidelines that should be followed for these types of surface decontamination projects should be as follows:

    1) Regulatory Values-Such as the DOE or BNL "Free Release" value of 2 $\mu g/100cm^2$

    2) "Zero-tolerance" Value. This value is based on the potential exposure to a carcinogen such as cobalt, and the fact that it is not normally found in the natural environment.

    3) Occupational-Based Values-This is the TLV or OEL approach, but in our opinion should only be used for "housekeeping" or internal values.

11. Therefore based on the goals and scope of this decontamination, chemicals of concern (cobalt), and general business historical activities at this facility, I believe that the most stringent clearance standard of 2 $\mu g/100cm^2$ should be used and incorporated into the sampling strategy and verification.




## 3.0  LIMITATIONS

This professional evaluation is limited to the information made available to AEC. The methods, conclusions and recommendations provided are based on AEC's judgment, expertise and the standard of practice for professional service. They are subject to the limitations and variability inherent in the documentation provided. As with all expert witness cases, this evaluation is limited to the defined scope and does not purport to set forth all possible scenarios or explanations.

Please do not hesitate to contact our local office at 831-277-5831 with any questions or concerns. Thank you for the opportunity to assist you in promoting a more healthful environment.





**Appendix A**
Professional Certifications

LEX OMNI-QUANTUM LABS V MAXIM-INDOOR SURFACE DECONTAMINATION REVIEW



INSTITUTE OF HAZARDOUS
MATERIALS MANAGEMENT

THIS CERTIFIES THAT

**Jorge Vizcaino**

HAS SUCCESSFULLY MET ALL THE REQUIREMENTS OF EDUCATION, EXPERIENCE AND
EXAMINATION, AND IS HEREBY DESIGNATED A

# CERTIFIED HAZARDOUS MATERIALS MANAGER

## CHMM

**October 04, 2016**

DATE OF CERTIFICATION

**October 31, 2021**

CERTIFICATION EXPIRES

19631

CREDENTIAL NUMBER

*M. Patricia Buley*

ACTING EXECUTIVE DIRECTOR





Accredited by the American National Standards Institute and
the Council of Engineering and Scientific Specialty Boards

VALID SO LONG AS THIS CREDENTIAL IS RENEWED ACCORDING
TO SCHEDULE AND IS NOT OTHERWISE REVOKED.

State of California
Division of Occupational Safety and Health
**Certified Asbestos Consultant**

Jorge Ignacio Vizcaino
Name

Certification No. ___04-3554___

Expires on ___04/15/22___

This certification was issued by the Division of
Occupational Safety and Health as authorized
by Sections 7180 et seq. of the Business and
Professions Code.

# The Board for Global EHS Credentialing (BGC)

through its vested authority, hereby confirms that

# Jorge I. Vizcaino

has met all requirements of education, experience, and examination, and on-going maintenance set forth through the BGC's American Board of Industrial Hygiene®'s (ABIH®) credentialing division for re-certification in the Comprehensive Practice of Industrial Hygiene and is thereby conferred the credential of

# Certified Industrial Hygienist® (CIH®)

The aforenamed individual is given all rights, privileges, and responsibilities as both a diplomate of the BGC and holder of the CIH credential, provided that the credential is not suspended or revoked, and it is renewed annually. Moreover, the holder must meet all recertification requirements, including the obligation to practice ethically as prescribed by the BGC.





| | |
|---|---|
| Credential Number: | 9814 CP |
| Award Date: | October 4, 2010 |
| Expiration Date: | June 1, 2026 |

Cynthia Hanko, CIH
Chair of the Board of Directors

Ulric K. Chung, MCS, PhD
Chief Executive Officer and Secretary



California Department of **PublicHealth**

STATE OF CALIFORNIA
DEPARTMENT OF PUBLIC HEALTH

# LEAD-RELATED CONSTRUCTION CERTIFICATE

**INDIVIDUAL:**



Jorge Vizcaíno

**CERTIFICATE TYPE:**

Lead Inspector/Assessor

**NUMBER:**

LRC-00001930

**EXPIRATION DATE:**

11/3/2022

Disclaimer: This document alone should not be relied upon to confirm certification status. Compare the individual's photo and name to another valid form of government issued photo identification. Verify the individual's certification status by searching for Lead-Related Construction Professionals at www.cdph.ca.gov/programs/clppb or calling (800) 597-LEAD.

**EXHIBIT B**

Re:    QUANTUM LABS, INC. v. MAXIM INTEGRATED PRODUCTS, INC.
       ADRS Case No. 21-0412-JL. NDCA5: 18-cv-07598-BLF-NC

AMENDED Memorandum of Understanding Re: Proposal

1.  This agreement (the "Agreement") is an amendment of the Memorandum of
    Understanding (the "MOU") entered into by Hyperion Group, Inc. ("Hyperion"), Quantum
    Labs, Inc. ("Quantum Labs") and Simon Planck a/k/a Serban Porumbescu on the one
    hand, and Maxim Integrated Products, Inc. ("Maxim"), on the other hand on June 30,
    2021, pursuant to Paragraph 22 of the MOU.  To the extent there is any conflict between
    this Agreement and the MOU, the language of this Agreement shall control.  Hyperion,
    Quantum Labs, and Mr. Planck are referred to collectively as the "Quantum Parties."  The
    Quantum Parties and Maxim may be referred to collectively as "Parties" and individually
    as "Party."

2.  A dispute has arisen between the Parties regarding each Party's duties, obligations, and
    liabilities towards the other Parties, including, without limitation, disputes related to the
    Research and Development Support Services Agreement entered into by Hyperion and
    Maxim on or around December 19, 2012 (the "RADSSA"), the building suite located at
    2108 Bering Drive, Suite B, San Jose, California ("Suite B"), and alleged cobalt-related
    contamination in Suite B.

3.  The Parties are presently involved in a proceeding in the Northern District of California,
    Case No. 5:18-cv-07598-BLF (the "Federal Action") and comprise some of the parties
    named in a proceeding in the Superior Court for the State of California, County of Santa
    Clara, Case No. 21CV387496 (the "State Action").

4.  The effective date of this Agreement is November 5, 2021 (the "Effective Date").



4890-8693-8882.1

5. Maxim claims ownership over several pieces of equipment (the "Maxim Equipment") that is located within Suite B. A list of the Maxim Equipment is attached hereto as Exhibit 1.

6. Proposals have been made for the removal of Maxim equipment and cleaning of Suite B. The Quantum Parties have provided a proposal (the "Belfor Proposal") from Belfor Environmental, Inc. ("Belfor") dated October 19, 2021, which is attached hereto as Exhibit 2, as well as a proposal (the "Aero Proposal") from Aero Environmental ("Aero"), which is attached as Exhibit 3. Maxim has provided a proposal (the "ACT Proposal") from Advanced Chemical Transport Inc. (DBA) ACTenviro("ACT") which is attached hereto as Exhibit 4.

7. The Parties have agreed for the implementation of a combination of the Belfor Proposal, Aero Proposal and ACT Proposal. The Parties have agreed that the Belfor Proposal dated October 19, 2021, will be implemented by Belfor at Suite B, based upon the $2ug/100cm^2$ cleaning standard the Parties agreed on. The Parties have agreed that ACT will implement the ACT proposal to take possession of the Maxim Equipment from Belfor at Quantum's rollup door at Suite B, transporting it to the locations set forth in the ACT proposal, and performing decontamination in full compliance with environmental legislation at city, county, state and federal level. ACT and Belfor will coordinate concerning the transportation and delivery of the Maxim Equipment from Suite B to ACT's location on Mabury Rd., San Jose, CA 95133.

8. Maxim agrees that the computer of the Temescal ebeam evaporator will be powered up and its software accessed only after ACT has performed equipment cleaning under the ACT Proposal, and only in the presence of a Quantum representative.

9. The Parties have agreed that Quantum will enter into the contractual relationship with Belfor based on the Belfor Proposal dated October 19, 2021, with a proposed cost of $336,305, subject to additional cost caused by work needed to reach the agreed cleaning standard of $2ug/100cm^2$, function of the conditions discovered during the implementation of the Belfor Proposal, including the cost of replacement of any fixtures, piping, walls, etc.,



that are dismantled during the implementation of the Belfor Proposal. Maxim has agreed to pay the cost to implement the Belfor Proposal. Maxim will pay Belfor directly prior to the commencement of the work described in the Belfor Proposal and will have joint access with the Quantum Parties to Belfor. This will include access to the contract between Belfor and the Quantum Parties, communications with Belfor concerning implementation of the Belfor Proposal, as well as communication with Aero on topics related to the implementation of the Aero Proposal and Belfor Proposal. Maxim has agreed to waive any property damages to the Maxim equipment that may occur during its removal by Belfor and transfer to ACT.

10. The Parties have agreed that Maxim will obtain a Temporary RCRA Hazardous Waste Permit for the transport and disposal of the hazardous substances collected during the implementation of the Belfor Proposal and ACT Proposal ("Waste") which transport and disposal service will be provided under the ACT Proposal. Maxim will be the generator of the Waste. Quantum and BELFOR will not assume any costs or generator status of the Waste. Maxim has agreed to obtain this permit solely for purposes of facilitating the implementation of the Belfor, Aero, and ACT Proposals and not as an admission of any wrongdoing or responsibility for transporting or disposing of any waste generated thereunder. The Parties agree that this Agreement, Maxim's agreement to obtain a Temporary RCRA Hazardous Waste Permit, and the Temporary RCRA Hazardous Waste Permit Maxim agrees to obtain shall not be used as evidence or in any other manner to support an argument or claim of negligence, culpable conduct, or other fault or omission of Maxim.

11. The Parties previously agreed that Quantum would enter into the contractual relationship with Aero based on the Aero Proposal, and Quantum has done so. Maxim has agreed to pay the cost to implement the Aero Proposal directly to Aero and Maxim has already advanced directly to Aero 50% of the cost of the Aero Proposal.



12. The Parties have agreed that Maxim will enter into the contractual relationship with ACT to implement the ACT Proposal. Maxim will pay the costs to implement the ACT Proposal.

13. The Parties agree that the Parties will notify California Region 9 of the Environmental Protection Agency who may provide federal oversight during the implementation of the Belfor Proposal, Aero Proposal and the ACT Proposal.

14. Belfor and ACT will make the decision on contacting the County of Santa Clara Department of Environmental Health prior to the implementation of the Belfor Proposal or the ACT Proposal. If Belfor decides to contact the County of Santa Clara Department of Environmental Health, Belfor will provide an amended proposal that shows the increased cost for involving the County of Santa Clara and Maxim will pay the cost. Such costs do not extend to citations or fines issued by any governmental body or agency thereof, including without limitation, the State of California, the County of Santa Clara, the City of San Jose, or the San Jose Fire Department.

15. Belfor and ACT will cooperate to preserve existing evidence concerning the condition and use of the Maxim Equipment and the contamination of the real property located at 2108 Bering Drive, Suite B, San Jose, CA 95131.

16. Maxim has agreed to pay the cost for the insurance policy described in Exhibit 5, assuming the cost remains approximately $44,000.

17. The Fire Department issued a Notice of Violation attached as Exhibit 6. The Parties dispute responsibility for such violations. Quantum has contracted with Sure Fire Protection Company ("Sure Fire") to remedy the violations and has been billed for the work in the amount of $5,400, the Sure Fire invoices are attached as Exhibit 7. While Maxim disputes its obligation to pay and reserves the right to challenge the claim, Maxim agrees to pay the amount of $5,400 to Sure Fire to remedy the violations. While Sure Fire remedied approximately 75% of the violations, it refused to complete the work until Belfor completes the cobalt decontamination at Suite B. Quantum Labs will work with Sure Fire



to complete the remaining work, function of Sure Fire's schedule and availability as soon as possible after the cleaning of Suite B under the Belfor Proposal.

18. If Belfor, Aero, ACT, or Sure Fire identify any material increase in their estimated costs or propose any material change to the scope of work described in their respective proposals to meet the agreed cleaning standard of $2ug/100cm^2$ due to the conditions discovered during the implementation of the Belfor Proposal, including, without limitation, the cost of replacement of any fixtures, piping, walls, etc., that are dismantled during the implementation of the Belfor Proposal, the Parties agree to mediate with Hon. James Lambden on who should advance the costs to cover the material increases in estimated costs or material changes to the scope of work.

19. The Parties are reserving all rights, including, without limitation, the right to seek damages, as well as reimbursement of expenses paid as part of this agreement, including all amounts paid pursuant to sections 9, 11, 12, 14, 16, and 17.

20. Maxim will provide the Quantum Parties with any interim or final reports related to the ACT Proposal. The Quantum Parties will provide Maxim with any interim or final reports related to the Aero Proposal, the Belfor Proposal, and/or the work performed by Sure Fire.

21. The Parties agree to return for a further mediation session with Hon. James Lambden on January 5, 2022 and after the implementation of the Belfor Proposal, Aero Proposal, and ACT Proposal have been substantially completed, meaning that Belfor, Aero, and ACT have provided reasonable assurance that there will be no further expenses or changes in scope of work related the completion of the Belfor Proposal, Aero Proposal, and/or ACT Proposal.

22. This Agreement is contingent on receiving approval from the court in the Federal Action to proceed with the implementation of the Belfor Proposal, Aero Proposal, and the ACT Proposal, as well as a stay of discovery pending the mediation described in section 21, and a corresponding extension of deadlines of the approximate length of the anticipated



stay of discovery.  The Parties agree to submit a stipulation to the Court in the Federal Action requesting the Court's approval in the form shown in Exhibit 8.

23. The Parties further agree to request that the court in the Federal Action order a temporary stay of the fines threatened to be issued by the San Jose Fire Department which temporary stay will continue until the completion of work by Sure Fire, and to provide a copy of the executed stipulation attached as Exhibit 8 to the San Jose Fire Department five (5) days prior to submitting the same to the court. 

24. By accepting this proposal, the Parties agree and hereby stipulate to allow Hon. James Lambden to mediate any dispute over the terms and execution of this Agreement using the ADR Services Rules.

25. This Agreement may be executed in counterparts by the Parties.

26. This Agreement and the MOU together constitute the entire agreement of the Parties and may not be amended, modified, or extended without a writing signed by all Parties and specifically amending this Agreement, and supersede all prior or contemporaneous agreements, discussions, or representations, oral or written, with respect to the subject matter of this Agreement.

| Quantum Labs, Inc. | Hyperion Group, Inc. |
|---|---|
| By: | By: |
| Its: DIRECTOR | Its: DIRECTOR |
| Print Name: Simon Planck | Print Name: Simon Planck |
| Date: 11.08-20 21 | Date: 11.08.2021 |

| Maxim Integrated Products, Inc. | Simon Planck a/k/a Serban Porumbescu |
|---|---|
| By:_____ <br><br> Its:_____ <br><br> Print Name: _____ <br><br> Date:_____ | _____ <br> Simon Planck <br><br> Date:_____11.08.2021_____ |

| Maxim Integrated Products, Inc. | Simon Planck a/k/a Serban Porumbescu |
|---|---|
| By: _____ <br> Its: _____ Chief Legal Officer <br> Print Name: _Janene Asgeirsson_ <br> Date: _11.8.2021_ | _____ <br> Simon Planck <br><br> Date: _____ |

EXHIBIT 1

## Belfor Removal list of Maxim tools

Transmission list October 28, 2021

| Removal ID | Item | Manufacturer |
|---|---|---|
| MAXIM A1 | Electron beam Evaporator with Cryo pump | Temescal / CTI-Cryogenics |
| MAXIM A2 | Power supply | Temescal |
| MAXIM A3 | Controller with Pump | Veeco / Ebara |
| MAXIM A4 | Temp control | Anova |
| MAXIM A5 | Spin dryer (1 stack) | Class One Equipment |
| MAXIM A6 | SPEC Profilometer | Tencor |
| MAXIM A7 | SPEC Stress gauge | Tencor |
| MAXIM A8 | SPEC 4-pt probe | Omnimap |
| MAXIM A9 | Optical microsope | Nikon |
| MAXIM A10 | Karl Suss Aligner & all accessories | Karl Suss |
| MAXIM A11 | SVG 2 track spin coater & all accessories | SVG |
| MAXIM A12 | Wafab solvent sink & all accessories | Wabfab International |
| MAXIM A13 | Wafab wet bench & all accessories | Wabfab International |
| MAXIM A14 | BlueM oven & all accessories | Blue M Electric |
| MAXIM A15 | YES-HDMS vapor primer & all accessories | Yes |
| MAXIM A16 | Plasma etcher & all accessories | Gasonics Int. |
| MAXIM A17 | Plasma etcher & all accessories | Trion Technology |
| MAXIM A18 | Nanospec eliipsometer & all accessories | BSI |
| MAXIM A19 | Engis lapper polisher & all accessories | Fastlap |
| MAXIM A20 | Class-One wafer scrubber & all accessories | Ultra Equipment Company |
| MAXIM A21 | Hot shoe dry film laminator & all accessories | Mega |
| MAXIM A22 | Vibrating sample magnetometer (VSM) & all accessories with VSM rack | Micro Sense |
| MAXIM A23 | Wafer prober & all accessories | Rucker & Kolls |
| MAXIM A24 | Chem capture cabinet | Wabfab International |
| MAXIM A25 | Freezer | True |
| MAXIM A26 | Quad Group Sebastian Five Strength Tester | Quad Group |

# EXHIBIT 2



## CONTRACT FOR SERVICES
License Number _____,

THIS CONTRACT is effective as of the date of full execution by both parties, by and between BELFOR Environmental, Inc. ("Contractor"), a Colorado corporation, with corporate headquarters located at 185 Oakland Avenue, Suite 150, Birmingham, MI 48009 and <u>Quantum Labs, Inc.</u> ("Owner"), whose address is <u>2108 Bering Drive, San Jose, CA 95050</u> (collectively, the "Parties") is entered into to have environmental services performed upon the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual promises and agreements contained in this Contract, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby Owner and Contractor agree as follows:

**Article 1        Scope**

**1.1**    The Scope of Work for this Contract authorized by Owner and agreed upon by the parties includes the removal and relocation of certain tools (which are the property of Maxim Integrated Products, Inc.) from Owner's facility (the "Tools") as further described in **Exhibit A** and infrastructure decontamination as further set forth in **Exhibit A**. For the avoidance of doubt, the Scope of Work under this Contract does not include any decontamination or cleaning of Tools moved from Owner's facility. Any clearance sampling will be performed by a third party industrial hygienist hired by Owner.

**1.2**    The address of the Work site: 2108 Bering Dr., San Jose, CA 95131.

**1.3**    The term "Work" used in this Contract shall mean all of the work necessary for the Contractor to complete the Scope of Work as defined herein and/or attached as **Exhibit A**.

**Article 2        Compensation and Payment to Contractor**

**2.1**    <u>Contract Sum:</u>  **Owner understands that Contractor is hired by Owner and not Owner's insurance company.**
Owner shall pay Contractor for the cost of the Work presently estimated at THREE-HUNDRED THIRTY-SIX THOUSAND, THREE-HUNDRED AND FIVE Dollars (**$336,305.00** ) ), subject to any change orders, additions, or deductions for the satisfactory performance of the Work in compliance with this Contract and as further set forth in **Exhibit A**. Owner understands that due to the nature of the Work and the unknown conditions at the Work site, it is not possible to render an accurate quotation before commencing Work. The Contract Sum stated above is an approximation made in good faith based on currently available information at the time of Contract execution, and is subject to increase based on conditions discovered later. Changes to the Contract Sum will be confirmed by written Change Order signed by the parties as further described in Article 2.2. If any portion of the Contract or any Change Order is to be performed on a rate and material basis, such Work will be invoiced based on Contractor's rate schedule attached at **Exhibit B**. Owner agrees that they are liable for payments under this Contract. Contractor agrees to provide industry standard documentation to help Owner with their insurance and subrogation efforts.

**2.2**    <u>Adjustments to Contract Sum; Standby:</u>  Any revised estimate, changes to the scope of work due to changed site conditions or Owner directives which may increase or decrease the price and scope of the Contract

PS

must be mutually agreed to and evidenced by written Change Order for the work to be performed ("Change Order"). If a governmental requirement or Order increases the scope of work, then the Owner must pay for the additional work without a written, signed amendment to this Contract. Notwithstanding anything to the contrary in this Contract, the parties acknowledge and agree that the Contract Sum identified in Article 2.1 is based on the Scope of Work set forth in **Exhibit A**, and is only an estimate based upon the information available to the parties at the time of signing this Contract. As a consequence, the parties further acknowledge that the Scope of Work and Contract Sum will be revised via Change Order(s) based on the conditions at the Work site. Contractor will notify Owner via email or other written notice when conditions require a Change Order, and Contractor shall have no obligation to continue with the Work unless (i) Owner has provided Contractor with written authorization to perform Work in excess of the Contract Sum via a Change Order signed by both parties; and (ii) Contractor has received payment in full for any Work covered by that Change Order.

For the avoidance of doubt, the parties further acknowledge that the Contract Sum identified in Article 2.1 does not include any work not specifically identified in the Scope of Work at **Exhibit A**, including, without limitation, any re-cleaning or additional cleaning, additional demolition, stand-by time and/or expenses incurred by Contractor, replacement of any fixtures, piping, walls, etc. that are dismantled during the performance of the Work, handling of any tools not identified in Exhibit A, and any other exclusions identified in Exhibit A. All such additional work is subject to a Change Order as described above.

In addition, Owner agrees to pay Contractor a **standby charge of $55.00 per man-hour ("Standby Charge")** for any stand-by time incurred by Contractor relating to or in connection with a Change Order or a revised scope of work, including, without limitation, any action, approval, or payment required by Owner or any third party. In addition, Owner agrees to pay Contractor any additional expenses incurred by Contractor during any stand-by period (**"Standby Expenses"**), which will be passed through to Owner at cost. Contractor will notify Owner via email or other written notice when any standby period begins. The Standby Charges and Standby Expenses will be invoiced to Owner as the charges are incurred, and payment will be due by Owner upon receipt of Contractor's invoice.

    **2.3**    <u>Invoice for Payment:</u>  Contractor will submit to Owner an Invoice, for the amount set forth in Article 2.1 prior to commencement of Work. Invoices based upon rate schedules will include industry standard supporting documentation for all charges. Owner agrees to pay Contractor's invoice upon receipt by the Owner and prior to commencement of Work. If Owner disputes any amount within an invoice, then Owner shall pay all undisputed amounts upon receipt of invoice and shall provide to Contractor, in writing, an explanation of the disputed amount with all supporting documentation within seven (7) days from Owner's receipt of the disputed invoice. Failure to do so shall result in an absolute waiver of Owner's right to dispute any amounts under said invoice. Owner agrees that it shall only assert disputes grounded in good faith and reasonable judgment. Owner shall not withhold payment of any undisputed amount payable by reason of any dispute. In the event of any such dispute, the Parties shall seek to resolve the disputed amount promptly. If such disputed amount cannot be resolved within fourteen (14) days of Owner's notice, then the Owner shall place the entire disputed amount in escrow until the Parties are able to resolve such dispute. The Contractor reserves the right to cease or suspend any work until the undisputed amount is paid in full, including interest, for Services performed. If there are adjustments to the Contract Sum or Change Orders pursuant to Article 2.2, Contractor shall invoice Owner for such Work and Owner shall pay Contractor's invoice(s) upon receipt. Contractor will not commence any work pursuant to a Change Order until such Change Order invoice is paid in full, and Contractor will charge Owner the Standby Charge and Standby Expenses for any time and/or expenses incurred while waiting for such payment.

    **2.4**    <u>Interest for Past Due Payment:</u>  If an invoice is not paid after fifteen (15) days of receipt of such invoice, then Contractor may apply an interest charge of one percent (1.5%) per month, except if otherwise prohibited by law.

    **2.5**    <u>Payment Disputes with Third Parties.</u> Contractor's right to timely and full payment of its progress and final invoices shall not be contingent upon resolution of any disputes between the Owner and its insurer(s) or any third party or dependent upon the insurers' payment or approval of Contractor's invoices or charges. Further, Owner understands and agrees that the Owner's obligation to make timely payment is not abated, stayed,



Page 2 of 164

P8

contingent, dependent or conditioned on Owner awaiting funds from its insurer(s), local government, State government, the federal government, or any government agency, grant, charitable organization, or any third-party.

**2.6** <u>Insurance Proceeds:</u> If applicable, the Owner hereby assigns their right, title, and interest in all insurance proceeds under policy for the work performed by Contractor to Contractor. The Owner directs their insurer to pay Contractor directly for work performed under this Contract. If requested, Owner agrees to provide Contractor with current evidence of insurance coverage and policy declarations. Lack of insurance funding will require Owner to immediately provide financial assurance to Contractor for payment of the Contract Sum. Contractor will have cause to terminate the contract if Owner cannot provide: (1) a retainer covering the estimated cost of the Work to be performed under this Contract; or (2) other financial assurance of payment, the sufficiency of which is determined to be adequate to Contractor.

**Article 3      Time of Completion**

**3.1** <u>Time of Performance:</u> All Contract time shall be subject to the issuance of all permits and various approvals or inspections by the appropriate authorities, if applicable. Contractor shall perform the Work on a reasonable-effort basis. Contractor shall not commence Work (including any Work to be performed via a Change Order) until it receives payment in full for the Work.

**3.2** <u>Completion of the Work:</u> Completion of the Work will have been achieved at the point when the entire Work, including all of its parts, is sufficiently complete in accordance with this Contract, as specified in Exhibit A (as may be revised pursuant to any Change Order), so the Work site can be utilized by Owner for its intended purpose, except for minor items that do not impair Owner's ability to occupy and utilize or continue to occupy or utilize the entire Work. For the avoidance of doubt, the Scope of Work under this Contract is complete ("Completion") when (a) Contractor moves all of the required Tools from Owner's facility to the loading dock designated by Owner as further described in Exhibit A; and (b) once the third party industrial hygienist retained by Owner determines that Contractor's Work reached an adequate "clearance" such that Contractor performed the Work according to its clearance standards and Exhibit A.

**3.3** <u>Force Majeure:</u> Under no circumstances shall Contractor be liable for any loss, condition of default, damage or delay or damage claims by Owner due to any cause beyond Contractor's reasonable control, including but not limited to acts of government, fire, explosion, theft, weather damage, flood, earthquake, riot, war, mischief, strikes, lockouts, pandemics, labor or material shortage, or act of God. Any agreement for the specific timing of performance of the work shall automatically be extended by the exact amount of time in days that an event of Force Majeure occurs.

**Article 4      Indemnification**

**4.1** <u>Contractor Indemnification:</u> To the fullest extent permitted by law, Contractor shall indemnify and hold harmless the Owner, including Owner's officers, directors, and employees, from all claims for bodily injury, death, and property damage, excluding damage to the Tools, (including reasonable attorney fees and court costs and expenses) that occur during the performance of the Work, provided that such claims are brought to Contractor's attention in writing prior to completion of the Work, and only to the extent caused by the negligent acts or omissions of Contractor, its subcontractors, or anyone employed by either one of them for whose acts they may be liable. Contractor shall have no obligation to indemnify Owner for damages to the extent caused by Owner's negligence, breach of contract, or violations of law. For the avoidance of doubt, Contractor's obligation to indemnify Owner under this Contract does not include claims in any way related to damage to any Tools removed from Owner's facility as part of the Scope of Work that may have occurred during Contractor's performance of the Work or after the Tools have been relocated by Contractor pursuant to the Scope of Work, unless Contractor is given notice of such claims in writing prior to completion of the Work, and then, only to the extent caused by the gross negligence or willful misconduct of Contractor. In addition, Contractor's obligation to indemnify Owner under this Contract does not include (a) any claims in any way related to contamination of Owner's property or contamination of the Tools moved by Contractor with Cobalt 59 or other hazardous substances; or (b) any claims related to sickness, disease, injury, or death related to Cobalt 59 or other hazardous substances in Owner's facility or on the Tools moved by Contractor as part of the Work.



**4.2**    Owner Indemnification:    To the fullest extent permitted by law, Owner shall fully release and shall defend, indemnify, and hold harmless Contractor, its parents, subsidiaries, affiliates, and their representatives, officers, directors, employees, and agents ("Contractor Indemnitees"), from all claims, damages, losses, liabilities, penalties, fines, demands, medical expenses, or any other expenses (including reasonable attorney fees and court costs and expenses) ("Claims"): (A) for bodily injury, sickness, disease, death or property damage arising out of or relating to (i) any contamination of Owner's facility where the Work is performed after Completion of the Work by Contractor; (ii) any contamination of the Tools removed and relocated from Owner's property by Contractor as called for by the Scope of Work; or (iii) that Contractor did not fully clean and/or decontaminate Owner's facility where the Work is performed after Completion of the Work; (B) arising out of or relating to contamination from Cobalt 59 or any other hazardous substances from Owner or any third party who enters the facility where Work is performed or comes into contact with any of the Tools moved by contractor as part of the Work during or after the term of this Contract; or (c) of any kind or nature arising out of or relating to damage to any Tools removed from Owner's facility as part of the Scope of Work that may have occurred during Contractor's performance of the Work or after the Tools are relocated by Contractor pursuant to the Scope of Work unless Contractor is given notice of such claims in writing prior to Completion of the Work, and then, only excluding such Claims to the extent caused by the gross negligence of the Contractor Indemnitees.

In addition, Owner shall indemnify and hold harmless the Contractor Indemnitees from all Claims on account of: (i) Contractor acting as Owner's agent in signing manifests, or obtaining permits on Owner's behalf; (ii) bodily injury, including death, property damage, or damage to the environment asserted or sustained by any person or entity arising out of, directly or indirectly, or connected in any way with the performance of this Contract to the extent caused by the negligent acts or omissions of Owner, or Owner's officers, directors, members, agents, employees, and contractors; (iii) from any trespass claims from third parties if Contractor was told Owner permission was granted to egress and (iv) all claims arising from the generation, transportation, storage, treatment, release or migration of hazardous materials unless caused by the negligence or willful misconduct of Contractor.

**4.3**    No Consequential or Indirect Damages. EXCEPT FOR OBLIGATIONS TO MAKE PAYMENT UNDER THIS CONTRACT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES, OR DIMINUTION IN VALUE ARISING OUT OF, OR RELATING TO, ANY BREACH OF THIS CONTRACT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER THE PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT, OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.

**4.4**    Maximum Liability. IN NO EVENT SHALL CONTRACTOR'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS CONTRACT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID TO CONTRACTOR PURSUANT TO THIS CONTRACT.

**Article 5    Representations and Warranty**

**5.1**    Hazardous Substances:    If the Work provided by the Contractor under this Contract for environmental services includes the use, storage, handling, disposal, or otherwise involves any "hazardous substance" as that term is defined under state or federal laws, including without limitation the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq., the Owner agrees to immediately disclose any and all known information to Contractor regarding such hazardous substances, including the Owner's EPA Hazardous Waste Identification number (if applicable).    Owner acknowledges that Owner or Owner's former lessee have exclusive title to all hazardous substances and any real or personal property contaminated or affected by such substances.    Owner agrees that Contractor is not the generator of any hazardous substances on Owner's property.    Owner agrees that Contractor will only act as Owner's agent and under the direction of Owner in the provision of such services involving or related to hazardous substances.    Both parties agree that the Contractor, by providing such services, does not own and is not taking title to any hazardous substance from the

Owner or the Owner's property. Owner shall defend, indemnify, and hold harmless the Contractor Indemnitees from any Claims arising out of or related to any finding that Contractor is the generator of, or has taken title to, any hazardous substances on or removed from Owner's property.

**5.2**    Transportation of Hazardous Substances: Unless specifically listed in the Scope of Work in this Contract, Owner shall be responsible to execute waste manifests, transport hazardous substances, dispose of hazardous substances, execute waste profile documents or obtain hazardous substance permits in connection with the Work to be performed by the Contractor under this Contract.

**5.3**    Limited Warranty; No Warranty for Removal of Tools: Contractor warrants that its provision of services under this Contract will conform to the standards of care, skill and diligence normally observed by professionals in the provision of similar services at the time the services are rendered. Contractor warrants that it will take reasonable and industry standard efforts to minimize real or personal property that is contaminated with hazardous substances or otherwise affected by such substances if rendering spill response services. Notwithstanding the foregoing or anything else contained in this Contract, Owner expressly assumes the risk of any and all damage to the Tools that are removed and relocated by Contractor as called for by the Scope of Work at Exhibit A except as set forth in Article 4. Contractor makes no express or implied warranties or representations regarding the condition of the Tools or that the Tools will be in proper working order or condition after Contractor completes its Scope of Work with respect to removal and relocation of the Tools. Owner hereby waives any express or implied warranties, including but not limited to, the warranty of habitability, fitness for intended purpose, and the warranty of good workmanship relating to the removal and relocation of the Tools.

**5.4**    Retaining an Industrial Hygienist: The parties acknowledge that mold, microbial matter, fungi, asbestos, lead, Cobalt 59 or other contaminant or hazardous material ("Material") is (1) found on the Owner's property; and (2) Owner has directed Contractor to provide cleaning, decontamination, abatement and/or remediation related services related to such Material. The parties agree to perform the services to current industry standards and according to any local, State or Federal laws and under the protocols of an industrial hygienist retained by Owner as may be further referenced in Exhibit A.

Owner understands that Contractor does not have the expertise or ability to detect hazardous Materials or determine whether Materials on the property are hazardous and the presence of such Material may not be apparent upon visual examination of the property. As such, Contractor has recommended that Owner retain a third party industrial hygienist to perform clearance testing of the property and that the property be remediated based on recommendations of a third party industrial hygienist and pursuant to an approved protocol. Owner has agreed to retain a third party industrial hygienist to perform clearance testing of the property and agrees that the property be remediated based on recommendations of a third party industrial hygienist and pursuant to an approved protocol. Notwithstanding the foregoing, if Owner does not agree to perform and pay for such Work to current industry standards, which include clearance testing by an industrial hygienist, Owner agrees that by doing so it knowingly accepts and expressly assumes all risks and consequences which may accrue in the future as a result of proceeding against Contractor's recommendations. It is understood by Owner that without professional testing, or without using an industry standard remediation protocol, Contractor cannot fully remediate and rid the property of the Material, including Cobalt 59, at or in the property or that the property is and will be safe for occupation. Owner shall indemnify, defend, hold harmless (including payment or reimbursement of Contractor's reasonable legal defense costs) and release Contractor from and against any claim, damage, cause of action, or loss regarding the failure to remediate or from the spreading of the Material, including Cobalt 59.

**5.5**    Abatement and Remediation Work: Contractor does not provide either an express or an implied warranty for mold remediation and asbestos abatement services, including implied warranties for workmanlike construction, habitability, fitness for a particular purpose, and merchantability, though this disclaimer does not excuse Contractor from its obligation to perform such services in a good and workmanlike manner under the circumstances and pursuant to industry standards. For mold or asbestos remediation work, Contractor's work is complete upon a mold or asbestos clearance testing of the work by an industrial hygienist or other third party environmental assessor. Any portion of Contractor's work that is subsequently found to be defective for its intended purpose that was performed under the direction of, in accordance with, or approved by, any such professional or their reports, testing or protocols, is not the liability or responsibility of Contractor. Owner's sole



P8

recourse in such an event is to file a claim against the industrial hygienist. Owner shall produce a copy of the industrial hygienist report to Contractor.

**5.6**    Cleaning and Decontamination Work. The Scope of Work under this Contract includes the cleaning and decontamination of Owner's facility which is known to contain Cobalt 59, a known carcinogen, and potentially other hazardous Materials. Contractor does not provide either an express or an implied warranty for cleaning and decontamination Work, including implied warranties for workmanlike construction, habitability, fitness for a particular purpose, and merchantability, though this disclaimer does not excuse Contractor from its obligation to perform such Work in a good and workmanlike manner under the circumstances and pursuant to industry standards. For the cleaning and decontamination Work to be performed, Contractor's Work is complete once Owner's third party industrial hygienist determines that Contractor's Work reached an adequate "clearance" such that Contractor performed the Work according to its protocol and Exhibit A. Any portion of Contractor's work that is subsequently found to be defective for its intended purpose that was performed under the direction of, in accordance with, or approved by, any such industrial hygienist or their reports, testing or protocols, is not the liability or responsibility of Contractor. Owner's sole recourse in such an event is to file a claim against the industrial hygienist. Owner shall produce a copy of the industrial hygienist report to Contractor. If Owner does not retain a third party industrial hygienist, Contractor's cleaning and decontamination Work is complete once Contractor certifies that it has completed the infrastructure decontamination according to the guidelines at Exhibit A, and Contractor shall be released and held harmless as set forth in Article 5.4 above.

**Article 6    Insurance**

Contractor shall provide Owner, at Owner's written request, a Certificate evidencing that it has obtained the following policies and coverages:

**6.1**    Commercial General Liability Insurance: Contractor shall maintain commercial general liability (CGL) coverage, with $1,000,000 combined single limit per occurrence, and $2,000,000 in the annual aggregate.

**6.2**    Business Auto: Contractor shall maintain business auto liability with $1,000,000 combined single limit per accident for bodily injury and property damage, without annual aggregate. Coverage shall apply to any automobile owned, hired and non-owned.

**6.3**    Workers' Compensation and Employers' Liability Insurance: Contractor shall maintain workers' compensation insurance as required by the state in which the work is being performed and Employers' Liability Insurance in the amount of $500,000 per accident for bodily injury or disease.

**6.4**    The Commercial General Liability and Business Automobile policies shall contain, or be endorsed to contain the following provision: The Owner, Quantum Labs, Inc., as well as Hyperion Group, Inc., and Maxim Integrated Products, Inc. shall be included as Additional Insureds as respects the Commercial General Liability Insurance and Business Automobile Liability Insurance that shall apply to claims, costs, injuries, or damages. The Owner and other insureds mentioned in this Section 6.4 shall not, because of their inclusion as insureds, become liable for any payment of premiums to carriers for such insurance coverage.

**Article 7    General Provisions**

**7.1**    Compliance with Applicable Laws: Contractor agrees to perform the Work under this Contract in accordance with all applicable requirements of codes, laws, regulations and ordinances pertaining to the Work.

**7.2**    Remedies: If Contractor fails to perform services in accordance with the terms of this Contract, and Owner timely notifies Contractor in writing of the listed defects and after seven (7) days fails to cure the defects, then the Owner may terminate this Contract upon an additional three (3) days written notice to Contractor. Contractor may terminate this Contract or suspend performance of the Work if Owner fails to pay Contractor any undisputed amounts when due and Owner fails to cure such failure within ten (10) days after receipt of written notice from Contractor.



**7.3**    Assignment:  Neither the Owner, nor Contractor, may assign or otherwise transfer its rights, obligations, and/or duties under this Contract without the prior written consent of the other unless those Assignments are to Contractor's subsidiaries, affiliates, or other owned company.  Any prohibited assignment is void.  Nothing in this article shall be deemed, or construed, to prevent Contractor from subcontracting out all or a portion of the services provided herein.

**7.4**    Independent Parties:  The Contractor is an independent contractor and not an employee of Owner. Nothing in this Contract shall be interpreted as creating any joint venture, partnership, joint tenancy, agency or other similar legal relationship between Owner and Contractor, or as creating any contractual obligation, whether direct, indirect or third party beneficiary, on the part of Owner to any Subcontractor.

**7.5**    Permits, Licenses & Egress:  If provided for in the scope of work, Contractor shall obtain and maintain during the term of this Contract, all required permits, licenses, and certificates in connection with the performance of its obligations herein as agent for the Owner.  Otherwise, Owner at his cost shall obtain and maintain all environmental governmental permits and approvals necessary to obtain Contractor's services and to obtain permission to enter or egress from any third parties property in order to effectuate services.

**7.6**    Execution:  This Contract may be executed in any number of counterparts, each of which will be deemed to be original, and all counterparts, when taken together, will constitute one and the same agreement. The parties agree that signatures on this Contract may be delivered by facsimile or electronically instead of an original signature and agree to treat facsimile or electronic signatures as original signatures that bind them to this Contract. Both Parties must sign this Contract for it to be binding and enforceable

**7.7**    Drafting:  No party shall be deemed the drafter of this Contract.  If this Contract is ever construed by a court of law, such court shall not construe this Contract or any provision hereof against any party as the drafter.

**7.8**    Governing Law:  This Contract shall, without regard to the principles of conflicts of laws, be construed and enforced in accordance with and governed by the laws of the State where the project is located.

**7.9**    Attorneys' Fees:  The prevailing party to any legal action or extra-judicial proceeding relating to this Contract shall be entitled to recovery of its reasonable attorneys' fees, costs, expert fees and other reasonable expenses incurred.  The determination of the "prevailing party" shall be based upon the party who prevails upon the matters actually litigated and shall not be determined solely based on the party receiving a net monetary recovery.

**7.10**    Severability:  In the event a provision or portion of a provision, of this Contract is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions or portions shall be enforceable to the fullest extent allowable by law in order to give maximum legal force to those provisions or portions that are not illegal or unenforceable.

**7.11**    Confidentiality:  Each party shall keep confidential any information marked or designated "Confidential" by the other party.

**7.12**    Subcontracts:  Contractor may utilize any subcontractor in connection with providing the Work. Utilization by Contractor of, or Owner's approval of, any subcontractor shall in no way relieve Contractor of any of its obligations or liabilities under this Contract.

**7.13**    Termination:  Either party may terminate this Contract, at any time, and for any or no reason whatsoever, by giving the other party not less than ten (10) days' advance written notice of same, which notice shall specify the effective date of early termination.  Contractor shall receive compensation for all the Work performed through the effective date of early termination.

**7.14**    Notices. Notices regarding this Contract shall be sent to:

For Contractor:        BELFOR Environmental Inc.                BELFOR Environmental Inc. (local office)
                       Attn: General Counsel                   Attn: Matt Hourigan
                       185 Oakland Avenue, Suite 150            5075 Kalamath Street
                       Birmingham, MI 48009                     Denver, CO 80221
                                                                Matt.hourigan@us.belfor.com


For Owner:             Quantum Labs, Inc.
                       445 E Cheyenne Mountain Blvd. C197
                       Colorado Springs, CO 80906


Notices regarding Change Orders and standby time and/or expenses may be sent via email to the email addresses listed above.

**7.15**    **Entire Agreement; Amendments:**    This Contract and its exhibits are the entire understanding and agreement between the Parties with respect to the subject matter covered, and all prior agreements, understandings, covenants, promises, warranties, and representations (oral or written, express or implied) not incorporated in this Contract are superseded. This Contract may not be amended or supplemented in any way except in writing, dated and signed by authorized representatives of both Parties.


THE PARTIES HERETO HAVE EXECUTED THIS CONTRACT AS OF THE DATE SET FORTH BELOW THEIR SIGNATURES.

OWNER: QUANTUM LABS, INC.                    BELFOR ENVIRONMENTAL, INC.

By: _____                By: _Paul Suchowski_____
                                                975D42FCC81A87AA32AFC1E249B6E249  ContractWorks

Name: __Simon Pverck_____               Name:  Paul Suchowski

Title: __Director_____                Title:   Controller

Date: __11.08-2021_____                 Date: **11/09/2021**_____

**EXHIBIT A**
**SCOPE OF WORK FOR ENVIRONMENTAL SERVICE**





October 6, 2021

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131

Re: Final Scope Summarized for Contract revised October 6, 2021

Dear Mr. Planck,

On Friday, July 1, 2021, Quantum informed BELFOR Environmental, Inc. that we have successfully been awarded the work involving the Cobalt 59 decontamination and the Maxim tool De-installation. This letter may be used to refine scope from the last proposal to current desired scope. Not all services originally provided will be used.

<u>Safety</u>

BELFOR Environmental Inc.'s primary concern and objective is to perform hazardous work safely. Incident free activities are accomplished through planning, communication, observation, training and careful development of work methods. Safety is considered through every task and is an intimate part of each employee's work day. Upon award, a Health and Safety Plan will be developed and implemented. Training, awareness of the hazards, and standard operating procedures to manage the hazards as identified in the HASP will be presented to every crew member on site with a signature acknowledgement on file. BELFOR intends to fully participate in all safety functions including daily safety meetings, safety observations, proper training records and medical clearance in conjunction with other contractors, Quantum representatives or any regulatory representatives. BELFOR will be providing as part of our management team, a designated site Health and Safety Officer for this project.

For this project, the contaminant of concern is Cobalt 59 which is a particulate that is known carcinogen. The majority of intrusive work in and around the contamination will be controlled with personnel decontamination procedures, established work zones (support area, contamination reduction zone and the hot or impacted zone) while utilizing Level C personal protective equipment. Level C PPE consists of fully covered person with Tyvek coveralls, gloves, boot covers and HEPA filtered air purifying respirators.

<u>Project Management</u>

The typical overall approach to managing any remediation project is to measure schedule and project goals and then to allocate and use the necessary resources the most efficient and effective way. If the project and needs of Quantum or any stakeholder in the project require specific reporting or coordination with any regulatory authority, BELFOR will tailor the information collected from this project in the form of a final report to satisfy those needs.

The following will comprise our onsite staff:
- Project Manager (1)
- Health and Safety Officer (designee)
- Site Superintendent (1)
- Supervisor (1)
- Hazmat Technician (4-6)





-    Tool Technical Specialist (3)
-    Tool Decontamination Technician (2)
-    Electrician (1)

Schedule plan consists of approximately 21 working days, 60 hours per week, M-S 7:00 am to 5:00 pm.


## Tool Removal/Shipping/Decontamination/Shipping to Maxim Scope Summary

### BELFOR Technical Services Tool/Instrument Scope

BELFOR has been requested to evaluate and provide a process to safely disconnect, cap and prepare a group of tools from the Quantum Facility with end result being to prep them for removal from Unit B and relocate them to the truck dock door for pick up by a Maxim contractor. The primary contaminate of concern is Cobalt 59. BELFOR's intent is to ensure tools are safe for shipping and handling.

### BELFOR Experience

BELFOR has extensive experience decontaminating High Tech Electronics and Machinery after fire, flood, and other events that result in possible exposure to potential hazardous materials. BELFOR is one of the primary decontamination service providers for multiple semiconductor tool OEM's including Applied Materials and Lam for the past 20+ years. BELFOR has performed 1000's of tool and equipment decontamination projects over the past 20 years.  These have been at customer locations as well at BELFOR's Fort Worth and Austin Decontamination Facilities.

### BELFOR Approach

BELFOR Technical Services will perform the following tasks:

- Prepare tools for moving, making sure liquids are drained, capping and plugging is performed, and tools will be entirely wrapped and sealed prior to moving to loading dock for shipping.
- The transport from current location to dock area will be videotaped.

- All robots and mechanisms will be secured so that damage as a result of movement is less apt to occur.

- No external wiping or cleaning will be performed onsite so as to make every effort that no additional contaminant is spread throughout the current location.

- BELFOR will provide a licensed electrician to disconnect any tools, HEPA filters, light fixtures etc. that need to be addressed during the course of the project.





**BELFOR ( )**

**ENVIRONMENTAL**

<u>**Facility Decontamination and limited Demolition Scope Summary**</u>

**BELFOR Environmental Facility Scope**
Belfor has based this proposal from a site walk performed in March and July 2021 and email correspondence in the following weeks. We will begin the infrastructure decontamination once the tools have been removed. The scope of work is derived from a list provided to BELFOR by Simon Plank titled *Updated List of Quantum Equipment-24B* (see attached). The tool list has 15 tools that are listed in BOLD. These are the 15 tools priced. Any additional tools that require handling by BELFOR will require a change order.

<u>**Infrastructure Decontamination**</u>

BELFOR Environmental will perform the following tasks:
- Construct a flame retardant 6 mil poly barrier wall, floor to ceiling, as needed. The wall will be constructed with zipper panels to allow access to the laser room. The purpose of the barrier is to prevent cross contamination.
- Lab pack the loose, containerized chemicals inside the Clean Rooms and the dock area. We have assumed that up to 8 lab pack drums of chemicals will be generated and will be staged for pick up by ACT (Maxim contractor) at the dock door.
- It will be necessary to construct a scaffold stairwell and roof safety rail on the northeast side of the building to allow for safe roof access for exhaust removal. The existing vertical ladder cannot be utilized due to safety issues.
- Exhaust ducting from the Temescal, lapper/polisher and cobalt station will be completely removed from the tool POC to the exhaust fan inlet on the roof. The fan housing should be sampled for cobalt contamination. If it meets the clearance requirements, the fan will be left in place. If not, it will be removed via change order. The remaining tool exhaust systems will be removed from the tool POC back to the first slide gate. Severed exhaust duct will be wet wiped and disposed as non-hazardous metal recycle through A & S Metals.
- The primary filters located on top of the HEPA fan filter units (FFU) will be removed prior to wet wiping of surfaces and disposed as cobalt contaminated waste. Belfor will install new filters after final clearance sampling is completed.
- Wet wipe all infrastructure surfaces (wall, ceiling, beams, clean room walls, suspended HEPA filter ceiling) located in and around the Clean Room area 1 – 3 and area used by Quantum Labs (Lab H, including the warehouse side with a low volatile organic compound (Simple Green, IPA or similar). Any tools remaining in the Clean Rooms will also be wet wiped on their exterior only. The lapper/polisher/cobalt station & dock area will also be wet wiped in the same fashion. The Implanter side of the facility will be wet wiped. Cleaning rags/PPE will be collected, containerized and staged at the dock door for pick up by ACT for disposal as cobalt contaminated waste at a licensed disposal facility. This proposal includes costs for one infrastructure cleanings to attempt to meet the clearance criteria to be established by AeroEnvironmental. If additional cleaning is needed to meet the clearance criteria of =/< 2ug/100cm$^2$ a change order will be required.
- The office area will be HEPA vacuumed, all surfaces (excluding small contents like books or office supplies) will be wet wiped as described above.
- The tile floor will be scrubbed using an industrial floor scrubbing machine with a low volatile organic compound cleaning solution. The rinsate will be collected, containerized and staged at the dock door for pick up by ACT for disposal as cobalt contaminated waste at a licensed disposal facility.
- It is not anticipated that any building materials will be disturbed that potentially contain asbestos. However, as described in our exclusions, if building materials are or need to be disturbed, an asbestos survey will be necessary and if needed, proper and compliant abatement of said materials will need to occur. BELFOR Environmental is licensed in the State of California to self-perform this type of work.





**BELFOR**

**ENVIRONMENTAL**

**Waste Management**

BELFOR Environmental's intent is to decontaminate most demolished materials to a point that downgrades the characterization from hazardous waste (potentially) to a special waste or most likely, construction debris. Metal recyclables will be neutralized and processed through A & S Metals. The rinsate and solids that is generated through the decontamination process will be collected in 55 gal drums or similar container and staged at the dock door for pick up by ACT for disposal as cobalt contaminated waste at a licensed disposal facility. No costs for Hazardous Waste disposal are included in this proposal. Maxim will be the generator of all waste and ACT will be their custodian providing waste management services. Quantum and BELFOR will not assume any costs or generator status of any waste resulting from this project.

**Projected Schedule**

Contract November 8, 2021 (also Notification to Proceed)
Mobilize November 29, 2021
Completion December 22, 2021

Should project be extended, project can resume after January 3, 2022

**Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work described herein.

| | | |
|---|---|---|
| 1. MAXIM Tool De-install and capping | $ 75,162.00 | |
| 2. Left Blank | $ 0.00 | |
| 3. Left Blank | $ 0.00 | |
| 4. Construct Barrier Wall and Personnel Decon Station | $ 18,634.00 | |
| 5. Lab Packing of excess chemicals | $ 11,244.00 | |
| 6. Left Blank | $ 0.00 | |
| 7. Demo and decon of exhaust duct | $ 76,863.00 | |
| 8. Wet wiping of Facility Surfaces | $ 97,016.00 | |
| 9. Floor Cleaning | $ 23,986.00 | |
| 10. Office Cleaning | $ 24,100.00 | |
| 11. Teardown & Demobilization | $ 9,300.00 | |
| CONTRACT TOTAL | $ 336,305.00 | |

| | | |
|---|---|---|
| 1. Tool Move to Dock: | $ 75,162.00 | |
| 2. Infrastructure decontamination: | $ 261,143.00 | |
| TOTAL: | $ 336,305.00 | |





**BELFOR (●)**
**E N V I R O N M E N T A L**

<u>Exclusions</u>

- It is assumed that part of the Unit B clean room steel/Plexiglas wall will need to be removed prior to tool removal and re-installed after tool removal. Replacement of any and all other components or construction materials removed due to decontamination purposes is not included in this base scope of work.
- Belfor assumes a start date of November 29, 2021.
- Belfor assumes the $CO_2$ fire suppression system will be disconnected by Quantum or Maxim or whomever the fire protection service provider is prior to November 29, 2021.
- Belfor assumes we would have access to all work areas and facilities including roll-off bin parking space and scaffold stairway in back of the building.
- Belfor will remove the primary filter from each HEPA fan filter unit (FFU) and dispose as cobalt contaminated waste.
- Belfor does not anticipate the removal of any building materials other than part of the clean room wall. If it is discovered that other building materials need to be removed (i.e. sheet rock, floor tile, insulation etc.), an asbestos survey will need to be conducted on those materials before removal at an additional cost.
- No cost is included for hazardous waste disposal in this proposal.
- Scope items removed from this proposal are not fully refunded or credited. At least 20% of any line item shall be retained in the base agreement.
- All changes in conditions, additional cleaning, additional demolition, disputes, replacement of demolished components or delays will be rectified with change orders, including standby time, and will require pre-payment prior to starting.
- Belfor will issue change order to replace items removed or damaged that are associated with Quantum's facility. Some components, such as exhaust duct, which was specifically installed for tooling that will no longer be in place will require a new design and specifications.

Thank you and please do not hesitate to call with questions. BELFOR can provide specific relative project experience.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



## Belfor Removal list of Maxim tools

| Removal ID | Item | Manufacturer |
|---|---|---|
| | Transmission list October 28, 2021 | |
| MAXIM A1 | Electron beam Evaporator with Cryo pump | Temescal / CTI-Cryogenics |
| MAXIM A2 | Power supply | Temescal |
| MAXIM A3 | Controller with Pump | Veeco / Ebara |
| MAXIM A4 | Temp control | Anova |
| MAXIM A5 | Spin dryer (1 stack) | Class One Equipment |
| MAXIM A6 | SPEC Profilometer | Tencor |
| MAXIM A7 | SPEC Stress gauge | Tencor |
| MAXIM A8 | SPEC 4-pt probe | Omnimap |
| MAXIM A9 | Optical microsope | Nikon |
| MAXIM A10 | Karl Suss Aligner & all accessories | Karl Suss |
| MAXIM A11 | SVG 2 track spin coater & all accessories | SVG |
| MAXIM A12 | Wafab solvent sink & all accessories | Wabfab International |
| MAXIM A13 | Wafab wet bench & all accessories | Wabfab International |
| MAXIM A14 | BlueM oven & all accessories | Blue M Electric |
| MAXIM A15 | YES-HDMS vapor primer & all accessories | Yes |
| MAXIM A16 | Plasma etcher & all accessories | Gasonics Int. |
| MAXIM A17 | Plasma etcher & all accessories | Trion Technology |
| MAXIM A18 | Nanospec eliipsometer & all accessories | BSI |
| MAXIM A19 | Engis lapper polisher & all accessories | Fastlap |
| MAXIM A20 | Class-One wafer scrubber & all accessories | Ultra Equipment Company |
| MAXIM A21 | Hot shoe dry film laminator & all accessories | Mega |
| MAXIM A22 | Vibrating sample magnetometer (VSM) & all accessories with VSM rack | Micro Sense |
| MAXIM A23 | Wafer prober & all accessories | Rucker & Kolls |
| MAXIM A24 | Chem capture cabinet | Wabfab International |
| MAXIM A25 | Freezer | True |
| MAXIM A26 | Quad Group Sebastian Five Strength Tester | Quad Group |



**EXHIBIT B**

**CONTRACTOR RATE SCHEDULE (IF APPLICABLE)**



**RATE AND MATERIALS SCHEDULE FOR INVOICING (Exhibit B)**
Effective Date: April 2020

**BELFOR** 
PROPERTY RESTORATION

# RATES AND INVOICE CONDITIONS
§ I.
ITEMIZED SCHEDULED LABOR CLASSIFICATIONS

| CODE | | | REGULAR RATE / HR |
|---|---|---|---|
| **PROJECT MANAGEMENT:[1,3]** | | | |
| APM | Assistant Project Manager | | $   73.00 |
| PM | Project Manager | | $  108.00 |
| PE | Project Estimator | | $  117.00 |
| SPM | Senior Project Manager | | $  133.00 |
| PC | Project Coordinator | | $  162.00 |
| **GENERAL CLASSIFICATIONS:[1,3]** | | | |
| GL | General Labor | | $   36.00 |
| AA | Administrative Assistant | | $   40.00 |
| LF | Labor Foreman | | $   41.00 |
| MS | Mobilization Support | | $   44.00 |
| TD | Truck Driver | | $   52.00 |
| DMT | Demolition Technician | | $   52.00 |
| RCO | Resource Coordinator | (Supply Technician) | $   54.00 |
| PA | Project Auditor | (Documentation Clerk) | $   59.00 |
| EO | Equipment Operator | | $   62.00 |
| HSO | Health & Safety Officer | | $   92.00 |
| **RESTORATION SERVICES (General):[1,3]** | | | |
| RT | Restoration Technician | | $   54.00 |
| RS | Restoration Supervisor | | $   59.00 |
| DT | Dehumidification Technician | | $   70.00 |
| MT | Mold Technician | (Remediation Technician or Supervisor) | $   70.00 |
| **RECONSTRUCTION SERVICES:[1,3]** | | | |
| PT | Painter | | $   67.00 |
| DP | Drywall Installer/Finisher | | $   73.00 |
| CR | Carpenter | (Framer/Finish) | $   78.00 |
| TF | Trade Foreman | (Commercial Supervision) | $   81.00 |
| **TECHNICAL SERVICES:[1,3]** | (Dehumidification, Documents/Media, Electronics, HVAC, Machinery, Mold) | | |
| TN | Technician | | $   75.00 |
| TS | Technical Specialist | | $   83.00 |
| TL | Team Leader | | $   95.00 |
| TMR | Technician, Machinery Rebuild | | $  102.00 |
| **SEMICONDUCTOR SERVICES:[1,3]** | | | |
| DTA | Decon Technician Assistant | | $   70.00 |
| DC | Decon Technician | | $   83.00 |
| DTL | Decon Team Leader | | $   95.00 |
| DE | Decon Engineer | | $  164.50 |
| **ENVIRONMENTAL SERVICES:[1,3]** | | | |
| HT | Hazmat/Asbestos Technician | | $   70.00 |
| HLT | Hazmat/Asbestos Lead Technician | | $   78.00 |
| HEO | Hazmat/Asbestos Equipment Operator | | $   83.00 |
| HS | Hazmat/Asbestos Supervisor | | $   91.00 |
| HPM | Hazmat/Asbestos Project Manager | | $  108.00 |
| **CONSULTING SERVICES:** | | | |
| CVP | President & Vice President | | $  225.00 |
| CSC | Senior Consultant | | $  185.00 |
| CCE | Consultant / Consulting Estimator | | $  145.00 |
| CWP | Clerk of the Works-Production Person | | $  100.00 |
| CAD | Administrative | | $   55.00 |
| COC | Outside Consultants | | Actual Billing + 10% |
| CLG | Deposition, Legal Work, & Court Testimony | see section I.IV Consulting Expenses | $  300.00 |
| CFE | Appraisal & Umpire fees | | $  300.00 |

[1] In New York City, Cape Cod, Martha's Vineyard, Nantuckett, AK, HI, Latin America, and the Caribbean, a multiplier of 1.35 will be applied to the regular hourly rate.  Note: The NYC rate applies to a seventy five mile radius from the borough of Manhattan and all of Long Island.

[2] In the states of CA and WA a multiplier of 1.25 will be applied to the regular hourly rate.

[3] Work performed in the Washington D.C. Metropolitan area is entitled to an additional 5% markup that will be applied to the total of all scheduled labor, scheduled equipment, scheduled consumables and 5% will be added to the markup for all vendors, unscheduled equipment, unscheduled material invoices.

§ I.II   **LABOR CALCULATION POLICY**

The guidelines for labor invoicing are as follows:  The first eight hours worked on any scheduled shift Monday through Friday will be charged at the regular hourly rate.  Any hours worked in excess of eight hours on any scheduled shift Monday through Friday will be charged at 1.5 times the regular hourly rate.  All hours worked on Saturday and Sunday will be at 1.5 times the regular hourly rate. All hours worked on Holidays (see §I.III Item 4 for recognized holidays)  will be charged at 2 times the regular hourly rate. OT applies to all labor classifications regardless if salary or hourly.
After Hours Emergency Services: In the event that BELFOR personnel are required for emergency services after normal BELFOR business hours (Weekdays 5:00 p.m.-7:00 a.m.), 1.5 times the regular hourly rate will be charged.



RATE AND MATERIALS SCHEDULE FOR INVOICING (Exhibit B)    
Effective Date: April 2020    BELFOR
PROPERTY RESTORATION

# RATES AND INVOICE CONDITIONS

**§ I.**

**§ I.III    LABOR CONSIDERATIONS**

1). Work performed under a particular contract that is subject to Federal and State wage and hour laws, prevailing wages, and/or collective bargaining agreements may require negotiated changes to the above stated rates. If necessary, adjustments will be made to the hourly rates and other labor provisions.

2). When circumstances beyond our control require BELFOR personnel to stand-by at the job site, a minimum stand-by charge of 6 hours at the regular hourly rate (no overtime) will be charged.

3). National holidays recognized by BELFOR for rate (not payroll) purposes are New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas.

4) The hourly Scheduled Labor rates will be charged portal to portal for all BELFOR personnel, labor subcontractors, and subcontractors fulfilling any Labor Classifications.

5). If a meeting is requested by the client that involves travel BELFOR will bill for travel expenses at documented cost plus 15%.

**§ I.IV    CONSULTING EXPENSES**

1). Reproduction of actual drawings at actual cost
2). Automobile mileage at IRS approved rate, tolls at cost with receipts over $25.00
3). Overnight mail is priced at $14.70/small package, $29.40/large package
4). Photographs at $1.00 per picture for standard size
5). Color copying at $1.00 per page or actual cost if Kinko's or other service
6). Airfare, hotels, rental car rates and other travel expenses are billed at cost + 15%
7). Daily per diem rate at $55.00 a day/based on (8) hour day
Note: *Fees for deposition and trial appearances are for a minimum eight-hour day @ $300/hr for all consultants

**§ II.    SCHEDULED EQUIPMENT CHARGES (see § II.I Itemized Scheduled Equipment)**

1). The Daily Rental Rate is charged for each calendar day equipment is utilized on a project, whether a partial day or complete day.

2). Small Tools Charge. Items such as shovels, ladders, demolition carts, extension cords, small hand tools, etc..., which are provided by BELFOR but are not included in the Scheduled Equipment list will be charged at 3% of total labor charges for all hands-on personnel (EO, GL, LF, RT, RS, DTA, DC, DTL, DMT, DT, MT, PT, DP, CR, TN, TS, HT, HLT, HEO). Any specialty items purchased for a project may be charged as per Section IV.

3). The Safety Equipment Packages (Personal Protection Equipment - PPE, Personal Fall Protection - PFP, and Personal Respiratory Protection - PRP) are inclusive of the reusable components of each package as well as any training, medical, or certification expenses related to their use. They do not include the disposable items within the Scheduled Consumables list.

4). During the course of performance of the work BELFOR may add additional equipment to the schedule.

**§ III.    SCHEDULED CONSUMABLES (see § III.I Itemized Scheduled Consumables)**

1). Any scheduled consumables purchased locally where the unit price exceeds 80% of the rate, the item will be invoiced at documented cost plus Contractor's 10% Overhead / 10% Profit  (21%)

2). During the course of performance of the work BELFOR may add additional consumables to the Rate Schedule.

3). BELFOR reserves the right to change the unit rate of scheduled consumables affected by market conditions.

4). Scheduled consumables are charged on a "per unit" basis whether consumed by the unit or not.

**§ IV.    VENDORS, UNSCHEDULED MATERIALS & UNSCHEDULED EQUIPMENT**

1). Contractor's 10% overhead plus 10% profit (21%) will be added to the total of all documented costs for Unscheduled Materials, Unscheduled Equipment, and Subcontractors / Vendors (including DUCTZ HVAC and BELFOR Environmental Services) who are not fulfilling a scheduled Labor Classification.

**§ V.    REIMBURSABLES**

1). Contractor's 15% mark-up will be added to the total of all reimbursables.

2). Standard per diem rates are $55 per person per day (2019 GSA base rate). The 1.35 multiplier will be applied for NYC, Cape Cod, Martha's Vineyard, Nantucket, AK, HI, Latin America, and the Caribbean ($74.25). The 1.25 multiplier will be applied for CA and WA ($68.75). Per Diem will be charged for all traveling personnel in **§ I. Itemized Scheduled Labor Classification**. BELFOR charges this daily rate whether the per diem is paid directly to the person, is charged to BELFOR as a separate charge, or is included with other compensation considerations. For multiple jobs on a single day, per diem will be prorated accordingly.

3). Per Diem reimbursement is subject to certain limitations regarding deductibility governed by the Internal Revenue Service, Code of 1986, Section 274(n)(1). Please consult your tax advisor on the appropriate treatment of these costs on your project as it is our policy that any deductibility limitation for income tax purposes is the responsibility of the customer.

4). BELFOR shall be reimbursed for travel expenses (airfare, lodging, rental cars, per diem) for personnel at documented costs plus markup (see item 5). Lodging will be charged in accordance with the published GSA lodging allowance in effect at the time of the stay (https://www.gsa.gov/travel/plan-book/per-diem-rates/) plus applicable fees and taxes. As is the case with the Federal Travel Regulations, actual expense reimbursement is allowed when the lodging allowance is insufficient to meet the necessary expenses.

6). An optional methodology for lodging charges is to apply a lodging allowance as follows: Lodging may be charged at the average nightly rate of up to three hotels that house project personnel (BELFOR and/or subcontractors). The full average nightly rate will be charged for single occupancy and 50% of the average nightly rate per person will be charged for double occupancy.

**§ VI.    DOCUMENT DRYING AND RECOVERY SERVICES**

Freeze drying charges will range from $45 to $85 per cubic foot based on the volume of documents to be dried, the type of document (bound or loose paper), and the moisture saturation.

The above rates represent the charges for freeze drying only. Labor, equipment, materials and other document treatments performed will be billed in accordance with the rates herein and any project specific quotations.

Other recovery service charges will be determined per job, based on the following relevant factors:
   * Nature of Damage    * Degree of soot/char    * Intended Use of Document    * Moisture Saturation    * Mold Contamination    * Odor
Because the type and level of contamination may vary so greatly and thus affect the resultant recovery protocol required, these additional services will be quoted after examining a sample of the affected documents.

**§ VII.    CAT CONSIDERATIONS (Based on Property Claim Services assigning a CAT Serial Number)**

1). A 6% fee will be added to the total of each invoice.  This fee will cover all of the indirect charges that must be allocated to each job in the CAT. Examples of these charges would be CAT management, CAT office, admin support, warehousing, etc...

**§ VIII.    BILLING AND PAYMENT**

1). Invoices generated in accordance with the BELFOR Rate and Materials Schedule will be submitted periodically for work that has been performed. As such, all invoices are due and payable upon receipt and will be considered late 30 days after receipt of the invoice. If there are any disputed charges on any invoice these should be clearly identified in writing within 30 days and an additional 30 days will be allowed to resolve disputed charges. Interest charges will begin to accrue after 30 days for undisputed charges and after 60 days for the disputed charges at the rate of: 1) 1% per month or 2) as specified in the terms and conditions of the applicable contract.

The rates contained in this exhibit are exclusive of federal, state and local sales or use taxes and the costs associated with any applicable federal, state or local approvals, consents, permits, licenses and orders incident to performance of the work.

v1-3
Rate and Materials (Standard)    Page 2 of 4    BELFOR Initial:_____    Customer Initial _____



**RATE AND MATERIALS SCHEDULE FOR INVOICING (Exhibit B)**
Effective Date: April 2020

 **BELFOR** PROPERTY RESTORATION

§ 11.5

# ITEMIZED SCHEDULED EQUIPMENT [3]

| EQUIPMENT DESCRIPTION | UNIT | RATE |
|---|---|---|
| **AIR MOVERS/COMPRESSORS/ACCESSORIES** | | |
| Air compressor, gas/electric | Ea / Day | $ 41.00 |
| Air compressor, tow behind | Ea / Day | $ 130.00 |
| Air movers/carpet blowers | Ea / Day | $ 33.00 |
| Octidry Bag or Direct It In (attachment) | Ea / Day | $ 33.00 |
| Injectidry Unit | Ea / Day | $ 144.00 |
| Manometer | Ea / Day | $ 91.00 |
| **BLAST/POWER WASH UNITS** | | |
| Blasting Unit, Agri/Soda | Ea / Day | $ 713.00 |
| Dry Ice Blaster w/Accessories | Ea / Day | $ 1,071.00 |
| Soda Blaster | Ea / Day | $ 1,063.00 |
| Washer, High Pressure (cold) | Ea / Day | $ 110.00 |
| Washer, High Pressure (hot) | Ea / Day | $ 137.00 |
| **CLEANING/VACUUMS/EXTRACTION** | | |
| Buffer, Floor | Ea / Day | $ 41.00 |
| Carpet Cleaning Machine | Ea / Day | $ 83.00 |
| Dry Cleaning Unit (portable) | Ea / Day | $ 157.00 |
| Extraction Unit (portable) | Ea / Day | $ 171.00 |
| Extraction Unit (Truck or Trailer mount) | Ea / Day | $ 618.00 |
| Floor cleaning system (walk behind) | Ea / Day | $ 261.00 |
| HEPA Filtration Unit / Air Scrubber | Ea / Day | $ 156.00 |
| Ion Air Cleaning System | Ea / Day | $ 52.00 |
| Steam Cleaner (Trailer) | Ea / Day | $ 267.00 |
| Upholstery Machine/Lady Vac (steam cleaner) | Ea / Day | $ 69.00 |
| Vacuum, HEPA | Ea / Day | $ 100.00 |
| Vacuum, Insulation Machine | Ea / Day | $ 99.00 |
| Vacuum, Upright, Wet/Dry or Canister | Ea / Day | $ 38.00 |
| Zip Poles, Set of 6 | Ea / Day | $ 30.00 |
| **LIGHTS** | | |
| Light, Balloon | Ea / Day | $ 121.00 |
| Light, Tower Mobile (400 WT diesel) | Ea / Day | $ 171.00 |
| Light, Wobble (37 inches) | Ea / Day | $ 48.00 |
| **MISC.** | | |
| Heat Gun, Shrink Wrap | Ea / Day | $ 83.00 |
| Ride on Flooring Stripper (includes blades) | Ea / Day | $ 1,320.00 |
| Saw, Demo | Ea / Day | $ 117.00 |
| Saw, Kett | Ea / Day | $ 39.00 |
| X-Ray Dryer | Ea / Day | $ 171.00 |
| X-Ray Separation Tank | Ea / Day | $ 514.00 |
| **ODOR CONTROL/DISINFECTION** | | |
| Fogger, Commercial | Ea / Day | $ 124.00 |
| Fogger, ULV / Thermal (electric) | Ea / Day | $ 44.00 |
| Ozone Generator | Ea / Day | $ 137.00 |
| Smoke Machines (small) | Ea / Day | $ 110.00 |
| Vapor Shark | Ea / Day | $ 44.00 |
| **POWER** | | |
| Electrical Distribution (Spider Box) | Ea / Day | $ 83.00 |
| Generator (portable) | Ea / Day | $ 137.00 |
| **PUMPS** | | |
| Pump, Sump / Flood | Ea / Day | $ 38.00 |
| Pump, Trash with Hose, 2" | Ea / Day | $ 153.00 |
| **DRYING/TEMP/HUMIDITY CONTROL** | | |
| Moisture Meter | Ea / Day | $ 23.00 |
| Camera, IR | Ea / Day | $ 25.00 |
| Dehumidification, Dehumidifier -102 to 140 AHAM Pints | Ea / Day | $ 103.00 |
| Dehumidification, Desiccant -500/600 cfm | Ea / Day | $ 446.00 |
| Dehumidification, Desiccant -2000/2250 cfm | Ea / Day | $ 627.00 |
| Dehumidification, Desiccant -3500 cfm | Ea / Day | $ 1,105.00 |
| Dehumidification, Desiccant -5000-6000 cfm | Ea / Day | $ 1,497.00 |
| Dehumidification, Desiccant -10000 / 12000 cfm | Ea / Day | $ 2,352.00 |
| Dehumidification, Desiccant -15000 cfm | Ea / Day | $ 4,036.00 |
| Dehumidification, Desiccant -25000 cfm | Ea / Day | $ 6,388.00 |
| Dehumidification/Cooling -1 Ton Spot Cooler | Ea / Day | $ 178.00 |
| Dehumidification/Cooling -DX Unit -20 / 30 ton | Ea / Day | $ 1,425.00 |
| Dehumidification/Cooling -DX Unit -60 / 70 Ton | Ea / Day | $ 2,246.00 |
| Dehumidification/Cooling - Chiller 100 to 400 Ton | Ton / Day | $ 29.00 |
| Dehumidification, Heater -20 KW | Ea / Day | $ 176.00 |
| Dehumidification, Heater -50 KW | Ea / Day | $ 393.00 |
| Dehumidification, Heater -100 KW | Ea / Day | $ 535.00 |
| Dehumidification, Heater -150 KW | Ea / Day | $ 641.00 |
| Dehumidification, Heater, indirect fired up to 500,000btu + fuel | Ea / Day | $ 1,033.50 |
| Heater, Electric -1500 watt | Ea / Day | $ 17.00 |
| Heater, Propane/Torpedo -direct fired + fuel | Ea / Day | $ 61.00 |
| Electrostatic Sprayer | Ea / Day | $ 150.00 |

| EQUIPMENT DESCRIPTION | UNIT | RATE |
|---|---|---|
| **TRUCKS, VEHICLES, TRAILERS (rate does not include fuel)** | | |
| BELFOR Command Center | Ea / Day | $ 550.00 |
| Mobile Office | Ea / Day | $ 72.00 |
| Mobile Warehouse (Trailer Only) | Ea / Day | $ 171.00 |
| Trailer, Freezer | Ea / Day | $ 165.00 |
| Truck, Dump Service (Pickup Truck) | Ea / Day | $ 105.00 |
| Truck, Dump-Trip Charge | Ea / Day | $ 165.00 |
| Truck, Moving/Box/Board up | Ea / Day | $ 171.00 |
| Truck (Cab) or Trailer (Flatbed, Transfer, etc) | Ea / Day | $ 137.00 |
| Vehicle, Pickup, SUV or Car | Ea / Day | $ 76.00 |
| Vehicle, Truck 1 Ton 4x4 Lift gate | Ea / Day | $ 182.00 |
| Vehicle, Van (1 per 10 Passenger or Cargo) | Ea / Day | $ 124.00 |
| **DUMPSTERS & STORAGE** | | |
| Dumpster, 20 yd (max weight 4 Tons) | Per Load | $ 605.00 |
| Dumpster, 30 yd (max weight 6 Tons) | Per Load | $ 770.00 |
| Dumpster, 40 yd (max weight 8 Tons) | Per Load | $ 935.00 |
| BELFOR Pods  8'x7'    12' x 7' | Per Month | $ 259.00 |
| BELFOR Pods (set up & breakdown) | Per Pod | $ 330.00 |
| Storage Vaults | Per Month | $ 138.00 |
| **ELECTRONICS / MECHANICAL** | | |
| Cart, Electronic Decontamination | Ea / Day | $ 69.00 |
| Cleaning Room, HEPA filtered | Ea / Day | $ 1,076.00 |
| Crane, A-Frame (1 ton) | Ea / Day | $ 153.00 |
| Crane, Overhead (? Ton, monorail 38 feet) | Ea / Day | $ 850.00 |
| Decon Room | Per Project | $ 567.00 |
| DI Water System | Ea / Day | $ 44.00 |
| Documentation Kit (digital camera/photo printer) | Ea / Day | $ 76.00 |
| Electrical Distribution (120 Amp Panel) | Ea / Day | $ 206.00 |
| Electrical Test Equipment (Meggar, Hi-Pot, Grounding Cables) | Ea / Day | $ 453.00 |
| Electronic Dehumidification Unit/Heating (KHT) | Ea / Day | $ 247.00 |
| Gas Detector, ATI PortaSens II | Ea / Day | $ 337.00 |
| HEPA Filtered Hood | Ea / Day | $ 170.00 |
| HEPA Water Displacement Unit | Ea / Day | $ 103.00 |
| Oven, Convection Drying (ULT) | Ea / Day | $ 481.00 |
| Oven, Vacuum Drying | Ea / Day | $ 685.00 |
| Quality Control Kit, (scientific instruments) | Ea / Day | $ 206.00 |
| Reflectoquant Test Device | Ea / Day | $ 113.00 |
| Sealer, Vacuum | Ea / Day | $ 300.00 |
| Spray Booth with 2 sinks (portable) | Ea / Day | $ 206.00 |
| Sprayer, Airless H.P. (Wagner) | Ea / Day | $ 90.00 |
| Tool Handling Charge | Per Project | $ 510.00 |
| Ultrasonic Bath, Portable | Ea / Day | $ 357.00 |
| Ultrasonic Bath, Bench Top | Ea / Day | $ 206.00 |
| Ultrasonic Dip Line, Industrial Multi-step | Ea / Day | $ 3,702.00 |
| Vacuum, Clean Room | Ea / Day | $ 170.00 |
| Wet Bench (portable) | Ea / Day | $ 207.00 |
| Workstation (table, chair, lights, ESD) | Ea / Day | $ 27.00 |
| **ENVIRONMENTAL** | | |
| Cascade Breathing Air System | Ea / Day | $ 187.00 |
| Chemical Hose, Hazmat | Ea / Day | $ 249.00 |
| Confined Space Entry System | Ea / Day | $ 227.00 |
| Decontamination Shower/Filter | Ea / Day | $ 159.00 |
| Jerome Mercury Vapor Analyzer | Ea / Day | $ 278.00 |
| Mini-Rae (PID) | Ea / Day | $ 198.00 |
| MSA Passport (O2, LEL, CO, H2S) | Ea / Day | $ 227.00 |
| Personal Sample Pump | Ea / Day | $ 32.00 |
| Pump, Diaphragm 1", Hazmat | Ea / Day | $ 227.00 |
| Pump, Diaphragm 2", Hazmat | Ea / Day | $ 340.00 |
| Self-Contained Breathing Apparatuses (SCBA-30Min) | Ea / Day | $ 159.00 |
| Self-Contained Breathing Apparatuses (SCBA-5Min) | Ea / Day | $ 125.00 |
| Trailer, Emergency Response, Hazmat | Ea / Day | $ 340.00 |
| **HVAC** | | |
| HVAC, High Volume Tornado System | Ea / Day | $ 105.00 |
| HVAC, Mobile Resource Unit | Ea / Day | $ 171.00 |
| HVAC, Power and Manual Hand Tools | PP/Day | $ 28.00 |
| HVAC, Rotary Brush Duct Cleaning System | Ea / Day | $ 50.00 |
| HVAC, Service Vehicle / Trailer Combo | Ea / Day | $ 137.00 |
| HVAC, High CFM HEPA Vacuum Collection System | Ea / Day | $ 215.00 |
| HVAC Video / Tool Robotic Inspection System | Ea / Day | $ 555.00 |
| HVAC, Viper Duct Cleaning System | Ea / Day | $ 50.00 |
| **SAFETY** | | |
| Personal Fall Protection (PFP) | PP / Day | $ 9.00 |
| Personal Protection Equipment (PPE) | PP / Day | $ 5.00 |
| Personal Respiratory Protection (PRP) | PP / Day | $ 9.00 |
| Respirator, PAPR | Ea / Day | $ 91.00 |



The rates contained in this exhibit are exclusive of federal, state and local sales or use taxes and the costs associated with any applicable federal, state or local approvals, consents, permits, licenses and orders incident to performance of the work.

RATE AND MATERIALS SCHEDULE FOR INVOICING (Exhibit B)
Effective Date: April 2020


BELFOR
PROPERTY RESTORATION

# ITEMIZED SCHEDULED CONSUMABLES [3]

| CONSUMABLE DESCRIPTION | | UNIT | RATE |
|---|---|---|---|
| **BAGS** | | | |
| Bags, Environmental Trash Bags | | Ea. | $ 3.30 |
| Bags, Insulation Machine (Vacuum) | | Ea. | $ 34.00 |
| Bags, Trash (each) | 3 mil $ 0.90 | 6 mil | $ 1.80 |
| **CLEANING-GENERAL** | | | |
| Disinfectant-Biosique | | Gal | $ 45.00 |
| BELFOR-All Natural Citrus Solvent Cleaner | | Gal | $ 37.00 |
| BELFOR-All Purpose Cleaner | | Gal | $ 12.00 |
| BELFOR-All Purpose Spotter | | Gal | $ 25.00 |
| BELFOR-Carpet Rinse & Neutralizer | | Gal | $ 20.00 |
| BELFOR-CFF Citrofix Lemon Scent | | Ounce | $ 1.10 |
| BELFOR-Concentrated Odor Counteractant & Smoke Elim. | | Gal | $ 34.00 |
| BELFOR-Extra Duty Cleaner Degreaser | | Gal | $ 19.00 |
| BELFOR-Glass Cleaner | | Gal | $ 9.00 |
| BELFOR-Hard Cleaning Wipes | | Tub | $ 45.00 |
| BELFOR-Multi-Enzyme Spotter-Deodorizer-Protector | | Gal | $ 34.00 |
| BELFOR-Multi-Purpose Restroom Cleaner | | Gal | $ 15.00 |
| BELFOR-Oil Preserver | | Gal | $ 51.00 |
| BELFOR-Quarry & Hard Tile Cleaner | | Gal | $ 19.00 |
| BELFOR-Rug & Upholstery / Traffic & Bonnet Cleaner | | Gal | $ 28.00 |
| Adhesive, Remover | | Can | $ 16.00 |
| Alcohol, Isopropyl | | Gal | $ 87.00 |
| Blocks, Odor Counteractant | | Ea. | $ 6.00 |
| Boot Covers, Latex | | Per Pair | $ 12.00 |
| Brush, Scrub | | Ea. | $ 13.00 |
| Brushes, Pipe | | Ea. | $ 34.00 |
| Brushes, Wire | Small $ 5.50 | Large | $ 8.00 |
| Cleaner, Stainless Steel | | Can | $ 17.00 |
| Disinfectant, Antimicrobial | | Gal | $ 56.00 |
| Fogger, Thermo Deodorizer | | Gal | $ 39.00 |
| Mop Heads | | Ea. | $ 15.00 |
| Pad, Floor Buffer | | Ea. | $ 14.00 |
| Pad, Foam Scrubbing | | Pak | $ 57.00 |
| Sponge, Particulate Removal (1.5"x3"x6") | | Ea. | $ 4.40 |
| Sponge, Particulate Removal (3/4"x2"x6") | | Ea. | $ 2.20 |
| Steel wool | | Ea. | $ 1.70 |
| Thinner, Paint/Mineral Spirits | | Gal | $ 25.00 |
| Vapor Shark Membrane | | Ea. | $ 58.00 |
| Wipes, Cotton Cloth/Workshop Rags | | Lb. | $ 6.00 |
| Wipes, Wipe All | | Pak | $ 14.00 |
| **CONTENTS/PACK-OUT/STORAGE** | | | |
| BELFOR-Fabric Protector | | Gal | $ 44.00 |
| BELFOR-Lemon Oil Furniture Polish | | Ea. | $ 6.00 |
| BELFOR-Liquid Laundry Detergent | | Gal | $ 19.00 |
| BELFOR-Premium Dish Detergent | | Quart | $ 7.00 |
| Boxes, Book | | Ea. | $ 6.00 |
| Boxes, Dish Pack | | Ea. | $ 7.00 |
| Boxes, Slip Covers | | Ea. | $ 3.30 |
| Boxes, Wardrobe/Specialty | | Ea. | $ 39.00 |
| Cloths, Masslinn | | Ea. | $ 1.50 |
| Foam Blocks | | Ea. | $ 1.50 |
| Inventory Tags | | Ea. | $ 1.50 |
| Tape, Poly Box | | Roll | $ 3.30 |
| Wrap, Bubble/Anti Static | | Roll | $ 93.00 |
| Wrap, Stretch | | Roll | $ 65.00 |
| **FILTERS** | | | |
| Filter, Charcoal (Carbon Activated) | | Ea. | $ 72.00 |
| Filter, HEPA | | Ea. | $ 254.00 |
| Filter, Pleated | | Ea. | $ 23.00 |
| Filter, Poly (Secondary) | | Ea. | $ 8.00 |
| **SHEETING/PLASTIC/FLOOR PROTECTION** | | | |
| Duct, Lay Flat (500') with hog rings | | Roll | $ 514.00 |
| Plastic Sheeting, 1.5 mil (24 x 200) | | Roll | $ 48.00 |
| Plastic Sheeting, 3 mil (20 x 100) | | Roll | $ 80.00 |
| Plastic Sheeting, 6 mil (20 x 100) | | Roll | $ 90.00 |
| Plastic Sheeting, 6 mil-Fire Retardant / Anti Static (20 x 100) | | Roll | $ 351.00 |
| Plastic Sheeting, 6 mil-Fire Retardant-Black (20 x 100) | | Roll | $ 435.00 |
| Plastic Sheeting, Carpet Protector | | Roll | $ 90.00 |
| Ram Board, (38" X 100') | | Roll | $ 68.00 |
| Red Rosin Paper (200 ft. roll) | | Roll | $ 27.00 |
| Scrim-Fire Rated (60'x100') | | Roll | $ 2,716.00 |
| Sticky Mat (26"x32") | | Ea. | $ 98.00 |
| **SHRINK WRAP** | | | |
| Strapping, Woven HD | | LF | $ 0.10 |
| Tape, Heat Shrink 2" | | Roll | $ 18.00 |
| Tape, Heat Shrink 4" | | Roll | $ 36.00 |
| Tape, Heat Shrink 6" | | Roll | $ 54.00 |
| Wrap, Shrink, 7 mil (45'x145") | | Roll | $ 897.00 |
| Wrap, Shrink, 12 mil (32'x180') | | Roll | $ 1,667.00 |
| **TAPE/ADHESIVE** | | | |
| Adhesive, Spray | | Can | $ 8.00 |
| Tape, 2-way (2" x 60') | | Roll | $ 33.00 |
| Tape, Bemcee-Banner Guard (Caution, Danger, etc .) | | Roll | $ 31.00 |
| Tape, Duct (2" x 60') | | Roll | $ 8.00 |
| Tape, Global | | Roll | $ 27.00 |
| Tape, Painters-Blue/red | | Roll | $ 9.00 |
| **MISC** | | | |
| Disposable Decontamination Unit | | Ea. | $ 458.00 |
| Encapsulant, Antifungicidal | | Gal | $ 90.00 |
| Encapsulant, Antimicrobial (Cranser) | | Gal | $ 83.00 |
| Encapsulant, Soot | | Gal | $ 48.00 |
| Fasteners, Misc / Lock & Hasp | | Ea. | $ 33.00 |
| Floor Dry (40#) | | Bag | $ 17.00 |
| Lock Box | | Ea. | $ 50.00 |
| Soda, Soda Blaster Material | | Bag | $ 39.00 |
| Zipper (containment) | | Ea. | $ 13.00 |

| CONSUMABLE DESCRIPTION | | UNIT | RATE |
|---|---|---|---|
| **ELECTRONICS / MECHANICAL** | | | |
| BELFOR-AC 14 Alkaline Cleaner 14 | | Gal | $ 37.00 |
| BELFOR-AC 12 Alkaline Cleaner 12 | | Gal | $ 51.00 |
| BELFOR-CD 04-C Complex Deruster 04 C | | Gal | $ 80.00 |
| BELFOR-CD 13 Complex Deruster 13 | | Gal | $ 126.00 |
| BELFOR-EC 12 Electronics Cleaner | | Gal | $ 33.00 |
| BELFOR-FSL Label Protection Lacquer | | Ounce | $ 19.00 |
| BELFOR-FC 10 Energized Cleaner | | Gal | $ 908.00 |
| BELFOR-GC General Cleaner | | Gal | $ 31.00 |
| BELFOR-HD 01 Hand Deruster 01 | | Gal | $ 43.00 |
| BELFOR-LP 40 Light Preserver 40 | | Gal | $ 80.00 |
| BELFOR-MPP Metal Polishing Paste | | Ounce | $ 17.00 |
| BELFOR-NC CR Neutral Cleaner CR | | Gal | $ 135.00 |
| BELFOR-NK One Step Cleaner and Preserver (electrical) | | Pint | $ 14.00 |
| BELFOR-OC24 Organic Cleaner 24 | | Gal | $ 51.00 |
| BELFOR-OC62 Organic Cleaner 62 | | Gal | $ 36.00 |
| BELFOR-Q-SW Oil Black (Elect. Contacts Only) | | Ounce | $ 37.00 |
| BELFOR-PM Polish Milk | | Ounce | $ 6.00 |
| BELFOR-SD 02 Sulfide Defroster | | Gal | $ 58.00 |
| BELFOR-WP Wax Preserver | | Gal | $ 86.00 |
| Nitric Acid, Ultra Pure | | Quart | $ 170.00 |
| Apron, Chemical | | Ea. | $ 6.00 |
| Arm Sleeves, Chemical | | Ea. | $ 4.40 |
| Arsenic Test Kit | | Per Test | $ 6.00 |
| Bags, Anti Static | | Ea. | $ 4.40 |
| Brady Cards | | Ea. | $ 8.00 |
| Brush, Dispersion (finish) | Small $ 5.50 | Large | $ 15.00 |
| Brush, Non Conduct | | Ea. | $ 12.00 |
| Chloride Quick Test Strips | | Ea. | $ 1.40 |
| Cleaning / Decon Sticks | | Ea. | $ 1.50 |
| Non-Conduct Scrubbers, Green (#2442) | | Box | $ 31.00 |
| Non-Conduct Scrubbers, Maroon (#95) | | Box | $ 86.00 |
| Non-Conduct Scrubbers, White (#98) | | Box | $ 52.00 |
| Tape, Clean Room | | Roll | $ 27.00 |
| Wipes, Lint Free | | Pak | $ 39.00 |
| Wipes, Presaturated IPA/DI | | Pak | $ 23.00 |
| Wipes, Standard Clean Room | | Pak | $ 32.00 |
| Wipes, Ultra Clean Room | | Pak | $ 68.00 |
| **ENVIRONMENTAL** | | | |
| Asbestos Glove Bag | | Ea. | $ 37.00 |
| Breathing Air, Type K Bottle | | Ea. | $ 61.00 |
| Cartridge, MSA Combination | | Ea. | $ 18.00 |
| Protective Suits (pair) | | Ea. | $ 93.00 |
| Protective Suits (Level A, fully encapsulating) | | Ea. | $ 1,728.00 |
| Protective Suits (PolyPro asbestos) | | Ea. | $ 9.00 |
| Protective Suits (Saranex Chemical) | | Ea. | $ 34.00 |
| Sorbent Boom | | Ea. | $ 74.00 |
| Sorbent Pad | Ea. $ 11.50 | Bale | $ 111.00 |
| Sorbent Pillows | | Ea. | $ 28.00 |
| **DRUMS** | 15g | 30g | 55g |
| Drum, Poly Closed Top | Ea. $ 46.00 | $54.00 | $ 77.00 |
| Drum, Poly Open Top | Ea. $ 50.00 | $59.00 | $ 84.00 |
| Drum, Steel Closed Top | Ea. $ 37.00 | $44.00 | $ 61.00 |
| Drum, Steel Open Top | Ea. $ 40.00 | $52.00 | $ 74.00 |
| Drum, Steel Salvage, 95 Gallon | | Ea. | $ 185.00 |
| Drum, Poly Overpack, 95 Gallon | | Ea. | $ 283.00 |
| Drum, Steel Overpack, 110 Gallon | | Ea. | $ 555.00 |
| **HVAC** | | | |
| HVAC Air Blast Nozzle, Replacement | | Ea. | $ 55.00 |
| HVAC Air Whip, Multi Head, Replacement | | Ea. | $ 72.00 |
| HVAC BIO Freshduct / Microbiocide | | 15oz | $ 55.00 |
| HVAC Cleaner Degreaser | | Gal | $ 19.00 |
| HVAC Closed Cell Foam Insulation Tape 1/8"x2"x30' | | Roll | $ 27.00 |
| HVAC Coil Cleaner | | Gal | $ 53.00 |
| HVAC Collection Machine Filters (Pleated & Bag) | | Ea. | $ 64.00 |
| HVAC Collection Machine HEPA Filter | | Ea. | $ 374.00 |
| HVAC Duct Liner 1" - 3'x100' | | Roll | $ 440.00 |
| HVAC Duct Mastic | | Gal | $ 32.00 |
| HVAC Encapsulant, Antimicrobial (Foster) | | Gal | $ 90.00 |
| HVAC Fiberlock | | Gal | $ 79.00 |
| HVAC HEPA Vac Collection Bag & Filter Protector | | Ea. | $ 11.00 |
| HVAC HEPA Vac Filters (Dacron Filter Bag & Impedison) | | Ea. | $ 66.00 |
| HVAC HEPA Vac HEPA Filter | | Ea. | $ 314.00 |
| HVAC Propane Fill Charge | | Cylinder | $ 50.00 |
| HVAC Rotary Brush Head, Replacement | | Ea. | $ 126.00 |
| HVAC Rotary Brush System, Replacement Core | | Ea. | $ 44.00 |
| HVAC Sheetmetal Blank | | Ea. | $ 19.00 |
| HVAC Sheetmetal Screw | | Box 100 | $ 24.00 |
| HVAC Spray Adhesive | | Can | $ 26.00 |
| HVAC Uplisht | | Ea. | $ 26.00 |
| HVAC Vacuum Brush Head - Replacement | | Ea. | $ 26.00 |
| **SAFETY** | | | |
| Boots, Chemical PVC | | Per Pair | $ 50.00 |
| Dust Mask | | Ea. | $ 2.20 |
| Gloves, Cotton (includes loam) | | Per Pair | $ 2.50 |
| Gloves, Latex (Surgical) | | Box 100 | $ 45.00 |
| Gloves, Leather | | Per Pair | $ 9.00 |
| Gloves, Nitrile | | Per Pair | $ 8.50 |
| Gloves, Nylon Inspection | | Per Pair | $ 0.55 |
| Protective Suits (Tyvek) | | Ea. | $ 30.00 |
| Respirator, N95 | | Ea. | $ 12.00 |
| Respirator, P100 | | Ea. | $ 12.00 |
| Respirator, HEPA + Particulate Replacement Filter | | Ea. | $ 40.00 |
| Respirator, HEPA Replacement Pancake Filter | | Ea. | $ 9.00 |

The rates contained in this exhibit are inclusive of federal, state and local sales or use taxes and
the costs associated with any applicable federal, state or local approvals, consents, permits,
licenses and orders incident to performance of the work.

EXHIBIT 3





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

**Aero-Environmental Consulting Services Agreement –September 2021-QUANTUM LABS-2108 BERING DRIVE, BUILDING B, SAN JOSE, CA**

1.      QUANTUM LABS AND AERO-ENVIRONMENTAL CONSULTING DEFINED

This Consulting Services Agreement is entered into by Aero-Environmental Consulting and QUANTUM LABS.  Execution of this Consulting Services Agreement is considered a retainer for stated Aero-Environmental Consulting services by on an (hourly) time and materials basis.  Consulting services will be initiated following the receipt of copy of this consulting services agreement signed by QUANTUM LABS (a signed fax copy of the consulting services agreement or e-mail confirmation authorizing the initiation of consulting services is acceptable until a signed copy of the consulting services agreement is received by Aero-Environmental Consulting.  Email communication by QUANTUM LABS authorizing initial services or changes in scope of service must include signed authorization by an authorized representative with QUANTUM LABS.

2.      SCOPE OF SERVICES

The Scope of Work would be as follow:

- Development and Review of the following elements: a) Sampling and Analytical Plan, b) Site History, c) Site contacts/personnel interviews, d) Review of Mechanical Ventilation System, e) Evaluation of compliance with all pertinent BNL, Cal/OSHA, and EPA standards as they relate to cobalt wafer semi-conductor facilities and equipment, policy, procedures, and all related operations, f) Scope of Work
- Preliminary Site Characterization- Characterization includes the collection of all information necessary to describe, in adequate detail, the following: a) The hazards present at/in the facility, b) The condition of the facility structure as it may affect worker health and safety, c) The extent, nature, and concentration of hazardous chemical contamination, d) the hazardous chemical contamination assessment will include both surface wipe sampling as well as air sampling.
- The assessment of cobalt work areas and equipment shall include but not be limited to general operational areas, and a risk assessment of any cross contamination, surface contamination, or other contamination/exposure with external environments (such as adjacent office spaces) and adjacent systems via ventilation ducting, natural egress, or otherwise.
- An assessment of policies, procedures and operations shall include but not be limited to an assessment of general operations, policies, standard operating procedures, cleaning, repair and maintenance, and proper cobalt waste disposal and abatement procedures.
- Determine extent of remediation required and review/develop Standard Operating Procedures (SOPs) for implementation.
- Once all of the above elements have been evaluated and a Site Remediation Work Plan has been developed and signed off by the Certified Industrial Hygienist, the site remediation (mitigation) can proceed.





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

- Once remediation is complete confirm project meets cleanup levels determined during SOP development (validation). This post-remedial (mitigation) process would consist of a post-mitigation survey, and collection of surface wipe samples and air samples in designated locations throughout the facility and as described in the SOP.
- Documentation of final results detailing initial contamination discovered and cleaned to pre-agreed public release levels.

If QUANTUM LABS requests additional services not originally included in the scope of the consulting services agreement, these changes should be authorized in writing and signed by QUANTUM LABS (or at a minimum, documented through a QUANTUM LABS email note detailing and authorizing the change in scope of consulting services by the individual who signed the original consulting services agreement).

NOTE: Under some state laws, an oral change to the scope of services, or one communicated by email is not sufficient. A signed addendum or attachment would be required to document and enforce the authorized change.

3.      COMPENSATION

Aero-Environmental Consulting will be compensated by QUANTUM LABS only for the services specified in the scope of services or any addendums.

- A non-refundable retainer of $23,350 will be issued to Aero-Environmental Consulting prior to the beginning of any consulting work.
- Aero-Environmental Consulting's hourly labor rates for services (include all rates for job categories who will charge to project)
- Any premium labor rates for hours charged on evenings, weekends, and holidays at the request of QUANTUM LABS
- Payment for travel (at hourly rate, all travel expenses, or mileage for local travel)
- Equipment cost (flat hourly rate, included in overhead of fully-burdened hourly labor rates, or project fixed cost)
- Expendable materials (sampling media, PPE, etc.)
- Laboratory analysis fees (standard for each analysis/analyte and markup for expedited turn-around-time)
- Shipping costs (rental equipment, samples, reports, etc.)
- Statement regarding additional services that are provided at the request of QUANTUM LABS (in writing or verbally) will be compensated at the standard rates and mark-ups.

Aero-Environmental Consulting shall receive from QUANTUM LABS for the performance of all services rendered to QUANTUM LABS compensation in accordance with Table 1 rates.

 

AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

**Table 1. Compensation for Consulting Services**

| ITEM | DESCRIPTION OF SERVICES | | UNIT RATE |
|---|---|---|---|
| 1 | **Fully-Burdened Direct Labor Rates** | | |
| 1a | Consulting Industrial Hygienist | | $175.00/hr. |
| 1b | Senior Industrial Hygienist-Report Writing/Documentation Review | | $333.00/hr. |
| 1c | Expert Witness Deposition/Court Testifying | | $500/hr. |
| 1d | Administrative Staff | | $85.00/hr. |
| 1e | Travel Fees | | $150/hr. |
| 2 | **Other Direct Costs** | | |
| 2a | Laboratory analysis fees (1week turn-around-time (TAT) | | |
| | Analysis of Cobalt Surface Wipes | $85/Sample | |
| | Analysis of Cobalt Air Samples | $85/Sample | |
| 2b | Ventilation and IAQ Equipment | $250/Day | |
| 2b | Sampling Media | | |
| | Wipes/Cassettes for Analytical Testing | $25/Wipe or Cassette | |
| 3 | Development and Review of the following elements: a) Sampling and Analytical Plan, b) Site History, c) Review of Mechanical Ventilation System d) Regulatory Standards | $3,600 | |
| 3a | Initial Site Characterization, Site Survey, Sample Collection | $5,000/day (sample analysis fees are additional and separate) | |
| 3b | Review of Initial Site Survey and Analytical Results | $1,400 | |





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

| ITEM | DESCRIPTION OF SERVICES | UNIT RATE |
|---|---|---|
| 3c | Development of Remediation Protocol and SOPs | $3,600 |
| 3d | Post-Remedial (Clearance) Survey and Sampling | $5,000/day ((does not include sample collection or analysis) |
| 4 | Final Clearance/Closure Report | $6,500 |
| 5a | Subtotal (Estimate of Costs) | $43,700 |
| 5b | Not to Exceed Amount | $46,700 |
| 5c | Not to Exceed Amount (if paid in full) | $44,365 |
| a- | Additional cost will apply for Client requested rush TAT for sample analysis. General mark ups from Table 1 listed standard TAT costs for rush TAT are as follows: 3-5 days 50%, 1-2 days 75%, 24-hour 100%. All requested TAT sample analysis is subject to laboratory availability. | |

### 4.    INVOICES

Aero-Environmental Consulting shall submit an itemized invoice(s) of services performed and expenses incurred during the period of performance in accordance with Table 1.  Aero Environmental may require advance or progress payments. Invoices are due and payable upon receipt by QUANTUM LABS. On amounts not paid within 30 days of invoice date, QUANTUM LABS shall pay interest from the invoice date until payment is received at a rate of 1.5% per month or, if less, the maximum rate allowed by law.

### 5.    STANDARD OF CARE

Aero-Environmental Consulting will exercise the degree of care and skill ordinarily exercised by a duly (*certified industrial hygienist or qualified indoor air quality consultant*) performing the same or similar services at the same time in the same geographic area.  Aero-Environmental Consulting will not be obligated to perform services not authorized in the consulting services agreement.





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

## 6.    LIMITATIONS ON RELIANCE ON DATA COLLECTED

Aero-Environmental Consulting and QUANTUM LABS  agree that Aero-Environmental Consulting is responsible to exercise the normal standard of care, as defined in Section 6, (Standard of Care above) and that all readings taken and  samples collected are only representative of the conditions existing at the time and location such readings were taken and samples collected. Aero-Environmental Consulting is not responsible for any conditions that existed prior to the time Aero-Environmental Consulting performed the work set forth in this consulting services agreement, or for any conditions that came into existence after Aero-Environmental Consulting performed such services.

## 7.    NO GUARANTEE

QUANTUM LABS is advised that Aero-Environmental Consulting provides no guarantee that readings will not change since conditions at each specific site can be very variable.  QUANTUM LABS should understand that the readings taken and samples collected are only as representative of the date, time, and location collected.

## 8.    DOCUMENTS (property-specific services)

Documents generated by Aero-Environmental Consulting are intended for the sole use of QUANTUM LABS.  Documents or computerized materials provided to QUANTUM LABS in performance of services under this agreement are for QUANTUM LABS's use only for the purposes disclosed to QUANTUM LABS as stated in a Scope of Services. QUANTUM LABS shall not transfer them to others or use them or permit them to be used at other projects for which they were not prepared, without Aero-Environmental Consulting's express written consent. In addition, Aero-Environmental Consulting will not accept liability for any loss, injury, claim or damage arising directly or indirectly from any unauthorized use or reliance on such documents.

## 9.     CONFIDENTIALITY AND NON-DISCLOSURE

Any information provided by Aero-Environmental Consulting in or pursuant to this consulting services agreement which is privileged, proprietary, confidential, or otherwise protected by statute or case law, including but not limited to any technical or pricing information, or any trademarked or copyrighted material, shall not be disclosed by QUANTUM LABS to any other person or entity without the express prior written consent of Aero-Environmental Consulting.

## 10.    INDEMNIFICATION

QUANTUM LABS shall provide prompt written notice to Aero-Environmental Consulting if QUANTUM LABS becomes aware of any claim, including any errors, omissions or inconsistencies in Aero-Environmental Consulting services under this Agreement.





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

## 11.     LIMITATION OF LIABILITY

With regard to the services to be performed by Aero-Environmental Consulting pursuant to the terms of this Agreement, Aero-Environmental Consulting shall not be liable to QUANTUM LABS , or to anyone who may claim any right due to any relationship with Aero-Environmental Consulting, for any acts or omissions in the performance of services on the part of Aero-Environmental Consulting or on the part of the agents or employees of Aero-Environmental Consulting, except when said acts or omissions of Aero-Environmental Consulting are due to willful misconduct or gross negligence of Aero-Environmental Consulting.  QUANTUM LABS  shall hold Aero-Environmental Consulting free and harmless from any obligations, costs, claims, judgments, settlements, attorneys' fees, and attachments arising from or growing out of such services rendered to QUANTUM LABS  pursuant to the terms of this Agreement or in any way connected with the rendering of services, except when the same shall arise due to the willful misconduct or gross negligence of Aero-Environmental Consulting and Aero-Environmental Consulting is adjudged to be liable for willful misconduct or gross negligence by a court of competent jurisdiction.

## 12.     LIMITATION OF REMEDIES

In the event of Aero-Environmental Consulting's liability, whether based on contract or tort (including but not limited to, negligence, strict liability or otherwise), QUANTUM LABS's sole and exclusive remedy will be limited to, at Aero-Environmental Consulting's option, replacement or correction of any Services not in conformance with this Agreement or to the repayment of the portion of compensation paid by QUANTUM LABS attributable to the nonconforming Services.  Aero-Environmental Consulting will not be liable for any other damages, either special, direct, indirect, incidental, consequential or otherwise, and in no event shall Aero-Environmental Consulting's liability exceed the compensation for the nonconforming services.

## 13.     FORCE MAJEURE

Aero-Environmental Consulting shall not be responsible for any delay or failure of performance caused by fire or other casualty, labor dispute, government or military action, terrorism, transportation delay, inclement weather, Act of God, epidemics, act or omission of QUANTUM LABS  or its contractors, or any other cause beyond Aero-Environmental Consulting's reasonable control, and Aero-Environmental Consulting's compensation shall be equitably adjusted to compensate it for any additional cost it incurs due to any such delay.

## 14.     SEVERABILITY

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity and enforceability of any other provision hereof. If any Section, subsection, sentence, or clause of this Agreement shall be adjudged illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability shall have no effect on the Agreement as a whole or on any Section, subsection, sentence, or clause hereof not expressly so adjudged.





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

**15.     WAIVER**

Any waiver by either party of any provision or condition of this Agreement shall not be construed or deemed to be a waiver of any other provision or condition of this Agreement nor a waiver of a subsequent breach of the same provision or condition, unless such waiver be so expressed in writing and signed by the party to be bound.

**16.     AMENDMENTS**

No modification of or change in this Agreement, waiver of any of its provisions or additional provisions shall be valid or enforceable unless previously approved in writing by both parties to this Agreement or their duly authorized representatives in the form of an amendment to this Agreement duly signed by the parties hereto.

**22.     GOVERNING LAW (California)**

This Agreement shall be construed, enforced in accordance with and governed by the laws of the State of California.

**23.     MISCELLANEOUS CLAUSES**

This Agreement represents the entire understanding and Agreement between the parties relating to the services provided by Aero-Environmental Consulting. This Agreement supersedes any and all prior agreements, whether written or oral, that may exist between the parties regarding same.  No other terms, conditions, prior course of dealings, course of performance, usage of trade, understandings, purchase orders, or agreement purporting to modify, vary, supplement, or explain any provision of this Agreement shall be effective unless in writing and signed by representatives of both parties authorized to amend this Agreement or provided such modification by email both (where this constitutes a legally binding agreement).

**24.     TERMINATION OF AGREEMENT**

In the event that this Agreement is cancelled or modified, Aero-Environmental Consulting shall immediately be paid for any services performed.





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

Sincerely

Aero-Environmental Consulting



Jorge Vizcaino

Certified Asbestos Consultant No. 04-3554/CDPH Lead Inspector/Assessor 15393

Certified Industrial Hygienist No. 9814

Certified Hazardous Materials Manager No. 19631


By signing above and below, Aero-Environmental Consulting and QUANTUM LABS have hereunto executed this Consulting Services Agreement.

**QUANTUM LABS** :


_____          _____

*Signature\**                            *Name (Please Print)*


_____          _____

*Title*                                  *Date*





AERO-ENVIRONMENTAL CONSULTING SERVICES AGREEMENT

Sincerely

Aero-Environmental Consulting

Jorge Vizcaino

Certified Asbestos Consultant No. 04-3554/CDPH Lead Inspector/Assessor 15393

Certified Industrial Hygienist No. 9814

Certified Hazardous Materials Manager No. 19631

By signing above and below, Aero-Environmental Consulting and QUANTUM LABS have hereunto executed this Consulting Services Agreement.

QUANTUM LABS :

_____          Simon Planck
**Signature***                     _____
                                   *Name (Please Print)*

  Director                           10/01/2021
_____          _____
*Title*                            *Date*

831.394.1199 Email: jorge@aero-enviro.com https://Aero-Enviro.com

# EXHIBIT 4



MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement") is made as of the _____ 4 day of *November, 2021* (the "Effective Date") by and between Maxim Integrated Products, Inc. with offices at 160 Rio Robles, San Jose, California 95134 (hereinafter referred to as CUSTOMER) and Advanced Chemical Transport, Inc. (DBA ACTenviro) of with offices at 967 Mabury Road, San Jose, California 95133 ("Service Provider").

1.0    GENERAL PROVISIONS

1.1    ACTenviro is an S-Corporation engaged in the business of environmental management, engaged in (but not limited to): 24 Hour Emergency Response (land and water); Hazardous Waste Management including Biohazard, Hazardous, Non-Hazardous, Universal Waste; Spill Management; Industrial Cleaning, Decontamination, Demolition and Decommissioning; Environmental Remediation, Household Hazardous Waste, and Industrial Derived Waste (IDW) Services; Onsite and Web-Based/Virtual Training and Consulting Services.

1.2    This Agreement applies to CUSTOMER and all of CUSTOMER's locations, including locations where CUSTOMER's property is located in all states and Canada, including without limitation 2108 Bering Drive, Suite B, San Jose, California 95131, and any CUSTOMER affiliates for which CUSTOMER has instructed ACTenviro to service.

1.3    ACTenviro has all applicable licenses and permits required to perform services for CUSTOMER and adheres to all Local, State, and Federal rules and regulations according to 40 CFR.

1.4    The term of the Agreement shall begin the date CUSTOMER accepts the Proposal for an initial term of two (2) years. The Agreement may be terminated immediately for cause and performance of their respective obligations under this Agreement stopped by written notice from either Party (i) upon breach by the other Party of a material obligation under the Agreement, (ii) if the other Party goes into bankruptcy, is liquidated or is otherwise unable to pay its debts as they become due or (iii) if the other Party resolves to appoint or has appointed for it an administrator, receiver or other similar officer for any part of the Party's business, property or assets. Any termination for cause will be effective only if the terminated Party is given (a) at least fifteen (15) days' written notice of termination, (b) opportunity for consultation with the terminating Party before the termination date, and (c) reasonable opportunity to cure the breach to the extent it can be cured. The foregoing notwithstanding, CUSTOMER may terminate the Agreement for its convenience upon 30 days' written notice to ACTenviro, in which event CUSTOMER shall pay all fees and expenses for Services accrued to the termination date and ACTenviro's reasonable costs resulting from termination, including, without limitation, demobilization costs, as detailed in a final invoice. This section does not limit any Party's rights to seek recovery for claims resulting from a breach by any other Party.

1.5    CUSTOMER shall provide ACTenviro with such resources, information, and assistance as ACTenviro may reasonably request in connection with the performance of the Services. Without limiting the generality of the foregoing, CUSTOMER shall provide access to its necessary equipment, assistance from qualified personnel familiar with CUSTOMER's operations, and other resources as reasonably requested by ACTenviro, whether requested during regular business hours or otherwise. CUSTOMER acknowledges and agrees that ACTenviro's ability to successfully perform the Services promptly is contingent upon its receipt from CUSTOMER of the information and resources and assistance requested. ACTenviro shall have no liability for deficiencies in the Services resulting solely from the acts or omissions of CUSTOMER, its agents or employees, or performance of the Services solely due to lack of CUSTOMER assistance.

2.0    LAWFUL COMPLIANCE IN PERFORMANCE OF WORK

2.1    ACTenviro and CUSTOMER agree to comply with all applicable federal, state, and local laws and ordinances and lawful orders, rules, and regulations of any constituted authority that may pertain to the generation, collection,



CUSTOMER INITIALS



transportation, handling, storage, or disposal of any of CUSTOMER'S waste. ACTenviro and CUSTOMER have obtained all necessary permits, licenses, and other forms of documentation required to perform their respective obligations hereunder and, upon request of the other party, each shall furnish copies thereof to such other party. CUSTOMER shall obtain generator EPA identification numbers and promptly notify ACTenviro of such EPA identification numbers and any changes thereto. ACTenviro will not accept improperly identified and/or unidentified material for packaging, transportation, and/or disposal.

2.2     CUSTOMER warrants that it is under no temporary or permanent injunction, administrative or court order, or writ, which would prohibit or constrain the transportation, decontamination, treatment, storage, and/or disposal of such equipment and wastes by ACTenviro in any manner whatsoever.

3.0     OWNERSHIP AND TITLE OF WASTE/EXECUTION OF DOCUMENTS

3.1     Nothing contained within this Contract shall be construed or interpreted as requiring ACTenviro to assume the status of "Generator" as that term appears in RCRA, CERCLA, or any federal, state, or local statute or ordinance or any treaty governing the generation, treatment, storage, transportation, and disposal of waste, such as, without limitation, the Hazardous Waste Control Act and the Carpenter-Presley-Tanner Hazardous Substance Account Act.

3.3     In the performance of ACTenviro's duties to CUSTOMER, CUSTOMER hereby authorizes ACTenviro to sign on CUSTOMER's behalf all documents including but not limited to:
Initial material/waste profile(s) request(s)
Renewal material/waste profile(s) request(s)
Land Disporal Restriction form(s)
Analytical Data request & Review
Manifest or other shipping documents
Corrections due to a change in chemical constituents of waste descriptions

4.0     INSURANCE

4.1     ACTenviro shall maintain policies of insurance for the following types of coverage, each with a limit of liability of not less than US$5,000,000 (except for Workers' Compensation or equivalent coverage): Workers' Compensation or equivalent coverage as required under applicable statute; Employer's Liability; Comprehensive General Liability; Comprehensive Automobile Liability; Professional Errors and Omissions and Contractor's Pollution Liability. ACTenviro shall include CUSTOMER as additional insured under the Comprehensive General Liability, Comprehensive Automobile Liability, Professional Errors and Omissions, and Contractor's Pollution Liability policies. ACTenviro will provide certified copies evidencing CUSTOMER's status as an additional insured on the above referenced policies.

Upon written agreement of the Parties, ACTenviro may procure and maintain additional insurance coverage or increased policy limits.

4.2     ACTenviro will provide Customer with Certificates of Insurance.

5.0

5.1     ACTenviro shall provide and perform all services described in the June 29, 2021 proposal (the "Proposal") sent to CUSTOMER (via Tim Warren) together with all expected or customery services associated with those described in the Proposal.

6.0     WASTE DISPOSAL


CUSTOMER INITIALS



6.1    ACTenviro shall profile and appropriately contain and dispose of all wastes generated from the services provided for in this Agreement. ACTenviro's shall identify and approve of an appropriate disposal facility to which all waste shall be taken.

If any hazardous or toxic waste, material, chemical, compound or substance or any waste regulated by local, state, provincial or federal law, including, without limitation, any sampling materials such as drill cuttings and fluids or asbestos (the "Waste") are encountered by ACTenviro or result from ACTenviro's performance, ACTenviro will appropriately containerize the Waste and assist with transportation of Waste to a location selected by ACTenviro for disposal.

7.0    PRICING AND COMPENSATION

- Exhibit A: Pricing Waste and Disposal
- Exhibit B: Miscellaneous Fees

7.1    CUSTOMER agrees to compensate ACTenviro according to the parameters outlined in this agreement. ACTenviro will invoice the CUSTOMER as each stage of the project is completed. All invoices are due net thirty (30) days from the date of issuance. ACTenviro reserves the right to charge a 1.5% finance charge per month for balances past due thirty (30) days. CUSTOMER agrees to timely pay all non-disputed invoices. ACTenviro may request that up to twenty-five percent (25%) of the estimated fees be paid in advance. All fees due hereunder are exclusive of, and CUSTOMER shall pay, all sales, use and other taxes, export and import fees, customs duties, and similar charges applicable to the transactions contemplated by this Agreement, except for taxes based upon ACTenviros net income. CUSTOMER agrees to indemnify and hold ACTenviro harmless from and against all claims, liabilities, costs, expenses, and penalties arising out of or related to CUSTOMER's failure to timely report or pay any such taxes, fees, duties, or charges.

7.2    Pricing may be modified to (a) include pricing for new services and/or (b) adjust current pricing for existing services. If the pricing is modified, ACTenviro shall provide CUSTOMER a Revised Pricing Schedule, which shall become effective 15 days after receipt, indicated by the signature of CUSTOMER. All fees due hereunder are non-refundable and are not contingent on any additional services or products to be provided.

8.0    INDEMNIFICATION

8.1    ACTenviro agrees, to the fullest extent permitted by law, to indemnify and hold harmless CUSTOMER, its officers, directors, principals, and employees, from and against any liabilities, damages, and/or costs (including reasonable attorney's fees and cost of defense) arising out of the death or bodily injury to any person, or the destruction or damage to any property, to the extent caused, during the performance of services under this Contract, by the negligent acts, errors and/or omissions of ACTenviro or its officers, directors, principals, employees, contractors, consultants or anyone for whom ACTeviro is legally responsible subject to the limitations outlined in Section 9.0 (Limitation of Liability) of this Contract.

8.2    CUSTOMER agrees, to the fullest extent permitted by law, to indemnify and hold harmless ACTenviro, its officers, directors, principals, and employees, from and against any liabilities, damages, and/or costs (including reasonable attorney's fees and cost of defense) arising out of the death or bodily injury to any person, or the destruction or damage to any property, to the extent caused, during the performance of services under this Contract, by the negligent acts, errors or omissions of the CUSTOMER or CUSTOMER'S contractors, consultants or anyone for whom CUSTOMER is legally responsible.





The indemnification obligations of either party ("Indemnifying Party") under this Section are subject to, and contingent upon, the other party's ("Indemnified Party") compliance with all the following:

(i)      The Indemnified Party will notify the Indemnifying Party in writing within a reasonable time of not less than thirty (30) days of becoming aware that any Claim has been asserted or is reasonably likely to be asserted.

(ii)      The Indemnified Party will allow the Indemnifying Party to have sole control of the defense of such Claim and all related settlement negotiations.

(iii)      The Indemnified Party will provide the Indemnifying Party with reasonable assistance, information, and authority necessary to enable the Indemnifying Party to discharge its obligations under this Section.  The Indemnifying Party will reimburse the Indemnified Party for all out-of-pocket expenses reasonably incurred by the Indemnified Party in providing such assistance, information, and authority.

(iv)      Provided, however, that noncompliance with subsection (i) above will only be grounds for the Indemnifying Party to avoid its obligations under this Section if and to the extent such noncompliance has prejudiced the Indemnifying Party's ability to defend the Claim in question.

9.0    LIMITATION OF LIABILITY

9.1    CUSTOMER acknowledges and understands the inherent difficulty in packaging and moving materials in chemical relocation projects. If any damage occurs to the materials during the packaging, shipment, unpacking, and placement of the materials, CUSTOMER agrees to submit claims only for the replacement value of the materials..

9.2    CUSTOMER has identified its equipment as materials with a value above $1,000.  Any other materials with a value above $1,000 shall be identified to the ACTenviro project manager.

9.3    Except in cases where CUSTOMER has misclassified waste, in no event shall either party be event liable for any consequential, Indirect, Exemplary, Special, or Incidental damages however caused and under any theory of liability (Including negligence), even if a party has been advised of the possibility of such damages.

9.4    ACTenviro's total cumulative liability in connection with this agreement and services provided by ACTenviro's to customer hereunder, whether in contract or tort or otherwise, will not exceed (1) the policy limits stated in Section 4 of this Agreement or (2) the total fees paid by the customer to ACTenviro for the particular item in a proposal or revised pricing agreement in question during the twelve (12) months before the date the first cause of action arose, whichever is greater. The customer acknowledges that this arrangement reflects the allocation of risk outlined in this agreement and that ACTenviro would not enter into this agreement without these limitations on its liability.

10.0    INDEPENDENT CONTRACTORS

10.1    CUSTOMER understands and acknowledges, and ACTenviro hereby agrees that this agreement shall not render the agents of ACTenviro as employees of CUSTOMER for any purpose. The agent of ACTenviro is and will remain an agent of ACTenviro in his or her relationship with the CUSTOMER. Consequently, the CUSTOMER shall not be responsible for withholding taxes concerning the agent's compensation. The agent shall have no claim against CUSTOMER hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind.

12.0    SUBCONTRACTORS

12.1    CUSTOMER understands and agrees that upon 15 days' written notice, ACTenviro may assign and subcontract certain portions of the work performed for CUSTOMER. However, ACTenviro warrants that all work performed for CUSTOMER by ACTenviro subcontractors shall be performed with the same due care is if performed by ACTenviro.

13.0    ATTORNEY'S FEES

13.1    In any litigation, arbitration, or other proceedings by which one party either seeks to enforce its rights under this agreement (whether in contract, tort, or both) or seeks a declaration of any rights or obligations under this Contract, the prevailing party shall be awarded its reasonable attorney fees, and costs and expenses incurred.







14.0    NOTICE

14.1    Any notices required or permitted to be given under this agreement shall be given in writing and shall be delivered (a) in person, (b) by a commercial overnight courier that guarantees next day delivery and provides a receipt, or (c) by or prepaid certified mail, return receipt requested to both: Advanced Chemical Transport, Inc. 967 Mabury Road, San Jose, CA 95133, Attn: Shawn Ball,  Vice President, and Maxim Integrated Products, Inc. 160 Rio Robles, San Jose, California 95134, Attn: Mark Casper.

15.0    CONFIDENTIALITY

15.1    During the term of this Agreement and for five (5) years after termination all information and material that may be disclosed by one party to the other in the course of performance of this Contract that is marked confidential and proprietary or under the circumstances are reasonably considered to be confidential shall not be used by the receiving party other than for the purposes under this agreement for which it was disclosed. The receiving party will protect such information from disclosure to third parties and hold it as confidential using the same degree of care as that party uses to protect its own confidential or proprietary material of like importance, but at least reasonable care. As used in this section, Confidential Information does not include information which: (i) was already known to the Recipient before entering into this Agreement (as established by a Recipient's records); (ii) is or becomes generally available to the public other than through a breach of this Agreement; (iii) is at any time furnished to the Recipient by a third party who is lawfully in possession of such information and who lawfully conveys such information; or (iv) the information was or is independently developed without any breach of this Agreement by the receiving party's personnel who have not had access to any of the Disclosing Party's Confidential Information as establishing Recipient's records.

16.0    FORCE MAJEURE

16.1    Neither party shall be liable in damages or have the right to terminate this agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its control including Acts of God, government restrictions (including the denial or cancellation of any export or other necessary license), wars, insurrections and/or any other cause beyond the reasonable control of the party whose performance is affected.

17.0    SEVERABILITY

17.1    If any provision or provisions of this agreement shall be held to be invalid, illegal, and unenforceable, or in conflict with the law of any jurisdiction, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

18.0    ENTIRE CONTRACT

18.1    This Service Agreement, together with any Proposal/Project, the scope of work, Revised Pricing Schedule, shipping documents, change order, waste profile, manifest sheet, or schedule or exhibit referred to in this Agreement, constitutes the final, complete, and exclusive statement of the terms of the Agreement between the parties about the subject matter of this Agreement and supersede all prior and contemporaneous understandings or agreements, whether oral or written, of the parties (the "Agreement").  In case of any direct conflict between the documents referenced above, this Service Agreement shall control.

18.2    No party has been induced to enter into this Agreement by, nor is any party relying on, any representation, understanding, agreement, commitment, or warranty outside those expressly outlined in this agreement.

18.3    No modification shall be binding on ACTenviro unless in writing and signed by both parties. In no event shall the conflicting terms or conditions found on any CUSTOMER purchase or work order be considered an amendment or modification to this agreement.


CUSTOMER INITIAL



19.0   GOVERNING LAW

19.1   The laws of the State of California shall govern the validity and interpretation of this agreement, without regard for conflicts of law principles of this, or any other, jurisdiction.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date by their duly authorized representatives.

Maxim Integrated Products, Inc.

BY

NAME  *Janene Asgeirsson*

TITLE  *SVP, Chief Legal Officer*

DATE  *Oct. 13, 2021*

Advanced Chemical Transport, Inc. (DBA ACTenviro)

BY

NAME  *Mariana Sabich*

TITLE  *Regional Sales Manager*

DATE  *November 19, 2021*



T 408.548.5050
F 408.548.5052

967 Mabury Road, San Jose, CA 95133
www.ACTenviro.com

4848-6156-3636 1



**Exhibit A** Pricing Schedule

(Insert Information)

DISPOSAL

| Description | Treatment | Unit Cost | Quantity | Price |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

*Estimated quote based on information supplied by the generator and conditioned on acceptance at the disposal facility.

SUPPLIES

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

TRANSPORTATION

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

LABOR

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

*Billing based on portal-to-portal transport with 2-hour minimum. Labor rates do not include overtime rates, which are billed in accordance with federal and state labor regulations.

TOTAL AMOUNT

| Description | Price |
|---|---|
| Total price does not include applicable sales tax, Misc. Fees | $ 0.00 |

FEES

| Description | Price |
|---|---|
|  | Additional Fees on Invoice Costs |

**Exhibit B** Miscellaneous Fees

In addition to fees listed in any Revised Pricing Schedule; Proposal, Change Order, Surcharge, or any other document, ACTenviro shall charge the following miscellaneous fees

| DESCRIPTION | PRICE |
|---|---|
| Cancellation Fee <24 hours notice or <1 business day | Minimum Charge of $350.00 or Cost of labor/equipment/materials for 1st day of work, whichever is greater |

CUSTOMER INITIALS



| | |
|---|---|
| Rush Pickups or Projects <24 hours' notice or <1 business day notice | Minimum Fee of $350.00 plus additional charges for service |
| Over Pack Surcharge | $150.00 plus the cost of overpack or more |
| Return Drum Fee | $250.00 per occurrence or more |
| Manifest Correction Fee | $75.00 per occurrence or more |
| E Manifest Fee | $35.00 each |
| Off Spec Fees or Surcharges | TBD based on material shipped |
| Variable Fuel Surcharge | Variable Fuel Surcharge applies to all transportation: Variable % of per gallon rate |
| Environmental Surcharge (Energy, Insurance, and Facility Maintenance) | 12% up to 16% Additional Fee on Invoice Total Amount |
| Emergency Response | Premium Price Fees Apply |
| Single Services or Project Related Work | 50% deposit for the total project cost upon mobilization and final balance due to 15days after receipt of the final invoice. |

| Non-Specified Container Conversion ||
|---|---|
| **Container Size** | **Conversion** |
| 01-05 gallon | 35% |
| 06-15 gallon | 50% |
| 16-30 gallon | 75% |
| 31-55 gallon | 1x |
| Cubic Yard Boxes | 4x |
| 250-275 gallon totes | 5x |
| 330-350 gallon totes | 6x |

Conversion Notes:
- These conversions will be applied to all disposal and transportation items unless provides in the above or an alternative quote.
- Numbers are expressed as a factor of a 55gallon drum (i.e., 55gallon price x 35% = Sell Price)
- The greater the conversion factor or location container minimum will be applied.
- Some waste may have a different, typically lower, minimum which is reflected in Table 6

Work Hours

*All personnel and equipment rates are subject to the following:*

Weekdays: 0700 to 1500 hours charged at Straight Time (ST= *Hourly rate*); 1500 to 1900 hours charged at Overtime (OT= *1 ½ times the hourly rate*); 1900 to 0700 hours charged at Double

Time (DT= *2 times the hourly rate*).  Changes to start times for Weekday ST, OT and DT may be requested by the Client and may be approved by ACT on a case-by-case basis.

Saturday:  First 8 hours charged at OT; hours over first 8 hours charged at DT.
Sundays and Holidays: All-time charged at DT. The above Rates are applied regardless of the number of hours worked for any Client on any day. Rates for hours subsequent to a break of fewer than 8 hours are charged at the appropriate OT or DT rate continuous to hours before a break.
All hourly rates will be charged portal-to-portal from the location of personnel when dispatched.

All charges are subject to a Two Hour Minimum (2 Hours). All holdover and stand-by time will be billed as regular work hours unless otherwise specified in advance.

CUSTOMER INITIALS


T 408.548.5050
Confidential
F 408.548.5052
967 Mabury Road, San Jose, CA 95133
www.ACTenviro.com

4848-6156-3636.1



All project-specific personnel, including accounting, administrative, personnel support, logistics, and management, whether on-site at ACT offices or support locations are chargeable. All personnel is charged according to the above rates, regardless of full-time, part-time, subcontracted, or third-party labor source status. Surcharges apply for remote sites and prevailing wage projects.

Time charges begin with initial notification and terminate after personnel, equipment arrives back at ACT operations centers, and equipment and supplies have been re-stocked.

Per Diem charges in metropolitan areas is $240.00 per person per day, unless actual costs incurred are greater, in which case, charges will be billed at cost + 15%. Rates for premium areas and remote sites to be determined by ACT at time of service. Vehicle mileage charges of $2.25/mile apply for responses greater than 50 miles from the responding office.

Double Time Recognized Holidays

| New Year's Day | Martin Luther King Jr. Birthday |
|---|---|
| Presidents Day | Veterans Day |
| Easter | Memorial Day |
| Independence Day (July 4th) | Labor Day |
| Thanksgiving | Day After Thanksgiving |
| December 24th | Christmas Day |

Prevailing Wages:
No rates provided account for prevailing wage rate tables or specific classes of labor.

Disposal, Subcontractors, and Rental Equipment:
Disposal costs are not listed, and all subcontractor services will be quoted on a case-by-case basis.

Equipment:
Day rates are based on 12-hours of operation beginning with mobilization. The minimum charge for Day rate equipment is a daily charge per day with additional hours over 12 charged in half-day increments Equipment *rates do not include operator or driver.* The minimum call-out for hourly equipment is 4 hours. All equipment remains on the clock and subject to charges until properly decontaminated by ACTenviro personnel and returned to service. ACTenviro personnel shall conduct all decontamination operations on its equipment. The customer is responsible for damages and wear.



T 408.548.5050
Confidential
F 408.548.5052

967 Mabury Road, San Jose, CA 95133
www.ACTenviro.com

4848-6156-3636.1





June 29, 2021

Maxim Integrated
2108 Bering Dr.
San Jose, CA 95131

Phone: 408-595-2732
Email: tim.warren@maximintegrated.com

| PROPOSAL # | ACTEnviroTemplate-2020 |
|---|---|

Dear Mr. Tim Warren,

ACTenviro is pleased to submit this proposal for your review and approval. ACTenviro will provide requested environmental services including one or more of the following: Consulting, Industrial, chemical waste packaging, biological waste packaging, radioactive waste packaging, and/or transportation and disposal of packaged waste. An estimated cost itemization appears below. Modifications to the pricing estimate, or additions to the scope of work requiring pricing changes, will be provided – as needed – in the form of an addendum entitled Revised Pricing Schedule.

**DISPOSAL**

| Description | Treatment | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| Waste Solid Debris | Landfill | $ 2,500.00 | 1 | $ 2,500.00 |

**SAMPLING**

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| Sampling and Analytical | Lump Sum / Budgetary Cost | $ 5,000.00 | 1 | $ 5,000.00 |

*Estimated quote based on information supplied by the generator and conditioned on acceptance at the disposal facility.

**SUPPLIES**

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| Portable Decontamination Unit | Each | $ 5,000.00 | 1 | $ 5,000.00 |
| Decontamination Materials | Lump Sum | $ 5,000.00 | 1 | $ 5,000.00 |
| Decontamination Equipment | Lump Sum | $ 5,000.00 | 1 | $ 5,000.00 |
| Collection Container 1 Bin | Lump Sum | $ 1,000.00 | 1 | $ 2,500.00 |
| Personal Protective Equipment | Lump Sum | $ 6,000.00 | 1 | $ 6,000.00 |

**TRANSPORTATION**

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| Tool Shipment (uncrated) to ACTenviro  Mabury Rd. San Jose, CA 95133 | Lump Sum / Budgetary Cost | $ 7,500.00 | 1 | $ 7,500.00 |
| Tool Shipment (uncrated) to Maxim Integrated Beaverton Or. | Lump Sum / Budgetary Cost | $ 15,000.00 | 1 | $ 15,000.00 |
| Transportation to Local Landfill | Lump Sum / Budgetary Cost | $ 1,000.00 | 1 | $ 1,000.00 |

**LABOR**

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|



| | | | | |
|---|---|---|---|---|
| Mobilization and De-Mobilization | Lump Sum | $ 5,000.00 | 1 | $ 5,000.00 |
| De-Install and Capping Plastic/Metal | Lump Sum / Budgetary Cost | $ 10,000.00 | 1 | $ 10,000.00 |
| Consultant | Hour | $ 200.00 | 10 | $ 2,000.00 |
| Health and Safety Plan | Lump Sum | $ 500.00 | 1 | $ 500.00 |
| **Decontamination Labor:** | | | | |
| Supervisor | Hour | $ 200.00 | 120 | $ 24,000.00 |
| Senior Tool Specialist | Hour | $ 195.00 | 120 | $ 23,400.00 |
| Lead Tool Specialist | Hour | $ 175.00 | 120 | $ 21,000.00 |
| Equipment Specialist | Hour | $ 150.00 | 120 | $ 18,000.00 |

*Billing based on portal-to-portal transport with 2-hour minimum. Labor rates do not include overtime rates, which are billed in accordance with federal and state labor regulations.

**TOTAL AMOUNT**

| Description | Price |
|---|---|
| **Budgetary Total Estimated Amount** | $ **270,000.00** |
| Estimated Budgetary Cost | $ 190,000.00 |
| Estimated Budgetary Cost for unforseen items or Change Order(s) | $ 60,000.00 |

Terms are net 10 days. ACT respectively requests 50% deposit upon mobilization, 50% deposit upon completion of project.

**FEES**

| Description | Price |
|---|---|
| Environmental Surcharge Fee | 12% Additional Fee on Invoice Costs |
| Manifest Fee | $ 35.00 per manifest |
| Fuel Surcharge | 18% Additional Fee on Transportation Costs |
| Profile Fee | No Charge |

ACT have decades of experience in offering fully documented tool decontamination. Every project undergoes a complete and thorough inspection, decontamination, and sampling process.

**Scope of Work Overview:**

- Prepare Health and Safety Plan
- Mob and De-Mob Tool
- Coordinate Freight and Rigging for tools identified in Exhibit A (the "Tools"
- Transport equipment on Tool List from rollup door at 2108 Bering Drive, Suite B, San Jose, CA 95131 to ACTenviro Mabury Rd. San Jose, CA 95133.
- Inspect tools and tool lines and reservoir for free liquids, drain, vacuum, and containerize chemical contaminants if present.
- Decontaminate: Wipe, scrub, clean all accessible interior and exterior surfaces.
  - o Decontamination performed at ACTenviro 967 Mabury Rd. San Jose, CA 95133.
- Containerize all waste generated from the project including any liquids and debris.
- Perform and document field pH and Spilfyter testing on tool surfaces and lines.
- Cap and plug all inlets and outlets.
  - o Customer Responsibility
    - ▪ Electrical Disconnects
    - ▪ Gas and Liquid Line Disconnect
    - ▪ Tool Disconnect
- Prepare and post Decontamination Certificate and 3D Declaration verifying each tool is clean for removal and/or detail work still necessary to render tool clean.



- Verify tools are free of chemical residue, solvent residue, and free liquids.
- Perform swipe testing and verify capping of lines in place.
- Sampling
  - Perform and document field pH and Spilfyter testing on tool surfaces and lines.
  - Certified Sampling
- Assumes a minimum of two weeks' notice to prepare transportation and project start date.
- Lab pack loose, containerized chemicals and arrange for disposal of same.
- Invoice will reflect Time & Materials basis utilizing rates herein, and final invoice amount may vary.

**Our standard assumptions are outlined below.**

- Pricing is based on the list as it has been supplied and the timeframe that has been given for the project duration. Any change in the list or schedule may result in changes in the total cost. Pricing is an estimate based on the information provided and normal expectations.
- ACT assumes that all tools have been purged and/or flushed prior to the decontamination phase of work is set to begin. The expectation is that only normal residual will remain and need to be removed to achieve the desired result.
- ACT will arrange to handle the waste management at an additional cost.
- If cleanroom protocol is to remain for a portion of the project or entire project, it is assumed that cleanroom suits and gloves are provided by others.
  - ACT is assuming majority of Tool and Equipment are palletized, shrink wrap and shipment ready.
- The decon scope of work is to provide safe shipping and handling. If additional cleaning is required to provide "show room" quality. ACT can provide this level of cleanliness as requested at a negotiated additional cost if needed.
- ACT will work closely with the tool deinstall/extraction team (if required).
- The decon pricing is inclusive of pump testing and removal of coolant. The inlet and outlet will be tested for pH and a visual description as to what was found will be documented. This will aid in the determination as to whether the unit needs to ship as DG or not. The lubricating oil will remain in dry pumps as this is not a hazard for shipment. If wet pumps are encountered, the filter oil will be removed and disposed onsite as needed. ACT will document that the units have been capped and plugged properly by the tool extraction team.
- ACT's decon pricing for the most part does not include any shared "point of use" scrubbers. In the event these become part of the tools as listed ACT will handle on an as needed basis.
- ACT is receiving tools and equipment "as is" and will not be held responsible for damages in transit or during decontamination.
- ACT will not dismantle equipment or tools.
- ACT respectively requests to inspect the tools upon award of project to verify level of effort proposed.

Upon acceptance of this, the parties agree to be bound by the terms of the Advanced Chemical Transport Inc. (DBA) ACTenvrio Master Service Agreement. The parties understand that the terms of this agreement and the terms of the Advanced Chemical Transport Inc. (DBA) ACTenvrio Master Service Agreement make up the entire contract of the parties.

We at ACTenviro appreciate your confidence in our abilities. Should you have any questions or if we can be of further service, please do not hesitate to contact us at (408) 595-6513 I msabich@actenviro.com

If this agreement is satisfactory to you, please sign below and return a copy to Advanced Chemical Transport Inc. DBA ACTenviro.

**Customer Name:**

_____

Print: Name, Title

_____

Signature                                    Date



September 2, 2021

Maxim Integrated
2108 Bering Drive
San Jose, CA 95131

| PROPOSAL # | ACTEnviro_LabpackPricing |
|---|---|

ACTenviro is pleased to submit this proposal for your review and approval. ACTenviro will provide requested environmental services including one or more of the following: consulting, chemical relocations, chemical waste packaging, biological waste packaging, radioactive waste packaging, and/or transportation and disposal of packaged waste. An estimated cost itemization appears below. Modifications to the pricing estimate, or additions to the scope of work requiring pricing changes, will be provided – as needed – in the form of an addendum entitled Revised Pricing Schedule.

**DISPOSAL**

| Description | Treatment | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| 05 Gallon Labpack Non-Reactive | Incineration | $ 170.00 | 30 | $ 5,100.00 |
| 15 Gallon Labpack Non-Reactive | Incineration | $ 250.00 | 15 | $ 3,750.00 |
| 30 Gallon Labpack Non-Reactive | Incineration | $ 350.00 | 10 | $ 3,500.00 |
| Non-Reactive Labpack Adder | - | $ 4.00/lb | - | - |
| 05 Gallon Labpack Reactive | Incineration | $ 330.00 | 10 | $ 3,300.00 |
| 15 Gallon Labpack Non-Reactive | Incineration | $ 450.00 | 5 | $ 2,250.00 |
| Reactive Labpack Adder | - | $ 8.00/lb | - | - |

*Estimated quote based on information supplied by the generator and conditioned on acceptance at the disposal facility.

**SUPPLIES**

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| 05 Gallon Drum | Each | $ 30.00 | 40 | $ 1,200.00 |
| 15 Gallon Drum | Each | $ 50.00 | 20 | $ 1,000.00 |
| 30 Gallon Drum | Each | $ 95.00 | 10 | $ 950.00 |
| 55 Gallon Drum | Each | $ 85.00 | 10 | $ 850.00 |
| Vermiculite | Each | $ 85.00 | 30 | $ 2,550.00 |

*Sales tax is not calculated in proposal pricing

**TRANSPORTATION**

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| 05 Gallon Drum | Each | $ 30.00 | 40 | $ 1,200.00 |
| 15 Gallon Drum | Each | $ 35.00 | 20 | $ 700.00 |
| 30 Gallon Drum | Each | $ 45.00 | 10 | $ 450.00 |
| 55 Gallon Drum | Each | $ 60.00 | 10 | $ 600.00 |

**LABOR**

| Description | UOM | Unit Cost | Quantity | Price |
|---|---|---|---|---|
| Chemist III | Hr | $ 120.00 | 40 | $ 4,800.00 |
| Chemist II | Hr | $ 100.00 | 40 | $ 4,000.00 |
| Driver | Hr | $ 95.00 | 40 | $ 3,600.00 |
| Technician | Hr | $ 75.00 | 40 | $ 2,950.00 |

*Billing based on portal-to-portal transport with 2-hour minimum. Labor rates do not include overtime rates, which are billed in accordance with federal and state labor regulations.



| FEES | Description | Price |
|---|---|---|
| | Environmental Surcharge Fee: | 12% |
| | Manifest Fee: | $ 35.00 per Manifest |
| | Variable Fuel Charge: | 18% on Trans ONLY |
| | Profile Fee | No Charge |

| ESTIMATED AMOUNT | Description | Price |
|---|---|---|
| | Total price does not include applicable sales Tax | $  55,000.00 |

## DISPOSAL:

ACT will segregate (inventory/pack) the chemicals per DOT Hazard Class. The chemicals will be packaged into UN SPEC containers (drums) with vermiculite and the container will be labeled with the proper DOT shipping Description for disposal.

**Not to exceed weight limits for Lab Packs:**
  Non-Reactive:  05 gallon: 25lbs / 15 gallon: 50lbs / 30 gallon: 50lbs / 55 gallon: 109lbs
  Reactive: 05 gallon: 30lbs / 15 gallon: 60lbs

ACT will prepare all documentation and the chemicals will be loaded and transported to the TSDF on an ACT fully licensed truck.

All consumables, non-hazardous equipment, non-hazardous trash is to be removed by others.

All chemical exhaust and chemical fume hoods are to stay in place. Closure of other permits is to be requested and ACTenviro will require copies of existing permits in assist with this process.

Total project estimate is a budgetary number; all charges may be subjected to an increase

Upon acceptance of this, the parties agree to be bound by the terms of the Advanced Chemical Transport Inc. (DBA) ACTenvrio Master Service Agreement. The parties understand that the terms of this agreement and the terms of the Advanced Chemical Transport Inc. (DBA) ACTenvrio Master Service Agreement make up the entire contract of the parties.

We at ACTenviro appreciate your confidence in our abilities. Should you have any questions or if we can be of further service, please do not hesitate to contact us at 408.417.0903 I asinger@actenviro.com

If this agreement is satisfactory to you, please sign below and return a copy to Advanced Chemical Transport Inc. DBA ACTenviro.

**Maxim Integrated:**

_____

Print: Name, Title

_____

Signature                          Date

T 408.548.5050          967 Mabury Road, San Jose, CA 95133
F 408.548.5052          www.ACTenviro.com

# EXHIBIT 5

**Subject:**          FW: Quantum vs Maxim

Premium / limit:

| Each Pollution Condition Limit | Aggregate Limit for the Policy Period | Each Pollution Condition Deductible | Beazley Premium | Term (Years) |
|---|---|---|---|---|
| $5,000,000 | $5,000,000 | $50,000 | $43,730 | 5 |

This premium does not include surplus lines tax/fees (i.e. +3.25% in CA), and does not include optional TRIA/terrorism.

Beazley provides a "new conditions" site-specific coverage (2108 Bering Dr., Unit B), with a retroactive date of 1 Dec 2012 (causing the coverage to capture the 2012-2021 window of time Maxim was involved at the facility).  Transportation, Disposal and Business Interruption (subject to a 3 day waiting period) & Defense coverage is also included.

Lastly, information to finalize/bind coverage is as follows:
- Completed & signed application (each insurer has their own template, which I can provide separately)
- Completed & signed TRIA/terrorism form
- Any environmental assessments available and not already submitted (if applicable)
- Documentation of completed & accepted decontamination work

**CERTIFICATE PROVISIONS**

 # Lloyd's Insurance

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

SLC-3 (USA) NMA2868 (24/08/00) Printed by the Corporation of Lloyd's.

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2. **Correspondent Not Underwriters.** The Correspondent is not an Underwriter hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Underwriters hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as hereinbefore set forth. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

5. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

6. It is hereby understood and agreed that wherever the word 'Policy' appears herein it shall be deemed to read 'Certificate.'



**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## LLOYD'S SECURITY SCHEDULE

Syndicate 2623      82%
Syndicate 623       18%

ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.

# CALIFORNIA SURPLUS LINES DISCLOSURE STATEMENT (PRE BIND)

## IMPORTANT NOTICE:

1.    The insurance policy that you have purchased is being issued by an insurer that is not licensed by the state of California.  These companies are called "nonadmitted" or "surplus line" insurers.

2.    The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.

3.    The insurer does not participate in any of the insurance guarantee funds created by California law.  Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.

4.    The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer.  You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.

5.    Foreign insurers should be licensed by a state in the United States and you may contact that state's department of

SPECIMEN

insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.

6.    For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.

7.    California Maintains A "List Of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet web site of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.

8.    If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.

LMA9099A
01 January 2020

# CALIFORNIA SURPLUS LINES NOTICE 1 (POST BIND)

## IMPORTANT NOTICE:

1.   The insurance policy that you have purchased is being issued by an insurer that is not licensed by the state of California.  These companies are called "nonadmitted" or "surplus line" insurers.

2.   The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.

3.   The insurer does not participate in any of the insurance guarantee funds created by California law.  Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.

4.   The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer.  You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.

5.   Foreign insurers should be licensed by a state in the United States and you may contact that state's department of

insurance to obtain more information about that insurer.  You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.

6.    For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers.  Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.

7.    California Maintains A "List Of Approved Surplus Line Insurers (LASLI)."  Ask your agent or broker if the insurer is on that list, or view that list at the internet web site of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/la sli.cfm.

8.    If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure.  If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.

LMA9098A
01 January 2020

**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

**BEAZLEY ECLIPSE**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

      (a)      with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (b)      resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

      (a)      the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

      (b)      the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (c)      the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or

possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)    any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.



**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.  war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.  any act of terrorism.

    For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**CYBER ACTS CLARIFICATION ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

It is hereby understood and agreed that this Policy does not contain a specific exclusion for cyber acts or cyber incidents.

Subject to all the terms and conditions of this Policy, coverage shall be provided under this Policy for any **Pollution Condition** in connection with a cyber act or cyber incident, whether involving malicious or non-malicious events.

Nothing in this Endorsement creates coverage not otherwise provided under this Policy.

_____
Authorized Representative

| POLICYHOLDER DISCLOSURE NOTICE OF |
| TERRORISM INSURANCE COVERAGE |

You are hereby notified that under the Terrorism Risk Insurance Act of 2002, as amended ("TRIA"), that you now have a right to purchase insurance coverage for losses arising out of acts of terrorism, **as defined in Section 102(1) of the Act, as amended:** The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Any coverage you purchase for "acts of terrorism" shall expire at 12:00 midnight December 31, 2027, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 80%; OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURER(S) PROVIDING THE COVERAGE. YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A USD100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS USD100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED USD100 BILLION, YOUR COVERAGE MAY BE REDUCED.

THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

|  | I hereby elect to purchase coverage for acts of terrorism for a prospective premium of . |  |
|  | I hereby elect to have coverage for acts of terrorism excluded from my policy. I understand that I will have no coverage for losses arising from acts of terrorism. |  |

_____        _____
Policyholder/Applicant's Signature

_____        _____
Print Name                                                   Policy Number

_____
Date

(LMA 9184)

**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

### U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### NOT PURCHASED CLAUSE

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for any amounts insured by this Insurance directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for any amounts insured by this Insurance directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

All other terms, exclusions and conditions of the policy remain unchanged.

(LMA 5390)

_____
Authorized Representative

E06694
082020 ed.

**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## <u>ADDITIONAL NAMED INSURED</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause **III. DEFINITIONS**, Definition U. **"Named Insured"** is amended to include the following person(s) or entity(ies):

> Maxim Integrated Products, Inc.
>
> Hyperion Group, Inc.
>
> Analog Devices, Inc.

but only with respect to liability arising out of the ownership, operation, maintenance or use of a **Covered Location**.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**MINIMUM EARNED PREMIUM**</u>

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that in the event of cancellation pursuant to Cause **XV. CANCELLATION** , this Policy shall be subject to a minimum earned premium of 100% of the amount shown in Item 5. of the Declarations.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E12411                                                                                             Page 1 of 1
012019 ed.

**Effective date of this Endorsement: 28-Jun-2021**
**This Endorsement is attached to and forms a part of Policy Number:**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## PFC AND PFAS EXCLUSION

This endorsement modifies insurance provided under the following:

**BEAZLEY ECLIPSE**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the following Paragraph PF. **PFC AND PFAS** is added to Clause **VI. EXCLUSIONS**:

    PF. **PFC AND PFAS**

    arising out of or resulting from any perfluorinated chemicals (PFC) and per- and polyfluoroalkyl substances (PFAS) including, but not limited to, perfluorooctane sulfonate (PFOS), perfluorooctanoic acid (PFOA), perfluorobutane sulfonate (PFBS) and GenX, and any precursor chemicals or compounds, or other replacement PFC or PFAS.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E13653
122019 ed.



**BEAZLEY ECLIPSE**
**E**NVIRO **C**OVERED **L**OCATION **I**NSURANCE **P**OLICY (**S**ITE **E**NVIRONMENTAL)

NOTICE: This Policy provides coverage on a Discovery and/or Claims Made and Reported Basis and the payment of **Claims Expenses** reduces the applicable Limits of Liability.  Please review the coverage afforded under this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") carefully and discuss the coverage hereunder with your insurance agent or broker.

In consideration of the payment of the premium and reliance upon the statements in the **Application**, which is deemed a part of this Insurance Policy and subject to the Limit of Liability, Deductible, Exclusions, conditions and other terms of this Insurance, the Underwriters agree with the **First Named Insured** as follows:

I.      **INSURING CLAUSE**

        **THE FOLLOWING COVERAGES ARE IN EFFECT ONLY IF INDICATED WITH A "YES" IN ITEM 13. OF THE DECLARATIONS.**

        A.      **Covered Location Pollution Liability Coverage - New Pollution Conditions**

                To pay on behalf of the **Insured**:

                1.      **Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable; and/or

                2.      **Cleanup Costs**, in excess of the Deductible, because of a **Pollution Condition** first discovered by the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable;

                provided that, such **Pollution Condition**:

                a.      first commenced on or after the Inception Date stated in Item 2. of the Declarations and before the end of the **Policy Period**; and

                b.      is on, at, under or migrated from a **Covered Location.**

B.    **Covered Location Pollution Liability Coverage - Existing Pollution  Conditions**

To pay on behalf of the **Insured**:

1.    **Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable; and/or

2.    **Cleanup Costs**, in excess of the Deductible, because of a **Pollution Condition** first discovered by the **Insured** and reported in writing to the Underwriters during the **Policy Period**; or within the Extended Reporting Period, if applicable;

provided that, such **Pollution Condition**:

a.    first commenced on or after the Retroactive Date, if any, set forth in Item 6.(a) of the Declarations and before the Inception Date stated in Item 2. of the Declarations; and

b.    is on, at, under or migrated from a **Covered Location**.

C.    **Transportation Pollution Liability Coverage**

To pay on behalf of the **Insured**:

**Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the Underwriters during the **Policy Period**, or within the Extended Reporting Period, if applicable, wholly occurring during and resulting solely from **Transportation**; provided that such **Pollution Condition** first commenced on or after the Retroactive Date set forth in Item 6.(b) of the Declarations and before the end of the **Policy Period**.

This Insuring Clause shall not be utilized to evidence financial responsibility of any **Insured** under any federal, state, provincial or local law.

D.    **Non-Owned Location Pollution Liability Coverage**

To pay on behalf of the **Insured**:

**Cleanup Costs**, **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of a **Claim** for a **Pollution Condition** first made against the **Insured** and reported in writing to the Underwriters during the **Policy Period**, or within the Extended Reporting Period, if applicable, provided that such **Pollution Condition**:

1.    first commenced on or after the Retroactive Date stated in Item 6.(c) of the Declarations and before the end of the **Policy Period**; and

2.    is on, at, under or migrated from a **Non-Owned Location**.

E.    **Crisis and Reputation Management Expenses Coverage**

To pay the **Named Insured Crisis Management Expenses** and/or **Reputation Management Expenses** in excess of the Deductible because of a **Pollution Condition** that is on, at, under or migrated from a **Covered Location** that:

1.    is the subject of material adverse regional or national news media coverage for the **Named Insured**;

2.    results in **Cleanup Costs** and/or **Damages** for a **Pollution Condition** that is reported to the Underwriters and covered under Insuring Clause I.A or I.B of the Policy; and

3.    the **Crisis Management Expenses** and/or **Reputation Management Expenses** are reported, in writing, to the Underwriters during the **Policy Period** and within seventy-two (72) hours after the **Named Insured** incurs or assumes **Reputation Management Expenses** and/or **Crisis Management Expenses** during the **Policy Period**.

In the event that **Crisis Management Expenses** and/or **Reputation Management Expenses** are caused by a **Pollution Condition** and some other cause(s), the Underwriters shall only provide coverage for that portion of **Crisis Management Expenses** and/or **Reputation Management Expenses** caused solely by the **Pollution Condition**.

F.    **Business Interruption Costs Coverage**

To pay the **Named Insured Business Interruption Costs** caused directly by a **Pollution Condition** on, at or under a **Covered Location**, provided that:

1.    such **Pollution Condition** results in **Cleanup Costs** covered under Insuring Clause I.A or I.B of this Policy; and

2.    the **Business Interruption Costs** are reported, in writing, to the Underwriters during the **Policy Period**.

In the event that **Business Interruption Costs** are caused by a **Pollution Condition** and some other cause(s), the Underwriters shall only provide coverage for that portion of **Business Interruption Costs** caused solely by the **Pollution Condition**.

## II.    SUPPLEMENTARY PAYMENTS

Supplementary Payments made under this Clause are not subject to the Deductible set forth in Item 4. of the Declarations and are payable by the Underwriters in addition to the Limits of Liability as set forth in Clause VII.

**Defendants Reimbursement**

Upon the Underwriters' request, the **Insured** shall attend mediation meetings, arbitration proceedings, hearings, depositions and trials relative to the defense of a **Claim**. Beginning on the fourth day of attendance, the Underwriters shall reimburse the **Insured**, upon written request, for actual loss of earnings and reasonable expenses that result from such attendance. The maximum aggregate amount that the Underwriters shall reimburse is $500 total per day for all **Insureds**, subject to a maximum aggregate amount of $10,000 for each **Claim**.

## III.  DEFINITIONS

Wherever used in this Policy in bold face type, the following definitions shall apply.

A.    "**Application**" means all signed applications, including all attachments and other materials submitted therewith or incorporated therein, and any other such documents submitted prior to the date the Policy, or as applicable, a post binding **Covered Location**, was bound, in connection with the underwriting of this Policy, including any endorsement or other part thereof, or any other policy issued by the Underwriters, of which this Policy is a renewal, replacement or which it succeeds in time.

B.    "**Bodily Injury**" means physical injury, sickness or disease, including death resulting therefrom, and any accompanying mental anguish, emotional distress or shock sustained by any person.

C.    "**Business Interruption Costs**" means the sum of the following:

1.    the **Named Insured**'s net income, which is calculated as net profit, if any, that would have been earned before taxes (or if there is a net loss before taxes, the net loss is deducted);

2.    the **Named Insured**'s continuing normal operating expenses incurred excluding payroll not deducted in 1. above;

3.    **Extra Expense**; and

4.    **Rental Value**

due to the reasonable and necessary suspension of the **Named Insured's** business operations during the **Period of Restoration** at a **Covered Location**. These sums will be reduced to the extent that the **Named Insured** can resume business operations, in whole or in part, at the **Covered Location**, or by making use of other location(s).

**Business Interruption Costs** shall not include any costs associated with: 1) costs incurred as a result of unfavorable business conditions, 2) loss of market or any other consequential loss, 3) costs associated with crisis management or reputational damage, 4) revoked or modified licenses, permits or, similar types of authorizations from a governmental agency, 5) legal costs or legal expenses, or 6) any costs associated with preventing any **Pollution Condition**.

D.    "**Cargo**" means waste, materials, goods or products transported by automobile, aircraft, watercraft or rolling stock for delivery by a **Named Insured**, or a third party carrier on the **Named Insured's** behalf, provided that the **Named Insured** or third party carrier is properly licensed to transport such waste, materials, goods or products.

E.    "**Claim**" means:

1.    a written demand received by an **Insured** for money or services or alleging liability or responsibility, including, but not limited to, the service of suit or institution of arbitration proceedings; or

2.    a court or government agency order or government or regulatory action filed against the **Insured**.

F.      "**Claims Expenses**" means:

1.      reasonable and necessary fees charged by an attorney designated or consented to by the Underwriters, such consent not to be unreasonably withheld or delayed;

2.      all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** arising in connection therewith, if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters, such consent not to be unreasonably withheld or delayed; and

3.      premiums for appeal bonds for judgments or bonds to release property used to secure a legal obligation, if required for a **Claim** against any **Insured** for a **Pollution Condition** to which this Insurance applies, provided, however, that the Underwriters shall have no obligation to appeal the underlying judgment or to obtain such bonds.

Except as set forth in Clause II., **Claims Expenses** do not include any goods supplied or services performed by the staff or salaried employees of the **Insured** in connection with the investigation, adjustment, defense or appeal of a **Claim** noticed under this Insurance or in connection with the investigation or remediation of a **Pollution Condition**.

G.      "**Cleanup Costs**" means:

1.      reasonable and necessary costs, charges and expenses incurred (if by an **Insured**, then only with the prior written consent of the Underwriters, such consent not to be unreasonably withheld or delayed) in the investigation, assessment, removal, disposal, containment, treatment, remediation (including the associated testing and monitoring) or neutralization of a **Pollution Condition**, to the extent required by **Environmental Laws**, required by a **Licensed Site Professional** or required to satisfy the **Insured's** obligations under a federal or state voluntary cleanup program, or with respect to **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories, and legionella pneumophilia, reasonable and necessary costs, charges and expenses required by **Indoor Air Quality Clean-Up Standards**;

2.      payments for civil fines, civil penalties, punitive damages, exemplary damages or any damages which are a multiple of compensatory damages, to the extent insurable by law, but only in connection with a **Claim** for **Cleanup Costs** covered under subparagraph 1. above;

3.      reasonable and necessary fees charged by an attorney designated or consented to by the Underwriters, such consent not to be unreasonably withheld or delayed, incurred in connection with any such **Cleanup Costs**;

4.      reasonable and necessary **Restoration Costs**; and

5.      reasonable and necessary expenses incurred to respond to an imminent and substantial endangerment to the public health or welfare or to the environment because of a **Pollution Condition**; provided that, the **Named Insured** shall forward written notice to the Underwriters of any action taken and expense incurred pursuant to this section as soon as practicable, but in no event later than seventy-two (72) hours after any such **Cleanup Costs** have been incurred or assumed.

H.      "**Covered Location**" means any location specified in Item 9. of the Declarations or in a Covered Location Endorsement attached to this Policy.

I.      "**Crisis Management Expenses**" means the following reasonable fees, costs, charges and expenses of a qualified and licensed crisis management firm incurred by the **Named Insured** during a **Period of Crisis** for:

1.      medical expenses;
2.      funeral expenses;
3.      psychological counseling;
4.      travel expenses;
5.      temporary living expenses; and
6.      security expenses;

**Crisis Management Expenses** do not include **Reputation Management Expenses**, **Damages**, **Cleanup Costs**, **Business   Interruption Costs** or any **Claims Expenses**.

J.      "**Damages**" means a monetary judgment, award or settlement of compensatory damages, including any pre-judgment and/or post-judgment interest thereon, incurred for **Property Damage** and/or **Bodily Injury**, including any required medical monitoring when accompanied by such **Bodily Injury**.

The term **Damages** shall not include or mean:

1.      taxes or loss of tax benefits;

2.      criminal fines, sanctions or criminal penalties assessed against the **Insured**;

3.      civil fines, civil penalties punitive damages, exemplary damages or any damages which are a multiple of compensatory damages assessed against the **Insured**, unless insurable by law and assessed in connection with a **Claim** for **Property Damage** and/or **Bodily Injury**;

4.      liquidated damages;

5.      any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**;

6.      matters deemed uninsurable under the law pursuant to which this Policy is construed; or

7.      goods supplied or services performed by the staff or salaried employees of the **Insured** in connection with the investigation, adjustment, defense or appeal of any **Claim** noticed under this Insurance or in connection with the investigation or remediation of a **Pollution Condition**, without the prior written consent of the Underwriters and in accordance with Clause II.

K.      "**Engineering Controls**" means physical modifications to a **Covered Location** to reduce or eliminate the potential for exposure to **Pollution Conditions**.

L.      "**Environmental Laws**" means any federal, state, provincial or local laws, including but not limited to statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives that are applicable to **Pollution Conditions** to which this Insurance applies.

M.    "**Extra Expense**" means the reasonable and necessary expenses incurred by the **Named Insured**, over and above the **Named Insured**'s continuing normal operating expenses, during the **Period of Restoration**, that the **Named Insured** would not have incurred had there been no suspension of business operations, provided that the expenses are incurred to avoid or minimize the suspension of business and to continue business operations:

1.    at the **Covered Location**, or

2.    at replacement or temporary location(s), including:

i.    relocation expenses; and

ii.    cost to equip and operate the replacement or temporary location(s).

**Extra Expense** shall be reduced by any salvage value of property obtained for temporary use during the **Period of Restoration** that remains after resumption of normal business operations. **Extra Expense** shall not include any amounts associated with: 1) costs, fees or expenses incurred as a result of unfavorable business conditions, 2) loss of market or any other consequential loss, 3) crisis management or reputational damage, 4) revoked or modified licenses, permits or, similar types of authorizations from a governmental agency, 5) legal and accounting costs, fees or expenses, including but not limited to any such amounts incurred in connection with defending or pursuing any litigation or in preparation for any litigation, 6) interest, including but not limited to the interest on money borrowed to finance any construction; 7) taxes, including but not limited to realty taxes and other, similar assessments; 8) advertising and promotional costs, fees or expenses; and 9) commissions and any other costs, fees or expenses resulting from the renegotiation of leases; 10) costs arising from any delay, lost opportunity, or additional overhead incurred by the contractor, 11) architect, engineering, design and consultant costs, fees and expenses and/or 12) preventing any **Pollution Condition**. Subject to the terms and conditions of this Policy, the Underwriters will pay no more for **Extra Expense** than the percentage shown below multiplied by the Limit of Liability stated in Item 3(a) of the Declarations.  If the **Period of Restoration** is:

1.    30 days or less, the percentage applied to the Limit of Liability shall be 40%.

2.    31-60 days, the percentage applied to the Limit of Liability shall be 80%.

3.    61 days or more, the percentage applied to the Limit of Liability shall be 100%.

N.    "**First Named Insured**" means the person or entity specified in Item 1. of the Declarations.

O.    "**Indoor Air Quality Clean-Up Standards**" means standards for the investigation and remediation of **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories, and legionella pneumophilia, imposed by a federal, state, local or provincial governmental authority pursuant to a law or regulation governing the investigation and remediation of **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories and/or legionella pneumophilia. If no standards have been imposed by such authority, then the standards for investigation and remediation shall be those necessary to protect human health at the **Covered Location** which shall be determined as follows:

1.    With respect to **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories, by a Certified Industrial

Hygienist, or similarly qualified health and safety professional, retained with the prior written consent of the Underwriters and experienced in performing investigation and remediation of **Microbial Matter**, methamphetamines or other chemicals associated with methamphetamine laboratories.

2.    With respect to legionella pneumophilia, to the extent required in writing by the Centers for Disease Control or local health department.

The applicable standards shall be those which applied to the use of the **Covered Location** identified by the **Insured** in the statements and information contained in the **Application** submitted to the Underwriters prior to the date the Policy is bound, or prior to adding such locations as a **Covered Location** specified in Item 9 of the Declarations.

P.    "**Insured**" means:

1.    the **Named Insured**;

2.    any other entity added as an additional **Insured** by Endorsement to the policy;

3.    a present or former director or officer, or, in the case of a limited liability company, a member or manager of the **Named Insured**, but only with respect to the performance of his or her duties as such on behalf of the **Named Insured**;

4.    a present or former employee of the **Named Insured**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Named Insured's** business;

5.    a present or former principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Named Insured**; and

6.    the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be entitled to coverage under this Insurance.

Q.    "**Institutional Controls**" means legal and administrative restrictions on the use of or access to a **Covered Location**, which are designed to reduce or eliminate the potential for exposure to **Pollution Conditions**.

R.    "**Licensed Site Professional**" means a licensed environmental scientist or engineer that is in good standing with, and acting under the authority of federal, state, provincial or local laws for the purpose of addressing **Pollution Conditions** at a **Covered Location**.

S.    "**Material Change in Use**" means any change in use or operations at a **Covered Location** from the use or operations identified by the **Insured**:

1.    in the **Application** submitted to the Underwriters prior to the date the Policy was bound, or

2.    prior to adding such location as a **Covered Location** specified in Item 9. of the Declarations

that materially increases the likelihood or severity of a **Pollution Condition**, or results in the imposition of more stringent remediation standards than those applicable to the **Covered Location** as of the date the Policy was bound or the date the **Covered Location** was added to the Policy, whichever is later.

T.     "**Microbial Matter**" means fungi, mold or mildew.

U.     "**Named Insured**" means:

     1.     the **First Named Insured**;

     2.     any other entity added as an additional **Named Insured** by endorsement to the policy; and

     3.     any corporations, partnerships, companies or other entities which, at the Inception Date of the Policy, or for such time during the **Policy Period,** the **First Named Insured** has at least 50% ownership interest, but solely with respect to liability arising out of the ownership, operation, maintenance or use of a **Covered Location**.

V.     "**Natural Resource Damage**" means physical injury to, or destruction of, and the resulting loss of use and loss of value (and the cost for assessment and replacement as a result of such injury, destruction or loss required by law to restore the natural resources to their baseline conditions as they existed immediately prior to the **Pollution Condition**) of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et. seq.), any state, local or provincial government, any foreign government, any Native American Tribe or if such resources are subject to a trust restriction on alienation, any member of a Native American Tribe.

W.     "**Non-Owned Location**" means any location in the United States, its territories or possessions, which is not managed, operated, owned or leased by any **Insured** or an affiliate of any **Insured** and is used by an **Insured**:

     1.     for the storage, warehousing or distribution of goods or products owned by an **Insured** and which originate from a **Covered Location**, or

     2.     for the treatment, storage or disposal of waste or materials generated at a **Covered Location**, provided that such location:

          a.     is properly permitted and/or licensed by the applicable federal, state, local or provincial authorities to accept such waste or materials as of the date the waste or materials are treated, stored or disposed of at such location; and

          b.     is not listed on a proposed or final Federal National Priorities List and/or any state or provincial equivalent National Priority List, Superfund or Hazardous Waste List prior to the treatment, storage or disposal of the waste or material at such location; and

          c.     is not owned or operated by a bankrupt or financially insolvent entity as of the date the waste or materials are treated, stored or disposed of at such location.

X.      "**Period of Restoration**" means the period of time that begins after the Deductible Period set forth in Item 4.(b) of the Declarations and ends with the earliest of:

      1.      the date the **Named Insured** may reasonably resume its normal business operations at the **Covered Location**;

      2.      the date the **Named Insured** should have resumed its normal business operations at the **Covered Location** had it used reasonable skill, speed, and effort to do so;

      3.      the date the **Named Insured** may reasonably resume its normal business operations at a new location; or

      4.      when the number of days shown in Item 3.(e) **Period of Restoration** Sublimit have elapsed.

The **Period of Restoration** does not include any delay in time caused by the interference by a **Named Insured** with restoring the property or with the resumption or continuation of business operations. The expiration date of this Policy will not reduce the **Period of Restoration**, nor shall the Extended Reporting Period extend it.

Y.      "**Policy Period**" means the period of time between the Inception Date stated in Item 2. of the Declarations and earlier of the Expiration Date stated in Item 2. of the Declarations, or any termination, expiration or cancellation of this Insurance, if applicable, and specifically excludes any Extended Reporting Period or any prior policy period or renewal period.

Z.      "**Pollution Condition**" means the

      1.      actual or alleged discharge, dispersal, release, escape, migration, seepage, or

      illicit abandonment on or after the Inception Date shown in Item 2. of the Declarations, by a third party without an **Insured's** consent,

      of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including but not limited to, smoke, vapors, soot, fumes, acids, alkalis, chemicals, toxic or hazardous substances, waste materials, including medical infectious and pathological waste, low-level radioactive waste and material into or upon land or structures thereupon, the atmosphere or any watercourse, body of water or groundwater, in concentrations or amounts in excess of those naturally occurring or present in the environment, which results in **Bodily Injury**, **Property Damage** or **Cleanup Costs** to which this Insurance applies; and

      2.      presence of legionella pneumophilia, methamphetamines or other chemicals associated with methamphetamine laboratories, and **Microbial Matter** on, at or within any structures or buildings on or at the **Covered Location**;

**Pollution Condition** does not include any exposure to infected humans or animals, or contact with bodily fluids or infected humans or animals.

AA.     "**Property Damage**" means:

      1.      physical injury to or destruction of any tangible property, including the loss of use thereof;

      2.      loss of use of tangible property that has not been physically injured or destroyed;

3.      diminished value of property owned by third parties, but only where there is physical injury to or destruction of such tangible property; or

4.      **Natural Resource Damage**.

**Property Damage** does not include **Cleanup Costs**.

BB.    "**Rental Value**" means the loss of any anticipated rental income the **Named Insured** would have earned during the **Period of Restoration** by renting all or a portion of the **Covered Location**(s) to a third party not owned by, affiliated with, or connected in any way to any **Named Insured**, less any rental income the **Named Insured** actually earned or could have earned during the **Period of Restoration** by renting all or a portion of the **Covered Location**(s) or by making use of other property.  **Rental Value** does not apply to any loss included in subparagraphs (1)-(3) of the definition of **Business Interruption Costs**.

CC.    "**Reputation Management Expenses**" means reasonable fees, costs, charges and expenses of, or at the direction of, a qualified public relations firm incurred by the **Named Insured** during a **Period of Crisis** to mitigate material adverse effects upon the **Named Insured's** reputation and to maintain and/or restore public confidence in the **Named Insured**, including but not limited to amounts for advising, printing, advertising, mailing of materials, or travel by the **Named Insured's** directors, officers, employees, or agents, or the public relations firm to the extent incurred at the direction of the public relations firm. **Reputation Management Expenses** do not include **Crisis Management Expenses**, **Damages, Cleanup Costs, Business Interruption Costs** or any **Claim Expenses**.

DD.    "**Restoration Costs**" means costs incurred by an **Insured**, in order to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during the course of investigating, assessing, removing, disposing, containing, treating, remediating or neutralizing a covered **Pollution Condition**. Such costs shall not exceed the actual cash value of such real or personal property immediately prior to such damage, or include costs associated with improvements or betterments.  Actual cash value shall be calculated by taking the cost to replace such real or personal property, immediately prior to such damage, minus the accumulated depreciation of the real or personal property.

EE.    **Period of Crisis** means the period of time that begins on the date that a **Pollution Condition** covered under Insuring Clause I.A. or I.B. of this Policy results in material adverse regional or national news media coverage for the **Named Insured** and ends the earlier of the date: (1) the Underwriters, in their sole discretion, determine that there is no reasonable basis that the **Pollution Condition** has or will continue to result in material adverse regional or national news media coverage against the **Named Insured**; or (2) when the applicable Sublimits of Liability set forth in Item 3(d) of the Declarations have been exhausted.

FF.    "**Responsible Insured**" means:

1.      any director, officer, principal, partner, or, in the case of a limited liability company, member or manager of the **Named Insured**;

2.      any manager or supervisor of the **Named Insured** responsible for environmental health and safety affairs, control or compliance;

3.      any insurance manager or any member of the risk management or legal department of the **Named Insured**; and/or

4.      any manager of a **Covered Location**.

GG.    "**Transportation**" means the movement of **Cargo** to or from (i) a **Covered Location**, and/or (ii) any location qualifying as a **Non-Owned Location** under Clause III, **DEFINITION** X.1. only, and includes the loading and unloading of **Cargo** onto or from an automobile, aircraft, watercraft or rolling stock provided that the loading and unloading is performed by or on behalf of the **Insured**. **Transportation** does not include **Cargo** that has been unloaded from the automobile, aircraft, watercraft or rolling stock transporting it.

HH.    "**Underground Storage Tank**" means any stationary container or vessel, including the associated piping and ancillary equipment connected thereto, which is:

1.      ten percent (10%) or more beneath the surface of the ground;

2.      constructed primarily of non-earthen materials; and

3.      designated to contain any substance.

## IV.    DEFENSE, SETTLEMENT AND INVESTIGATION

A.      The Underwriters shall have the right and duty to defend, subject to the Limit of Liability, exclusions and other terms and conditions of this Policy, any **Claim** against the **Insured** seeking **Cleanup Costs** and/or **Damages** to which this Insurance applies, even if any of the allegations of the **Claim** are groundless, false or fraudulent.

B.      The Underwriters shall have the right to make any investigation they deem necessary, including, without limitation, any investigation with respect to the **Application,** statements made in the **Application** and with respect to coverage.

C.      If the **Insured** refuses to consent to any settlement or compromise of a **Claim** recommended by the Underwriters and acceptable to the claimant, the Underwriters' liability associated with such **Claim** shall not exceed the amount for which the **Claim** could have been settled, less the remaining Deductible, plus the **Claims Expenses** incurred up to the time of such refusal, or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the further defense of the **Claim** by tendering control of the defense to the **Insured**.

D.      The Underwriters shall not be obligated to pay any **Cleanup Costs**, **Damages**, **Claims Expenses**, **Business Interruption Costs**, **Crisis Management Expenses** or **Reputation Management Expenses** or to undertake or continue defense of any suit or proceeding after the applicable Limit of Liability has been exhausted by payment of **Cleanup Costs**, **Damages**, **Claims Expenses**, **Business Interruption Costs**, **Crisis Management Expenses** and/or **Reputation Management Expenses**.

E.      If an **Insured** and the Underwriters jointly agree to utilize mediation as a means to resolve a **Claim** made against the **Insured**, and if such **Claim** is resolved as a direct result of the mediation, the applicable Each **Pollution Condition** deductible shall be reduced by 50% subject to a maximum reduction of $50,000. Mediation means a formal alternative dispute resolution process involving a neutral third party.

## V.    TERRITORY

Subject to Clause III.W., this Policy applies to any **Claim** made and any **Pollution Condition** arising anywhere in the world where permitted by applicable law.

**VI.    EXCLUSIONS**

The coverage under this Insurance does not apply to any amounts:

A.    **Intentional Acts**

arising out of or resulting from any actual or alleged **Pollution Condition** that results from a **Responsible Insured's** intentional disregard of, or wilful, deliberate, or dishonest non-compliance with, any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, order or instruction by or on behalf of any governmental agency or representative.

B.    **Prior Knowledge**

arising out of or resulting from any actual or alleged **Pollution Condition** existing prior to the Inception Date stated in Item 2. of the Declarations, or the date on which a post binding **Covered Location** was added by Endorsement, if applicable, and known by a **Responsible Insured**, except to the extent specifically disclosed in the **Application** for this Policy or specifically disclosed in a document listed on a Disclosed Document Endorsement scheduled to this Policy. Any **Pollution Condition** disclosed and not otherwise excluded under this Policy or by endorsement shall be deemed to have been first discovered as of the date the **Covered Location** was added to this Policy.

C.    **Insured Versus Insured**

arising out of or resulting from a **Claim** made by or on behalf of any **Insured** against any other person or entity who is also an **Insured**. This exclusion does not apply to:

1.    any **Claim** involving a **Named Insured** and any other person or entity who is also an **Insured**, in which the underlying action is initiated by a third party who is not an **Insured**, such as an action for contribution or cross claim; or

2.    any **Claim** that arises out of an indemnification given by one **Insured** to another **Insured** as specified in a contract approved by the Underwriters and identified on a Schedule of Insured Contracts Endorsement attached to this Policy.

D.    **Assumption of Contractual Liability of Others**

arising out of or resulting from the liability of others assumed by the **Insured** under any contract or agreement either oral or written, including any hold harmless or indemnity agreements, except to the extent:

1.    the **Insured** would have been liable in the absence of such contract or agreement; or

2.    provided under contracts approved by the Underwriters and identified on a Schedule of Insured Contracts Endorsement attached to this Policy.

E.    **Asbestos / Lead**

arising out of or resulting from asbestos or lead; provided, that this exclusion does not apply to:

1.    any **Claim** for **Damages**, except for **Natural Resource Damages**, and **Claims Expenses** arising therefrom, under Insuring Clause I.A. or I.B. of this Policy;

2.    Insuring Clause I.A. or I.B. of this Policy to the extent of asbestos or lead, or any materials containing asbestos or lead, in soil or in any surface water or in groundwater; or

3.    Insuring Clause I.C. or I.D. of this Policy.

F.    **Employers Liability and Workers Compensation**

arising out of or resulting from:

1.    **Bodily Injury** to any employee of any **Insured** arising out of and in the course of:

a.    employment by an **Insured**; or

b.    performing duties related to the conduct of an **Insured's** business; or

2.    **Bodily Injury** to any spouse (or person living together as spouse), child, parent, brother, sister or dependent of the employee as a consequence of 1. above; or

3.    any **Insured's** employment obligations, decisions, practices or policies as an employer; or

4.    any obligation for which the **Insured** or its insurance carrier(s) may be liable under any workers compensation, unemployment compensation or disability benefits law or similar law.

G.    **Products Liability**

arising out of or resulting from any goods or products designed, manufactured, sold, handled, distributed, installed, altered or repaired, including any container thereof, any failure to warn, or any reliance upon a representation or warranty made at any time with respect thereto, by (i) the **Insured**, (ii) others trading under the **Insured's** name; or (iii) a person or organization whose business or assets an **Insured** has acquired.

This exclusion only applies to the extent the **Pollution Condition** took place away from a **Covered Location** and after physical possession of such goods or products has been relinquished by the **Insured** to others.

This exclusion shall not apply to **Non-Owned Locations** under subparagraph X.1. provided that the **Insured** has retained uninterrupted ownership of such goods or products, or to Insuring Clause I.C. of this Policy.

H.    **Property Damage to an Insured's Property**

arising out of or resulting from, any **Property Damage** to any property owned, leased or operated by, or in the care, custody or control of an **Insured**, even if such **Property Damage** is incurred to avoid or mitigate **Damages**, **Cleanup Costs**, **Business Interruption Costs**, **Crisis Management Expenses** or **Reputation Management Expenses**, to which this Insurance applies.

I.    **New Pollution Conditions at Divested Property**

arising out of or resulting from a **Pollution Condition** on, at, under or migrating from a **Covered Location**, where such **Pollution Condition** first commences after such **Covered Location** was sold, given away or abandoned by the **Insured** or condemned during the **Policy Period**.

J.    **Aircraft, Auto or Watercraft**

arising out of or resulting from the ownership, operation, maintenance, use, loading and unloading, or entrustment to others of any aircraft, automobile or watercraft beyond the boundaries of a **Covered Location**.

This exclusion shall not apply to Insuring Clause I.C. of this Policy.

K.    **Material Change In Use**

arising out of or resulting from a **Material Change In Use**.

L.    **Failure to Maintain Institutional Controls or Engineering Controls**

arising out of or resulting from:

1.    the failure to monitor, maintain or enforce the **Institutional Controls** or **Engineering Controls** for a **Covered Location**; or

2.    costs associated with implementing, designing, installing, operating, monitoring, maintaining or enforcing the existing **Institutional Controls** or **Engineering Controls** in place on or before the Inception Date stated in Item 2. of the Declarations.

M.    **Underground Storage Tank**

arising out of or resulting from the existence of any **Underground Storage Tank** at a **Covered Location**.  This exclusion shall not apply to:

1.    an **Underground Storage Tank** at a **Covered Location** that is closed, abandoned in place or removed prior to the Inception Date stated in Item 2. of the Declarations, in accordance with all applicable federal, state, local or provincial regulations in effect at the time of closure, abandonment or removal;

2.    an **Underground Storage Tank** identified and described in a Schedule of Underground Storage Tank Endorsement attached to the Policy;

3.    an **Underground Storage Tank** at a **Covered Location**, the existence of which is not known to any **Responsible Insured** as of the Inception Date stated in Item 2. of the Declarations or the date on which a post binding **Covered Location** was added by Endorsement, if applicable;

4.    a flow-through process tank, including oil/water separators and/or septic tanks at a **Covered Location**; or

5.    a storage tank situated in a man-made underground area (such as a basement, cellar, mine shaft or tunnel) at a **Covered Location** if the storage tank is situated upon or above the surface of the floor.

**VII.    LIMIT OF LIABILITY**

A.    The Each **Pollution Condition** Limit of Liability stated in Item 3.(a) of the Declarations is the limit of the Underwriters' liability for all covered amounts arising out of any single **Pollution Condition,** except as set forth in Paragraph G. below.

B.    The Aggregate Limit of Liability for the **Policy Period** stated in Item 3.(b) of the Declarations is the Underwriters' total Limit of Liability for all covered amounts arising out of all **Pollution Conditions** covered by this Policy**,** except as set forth in Paragraph F. below.

C.    The Limit of Liability available to pay **Damages**, **Cleanup Costs, Business Interruption Costs, Crisis Management Expenses** and **Reputation Management Expenses** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Cleanup Costs**, **Damages**, **Claims Expenses Business Interruption Costs, Crisis Management Expenses** and **Reputation Management Expenses** shall be applied against the applicable Deductible.

D.    Neither the inclusion of more than one **Insured** under this Policy, nor the making of **Claims** by more than one person or entity shall increase the applicable Limit of Liability.

E.    The **Crisis and Reputation Management Expenses Coverage** Aggregate **Pollution Condition** Sublimit stated in Item 3.(d) of the Declarations, if any, is the limit of the Underwriters' liability for all **Crisis Management Expenses** and/or **Reputation Management Expenses** under the Policy.

The Sublimit of Liability stated in Item 3.(d) is part of, reduces and is subject to the Limit of Liability stated in Item 3.(a) and (b) of the Declarations.

If the remaining Limit of Liability stated in Item 3.(a) and (b) is less than the applicable Sublimit of Liability, the remaining Each **Pollution Condition** Limit or Aggregate for the **Policy Period** Limit is the most that will be available for payment of coverage provided under the Policy subject to the Sublimit of Liability.

F.    The Limit of Liability for the Extended Reporting Period shall be part of, and not be in addition to, the Limit of Liability of the Underwriters for the **Policy Period**.

G.    The Additional **Claims Expenses** Limit of Liability stated in Item 3.(c) of the Declarations, if any, is separate and in addition to the Each **Pollution Condition** Limit of Liability.

Payments of **Claims Expenses** by Underwriters shall first reduce the Additional **Claims Expenses** Limit of Liability in Item 3.(c) of the Declarations, if applicable. If the Additional **Claims Expenses** Limit of Liability is fully eroded, then any additional payments of **Claims Expenses** shall reduce the applicable Each **Pollution Condition** and Aggregate Limits of Liability. The Underwriter's total liability for all **Pollution Conditions** under this Policy, inclusive of **Claims Expenses**, shall not exceed the sum of the aggregate limit amounts shown in in Items 3.(b) and 3.(c) of the Declarations.

**VIII.    RELATED POLLUTION CONDITIONS**

A.    The same, continuous repeated or related **Pollution Conditions** shall be considered a single **Pollution Condition**, irrespective of the number of claimants or **Insureds** involved in the **Claim** or the number of **Claims** made, subject to the Limit of Liability applicable in the Policy Period when the first such **Pollution Condition** was reported to the Underwriters.

B.    If an **Insured**:

1.    first discovered a **Pollution Condition** during the policy period of a policy issued by the Underwriters prior to the Inception Date stated in Item 2. of the

Declarations, and reported it to the Underwriters in accordance with the terms of that prior policy; and/or

2.    reported a **Claim** to the Underwriters during the policy period of a policy issued by the Underwriters prior to the Inception Date stated in Item 2. of the Declarations, in accordance with the terms of that prior policy,

and this Policy provides coverage on substantially the same basis as such prior policy, then all of the same, continuous repeated or related **Pollution Conditions**, and/or all **Claims** arising from the same, continuous, repeated or related **Pollution Conditions**, shall be subject only to the applicable Limits of Liability under the first such policy issued by the Underwriters.

## IX.    DEDUCTIBLE

A.    Except with respect to Insuring Clause I.F., the Deductible stated in Item 4.(a) of the Declarations applies separately to each **Pollution Condition** and one Deductible shall apply to all coverage under the Policy arising from the same, continuous, repeated or related **Pollution Conditions**.

The **First Named Insured** shall satisfy the Deductible by payment of amounts covered by this Policy to third parties designated by the Underwriters, with Underwriters' prior written consent (not to be unreasonably withheld). Payments of any amounts not covered by this Policy or without Underwriters' prior written consent shall not satisfy the applicable Deductible. Payments made by any **Insured** in satisfaction of deductible obligations under any other insurance shall not satisfy the applicable Deductible under this Policy.

B.    With respect to Insuring Clause I.F, the Deductible stated in Item 4.(b) of the Declarations applies separately to each **Pollution Condition** with respect to all **Business Interruption Costs** covered under the Policy arising from the same, continuous, repeated or related **Pollution Conditions**.

C.    Full payment of the Deductible is a condition precedent to the payment by the Underwriters of any amounts under the Policy. Underwriters shall be liable only for the amounts in excess of the Deductible, subject to the Underwriters total liability not exceeding the applicable Limits of Liability. The Deductible amount does not reduce the Limit of Liability.

## X.    NOTICE OF CLAIM AND DISCOVERY OF POLLUTION CONDITION

A.    With respect to Insuring Clauses I.A.1., I.B.1., I.C. and I.D., if any **Claim** is made against an **Insured**, the **Insured** shall forward written notice as soon as practicable to the Underwriters but in no event shall such notice be provided after the expiration of the **Policy Period** or the time allowed, if applicable, under Section XI. Notice shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations. Such notice should include a copy of every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative.

B.    With respect to Insuring Clauses I.A.2. and I.B.2., the **Insured** shall forward written notice to the Underwriters as soon as practicable after a **Responsible Insured** becomes aware of any **Pollution Condition**, but in no event shall such notice be provided after the expiration of the **Policy Period** or the time allowed, if applicable, under section XI. Notice shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations. Notice shall include, at a minimum, information

sufficient to identify the **Insured**, the **Covered Location** affected, the names of persons with knowledge of the **Pollution Condition**, and all known and reasonably obtainable information regarding the time, place, cause, nature of and other circumstances of the **Pollution Condition**, and any resulting injuries or damages and remedial steps proposed to be undertaken by the **Insured**.

C.     With respect to Insuring Clause I.E., the **Named Insured** shall forward written notice to the Underwriters of any action taken and expenses incurred as soon as practicable, but in no event later than seventy-two (72) hours after the **Named Insured** incurs or assumes **Reputation Management Expenses** and/or **Crisis Management Expenses**. The **Underwriters** reserve the right in their sole discretion after the first seventy-two (72) hours following the commencement of the **Pollution Condition** to determine (1) if the **Pollution Condition** has or will result in material adverse regional or national news media coverage against the **Named Insured**, or (2) the reasonable type and scope of services, and rates and charges associated with **Crisis Management Expenses** and/or **Reputation Management Expenses** and thereafter the **Named Insured** shall not incur or assume any further or additional **Crisis Management Expenses** and/or **Reputation Management Expenses** without the written consent of the Underwriters.

Written notice of a **Pollution Condition** that gives rise to **Reputation Management Expenses** and/or **Crisis Management Expenses** shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations. Such notice should include:

1.     a description of the **Pollution Condition**;

2.     the **Named Insured**'s basis for a good faith opinion of material adverse regional or national news media coverage;

3.     reasonably obtainable and available information regarding any **Claim** or requests for **Cleanup Costs**; and

4.     a description of any **Crisis Management Expenses** and/or **Reputation Management Expenses** incurred or planned to be incurred including identification of service providers.

Any payment under Insuring Clause I.E. shall not determine or waive any of the Underwriters' rights or obligations or create a duty to defend any **Claim** or to pay any **Cleanup Costs** under any other provision of the Policy; nor shall it waive the **Insured's** obligations to provide notice of **Claim** and/or discovery of **Pollution Condition** under the Policy as set forth in Clause X.A or X.B. of the Policy.

D.     With respect to Insuring Clause I.F., the **Named Insured** shall forward written notice to the Underwriters as soon as practicable after the **Named Insured** becomes aware of any **Business Interruption Costs** loss but in no event shall such notice be provided after the expiration of the **Policy Period**. Notice shall be forwarded via facsimile, email or express or certified mail to the persons identified in Item 8.(a) of the Declarations.

Notice shall include, at a minimum, information sufficient to identify the **Named Insured**, the **Covered Location** affected, the **Pollution Condition** covered under Insuring Clause I.A or I.B associated with the **Business Interruption Costs**, the type and amount of **Business Interruption Costs**, and all known and reasonably obtainable information regarding the time, place, cause, nature and itemization of and other circumstances of the **Business Interruption Costs**.

E.    A **Claim** or **Pollution Condition** shall be considered to be reported to the Underwriters when written notice is first received by any of the recipients identified in Item 8.(a) of the Declarations.

## XI.    EXTENDED REPORTING PERIOD

A.    Automatic Extended Reporting Period

1.    If this Policy is cancelled or non-renewed by the Underwriters or by the **First Named Insured**, then the **First Named Insured** shall have the right to an Automatic Extended Reporting Period, commencing on the last day of the **Policy Period**, with respect to:

a.    any **Claim** first made against any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the ninety (90) day Automatic Extended Reporting Period, and otherwise covered by this Policy;

b.    any **Claim** first made against any **Insured** during the ninety (90) day Automatic Extended Reporting Period, resulting from a **Pollution Condition** first discovered and reported in writing to the Underwriters during the **Policy Period**, and otherwise covered by this Policy;

c.    any **Pollution Condition** first discovered by any **Insured** during the **Policy Period** and reported in writing to the Underwriters during the Automatic Extended Reporting Period, and otherwise covered by this Policy.

The above Automatic Extended Reporting Period shall not apply if the Policy is canceled by the Underwriters due to fraud or non-payment of premium, or if the **Insured** has purchased other insurance to replace the insurance provided under this Policy.

B.    Optional Extended Reporting Period

1.    If this Policy is cancelled or non-renewed by the Underwriters or by the **First Named Insured**, then the **First Named Insured** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item 7.(a) of the Declarations of the total premium for this Policy, to an Optional Extended Reporting Period with respect to any **Claim** first made against any **Insured** and reported during the period of time set forth in Item 7.(b) of the Declarations following the end of the **Policy Period**, but only with respect to any **Pollution Condition** first discovered and reported in writing to the Underwriters during the **Policy Period,** which is otherwise covered by this Policy.

2.    If the Optional Extended Reporting Period is purchased, the ninety (90) day Automatic Extended Reporting Period referred to in Clause XI.A. above shall form part of, and not be in addition to the Optional Extended Reporting Period.

3.    As a condition precedent to the right to purchase the Optional Extended Reporting Period, the total premium for this Policy must have been paid and that cancelation by the Underwriters, if applicable, was not due to fraud. The right to purchase such extension of coverage shall terminate unless written notice together with full payment of the premium for such extension of coverage is given to the Underwriters within sixty (60) days after the effective date of cancellation or non-renewal.  If such notice and premium payment is not so given to the Underwriters, there shall be no right to purchase such extension of coverage.

4.    In the event of the purchase of the Optional Extended Reporting Period, the entire premium for the Optional Extension Period shall be deemed earned at its commencement.

5.    The exercise of the Optional Extended Reporting Period shall not in any way increase the Limits of Liability set forth in Item 3. of the Declarations.

6.    The offer of renewal terms, conditions or premiums different from those in effect prior to renewal shall not constitute a refusal to renew for purposes of this Clause XI.

## XII.    REPRESENTATIONS

By acceptance of this Policy, all **Insureds** agree that the statements contained in the **Application** are their agreements and representations, that such statements shall be deemed material to the risk assumed by the Underwriters, and that this Policy is issued in reliance upon the truth thereof.

This entire Policy shall be void if, whether before or after a **Claim** or **Pollution Condition** is first reported to the Underwriters, any **Insured** has concealed or misrepresented any fact or circumstance material to the granting of coverage under this Policy.

## XIII.    OTHER INSURANCE

A.    Except as set forth in Clause XIII.C and D. below, this Insurance is primary, and the Underwriters' obligations are not affected unless any other insurance is also primary.  In that case, the Underwriters will share with all such other insurance by the method described in Clause XIII.C. below.

B.    When this Insurance is excess, the Underwriters will pay only its share of the amounts covered under the Policy, if any, that exceeds the total amount of such other insurance.

C.    When both this Insurance and other insurance apply to amounts covered under the Policy on the same basis, whether primary or excess, the Underwriters shall not be liable under this Policy for a greater proportion of any amounts covered by this Policy than the amount resulting from the following contribution methods, whichever is lesser:

1.    contribution by equal shares where each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the amounts covered by this Policy remains, whichever occurs first; or

2.    contribution by limits where each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

D.    Solely with respect to a **Pollution Condition** due to **Microbial Matter** Legionella pneumophilia and/or methamphetamines, this insurance is excess of any other valid and collectable insurance. The Underwriters will pay only its share of the amounts covered by this Policy, if any, that exceeds the total amount of such other valid and collectible insurance. Where other insurance may be available for amounts covered by this Policy as noted above, the **Insured** shall promptly, upon request, provide the Underwriters with copies of all such policies.

XIV.    **ASSIGNMENT**

This Policy may be assigned by the **First Named Insured** with the prior written consent of the Underwriters, which shall not be unreasonably withheld or delayed. Assignment of the Policy shall not be effective until such assignment is endorsed to the Policy. Notwithstanding the foregoing, if an **Insured** shall die or be adjudged incompetent, such insurance shall cover that **Insured's** legal representative to the extent that the **Insured** would be covered by this Policy.

XV.    **CANCELLATION**

This Insurance may be cancelled by the **First Named Insured** by surrender of this Policy to the Underwriters or by mailing to the Underwriters written notice stating when thereafter cancellation shall be effective.

This Insurance may be cancelled by the Underwriters by mailing the **First Named Insured** at the address set forth in Item 1. of the Declarations, a notice stating when thereafter such cancellation shall be effective.  The Underwriters may only cancel this Insurance for the following reasons:

1.    fraud on the part of the **Named Insured** in the **Application**; or

2.    any **Insured's** material failure to comply with the terms, conditions or contractual obligations under this Policy, including the failure to pay any premium or Deductible when due, however, the **Insured** shall have the ability, within the first sixty (60) days (ten (10) days for failure to pay any premium when due) of the ninety (90) day notice period, to cure such failure to comply with the material terms, conditions or contractual obligations under this Policy to the satisfaction of the Underwriters.

The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the **Policy Period**.  Delivery of such written notice either by the **Named Insured** or by the Underwriters shall be the equivalent of mailing.  Notice of pending cancellation will be provided not less than: (a) ninety (90) days prior to the effective date of cancellation for any **Insured's** failure to comply with the terms, conditions or contractual obligations under this Policy including failure to pay the Deductible when due; (b) thirty (30) days prior to the effective date of cancellation for fraud; or (c) ten (10) days prior to the effective date of cancellation for non-payment of premium.

If the Underwriters cancel, subject to any minimum earned premium that may apply, the return premium will be calculated on a pro rata basis.  If the **First Named Insured** cancels, subject to any minimum earned premium that may apply, the return premium will be calculated in accordance with the customary short rate table and procedure.

XVI.    **ASSISTANCE AND COOPERATION OF THE INSURED**

The **Insured** shall cooperate with the Underwriters and provide all reasonable assistance in the investigation and defense of any **Claim**, **Pollution Condition,** the **Application**, **Business Interruption Cost**, **Crisis Management Expense**, **Reputation Management Expense**, and any other matters relating to coverage under this Policy.

The **Insured** shall execute or cause to be executed all papers and render all assistance as is reasonably requested by the Underwriters and related to the defense of any **Claim,** the cleanup of any **Pollution Condition**, **Business Interruption Cost**, **Crisis Management Expense** and **Reputation Management Expense**.  The Underwriters may require that the **Insured** submit to examination under oath, attend hearings, depositions and trials and assist in securing and giving evidence and obtaining the attendance of witnesses in connection with the defense of any **Claim**, cleanup of **Pollution Condition**, **Business Interruption Cost**, **Crisis Management Expense** and **Reputation Management Expense**.  In the course of investigation or defense of any **Claim**,

the Underwriters may require written statements or the **Insured's** attendance at meetings with the Underwriters.

Upon the Underwriters request, the **Insured** shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of any **Pollution Condition** covered under this Policy.

The **Insured** shall not admit liability, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim**, or, except as provided in Clause I.E. and/or III.G.5, make any payment, assume any obligations, incur any expense (including, but not limited to, any **Claims Expenses** or **Cleanup Costs**), without the written consent of the Underwriters, such consent not to be unreasonably withheld or delayed.  Except as provided for in Clause II., expenses incurred by the **Insured** in assisting and cooperating with the Underwriters, as described above, do not constitute **Claims Expenses** and are not reimbursable under this Policy.

## XVII.   ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters unless the **Insured** shall have fully complied with all of the terms of this Policy, nor until the amount of the **Insured's** obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and the Underwriters.  Nothing contained herein shall give any person or organization any right to join the Underwriters as a party to any **Claim** against the **Insured** to determine their liability, nor shall the Underwriters be impleaded by the **Insureds** or their legal representative in any **Claim**.

## XVIII.   SUBROGATION

In the event of any payment under this Insurance, the Underwriters shall be subrogated to all the **Insureds'** rights of recovery therefore against any person or organization, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing to prejudice such rights.  Any recoveries shall be applied first to subrogation expenses, second to the **Named Insured** to the extent of any payments in excess of the Limit of Liability, third to amounts covered by this Policy and paid by the Underwriters, and fourth to the Deductible.  Any additional amounts recovered shall be paid to the **Named Insured**.

## XIX.   ENTIRE AGREEMENT

By acceptance of this Policy, all **Insureds** agree that this Policy embodies all agreements existing between them and the Underwriters relating to this Insurance.  Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Underwriters from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by written endorsement issued to form a part of this Policy, signed by the Underwriters.

## XX.   VALUATION AND CURRENCY

All premiums, limits, deductibles, and any amounts covered by this Policy are expressed and payable in the currency of the United States.  If judgment is rendered, settlement is denominated, or another element of **Damages** under this Policy is stated in a currency other than United States dollars or if any other amounts covered by this Policy are paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date on which a relevant final judgment becomes incapable of appeal or payment of the settlement or other element of **Damages** is due or the date such other amounts covered by this Policy are paid.

XXI.    **BANKRUPTCY**

Bankruptcy or insolvency of the **Insured** shall not relieve the Underwriters of its obligations nor deprive the Underwriters of its rights or defenses under this Policy.

XXII.    **AUTHORIZATION**

By acceptance of this Policy, the **Insureds** agree that the **Named Insured** will act on their behalf with respect to the giving and receiving of any notice provided for in this Policy, the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements.

XXIII.    **RIGHT OF ACCESS AND INSPECTION**

The **Named Insured** agrees to provide the Underwriters with access to any information developed or discovered by an **Insured** concerning a **Claim**, **Pollution Condition**, **Business Interruption Costs**, **Crisis Management Expenses** or **Reputation Management Expenses** to which this Insurance applies, whether or not deemed by an **Insured** to be relevant and to provide the Underwriters with access to interview any **Insured** and review any documents of an **Insured**. Further, to the extent that an **Insured** has such rights, any of the Underwriters representatives shall have the right and opportunity but not the obligation to inspect at any reasonable time, during the **Policy Period** or thereafter, a **Covered Location** associated with a **Claim**, **Pollution Condition**, **Business Interruption Costs**, **Crisis Management Expenses**, or **Reputation Management Expenses** reported to the Underwriters. Neither the Underwriters nor its representatives shall assume any responsibility or duty to the **Insured** or to any other person or entity, by reason of such right of inspection. Neither the Underwriters right to make inspections, sample and monitor, nor the actual undertaking thereof nor any report thereon shall constitute an undertaking on behalf of the **Insured** or others, to determine or warrant that the property or operations are safe, healthful or conform to acceptable engineering practices or are in compliance with any law, rule or regulation. The **Named Insured** agrees to provide appropriate personnel to assist the Underwriters' representatives during any inspection.

XXIV.    **HEADINGS**

The descriptions in the headings and subheadings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

XXV.    **SERVICE OF SUIT**

It is agreed that in the event of the failure of the Underwriters to pay any amount claimed to be due under this Insurance, the Underwriters, at the request of the **Insured**, will submit to the jurisdiction of any court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon Underwriters representative, designated in Item 11. of the Declarations, and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The Underwriters' representative designated in Item 11. of the Declarations is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the **Insured** to give a written undertaking to the **Insured** that they will enter a general appearance upon Underwriters behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Underwriters designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his or her successor in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of Insurance, and hereby designate the Underwriters representative, designated in Item 11. of the Declarations, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XXVI.  CHOICE OF LAW

Any disputes involving this Policy shall be resolved applying the law designated in Item 12. of the Declarations.

## XXVII.  SOLE AGENT

The **First Named Insured** shall act on behalf of all **Insureds** for all purposes, including but not limited to the payment of Deductible amounts, payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this Policy, giving and receiving notice of cancellation or nonrenewal and the exercise of the rights stated in Clause XI.

## XXVIII.  SANCTION LIMITATIONS

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any **Claim** or provide any benefit hereunder to the extent that the provision of such cover, payment of such **Claim** or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

## XXIX.  SEVERABILITY OF INTEREST

Except with respect to the Limit of Liability, Clause XII. and any rights and duties assigned in this Policy to the **First Named Insured**, this Insurance applies as if each **Insured** were the only **Insured** and separately to each **Insured** against whom a **Claim** is made.

EXHIBIT 6

# SAN JOSE FIRE DEPARTMENT
## Bureau of Fire Prevention
**200 E. Santa Clara St, Suite T2**
**San Jose, CA 95113**
**(408) 535-7750**

# Violation Notice

| | | |
|---|---|---|
| QUANTUM LABS INC | **Occupancy ID** | Date  09/28/2021 |
| 2108 BERING DR | 602018 | Inspector: Crawford, Richard |
| B | | Station: BFP  Insp.Dist:    05 |
| SAN JOSE, CA 95131 | 408-372-2448 | |

An inspection of your facility on    Friday September 24, 2021    revealed the violations listed below

| Violation Code | Article | Division | Page | Count |
|---|---|---|---|---|
| 904 (4) Automatic Fire Sprinkler Systems Service | Article 4 | Chapter 5 | 0 | 0 |

Recheck violation record auto-generated from inspection on 08/04/2021.
Violation carried over from inspection on 06/24/2021
Recheck violation record auto-generated from inspection on 04/14/2021.
Recheck violation record auto-generated from inspection on 01/29/2021.
Recheck violation record auto-generated from inspection on 10/14/2020.
Recheck violation record auto-generated from inspection on 09/23/2020.
Recheck violation record auto-generated from inspection on 08/26/2020.
Recheck violation record auto-generated from inspection on 07/30/2020.
Automatic fire sprinkler systems shall be serviced at least every five (5) years.
PLEASE PROVIDE PROOF OF PASSING 5 YEAR SPRINKLER SYSTEM TEST BY AN AUTHORIZED
CONTRACTOR.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 907.8.5 Inspection, testing and maintenance. | | | 0 | 0 |
|---|---|---|---|---|

Recheck violation record auto-generated from inspection on 08/04/2021.
Violation carried over from inspection on 06/24/2021
Recheck violation record auto-generated from inspection on 04/14/2021.
Recheck violation record auto-generated from inspection on 01/29/2021.
Recheck violation record auto-generated from inspection on 10/14/2020.
Recheck violation record auto-generated from inspection on 09/23/2020.
Recheck violation record auto-generated from inspection on 08/26/2020.
Recheck violation record auto-generated from inspection on 07/30/2020.
The building owner shall be responsible to maintain the fire and life safety systems in an operable condition at
all times. Service personnel shall meet the qualification requirements of NFPA 72 for inspection, testing and
maintenance of such systems. Records of inspection, testing and maintenance shall be maintained.
PLEASE PROVIDE PROOF OF ANNUAL FIRE ALARM SYSTEM TEST BY AN AUTHORIZED
CONTRACTOR. UNABLE TO LOCATE FIRE ALARM PANEL ON PROPERTY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SAN JOSE FIRE DEPARTMENT**
**Bureau of Fire Prevention**
**200 E. Santa Clara St, Suite T2**
**San Jose, CA 95113**
**(408) 535-7750**

# Violation Notice

| | | |
|---|---|---|
| QUANTUM LABS INC | **Occupancy ID** | |
| 2108 BERING DR | 602018 | |
| B | | |
| SAN JOSE, CA 95131 | 408-372-2448 | |

Date  09/28/2021
Inspector: Crawford, Richard
Station: BFP  Insp.Dist:    05

ORDER TO COMPLY:   Since these conditions are contrary to law, you must correct them upon receipt of this notice. An inspection to determine compliance with this Notice will be conducted on or after 10/19/2021 .
If you fail to comply with this notice before the reinspection date listed, you may be liable for the penalties provided for by law  for such violations.

CITATION TIMELINE:   When a violation is defined as recalcitrant an Administrative Citation shall be issued upon the third site inspection for any violation that has not been corrected.
Upon the fourth site inspection a new Administrative Citation with an increased fee shall be issued for any violation that has not been corrected.
Upon the fifth and any subsequent site inspection a new Administrative Citation shall be issued with the maximum fees applied for any violation that has not been corrected.

*Richard Crawford* _____ X

Crawford, Richard /Fire Inspector
Inspector

EXHIBIT 7

# QUANTUM LABS INC

# PURCHASE ORDER

SUPPLIER: **SURE FIRE PROTECTION CO.INC**
4141 Fremont, Ca 94538-6540
ATTN: **RON ARATA**
License No. C-16 751161
Phone (510) 490-7873 X 305
MOBILE: (408)590-5711
Fax (510)490-1233

| DATE | PO # |
|---|---|
| 2021-05-04 | SFP21005041472-02A |

| BILL TO |
|---|
| QUANTUM LABS INC
2050 GATEWAY PLACE MS100-147
SAN JOSE
CA
95110
US
Tel:408-634-4778 |

| SHIP TO |
|---|
| QUANTUM LABS INC
2108 BERING DRIVE BLDG B
SAN JOSE
CA
95131
US
Tel:408-634-2108 |

| P.O. # | TERMS | SHIP DATE | SHIP | VIA | ACCOUNT | EX WORKS | QUOTE |
|---|---|---|---|---|---|---|---|
| SFP21005041472-02A | NET 30 | 2021-05-04 | | | | SUPPLIER | |

| | ITEM | DESCRIPTION | QTY | U/P[$] | AMOUNT[$] |
|---|---|---|---|---|---|
| 1 | | YEARLY FIRE  SPRINKLERS INSPECTION | 1 | 600.00 | 600.00 |
| 2 | | MAXIM CORRECTIONS -SEE LIST | 1 | 5400.00 | 5400.00 |
| | | | | | |
| | | M1-MAXIM LAPPER/POLISHER ROOM -ADD FD COMPLIANT SPRINKLER | | | |
| | | M2-MAXIM CLEAN ROOM -RAISE ALL HEADS TO CEILING LEVEL | | | |
| | | M3-ADD 4 SPRINKLER HEADS TO COVER PLASTIC CURTAINS TO MAXIM CLEAN ROOM | | | |

THANK YOU. SIMON PLANCK

| | TOTAL | 6000.00 |
|---|---|---|

| QUANTUM LABS CORPORATION
MAIL TO/BILL TO: 2050 Gateway Place MS 100-147 San Jose CA 95110-1001 |
|---|

Sure Fire Protection Company, Inc.
4141 Pestana Place
Fremont CA 94538

Ph 510 490-7873
Fx 510 490-1233

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/21/2021 | 21032-01 |

| Customer | Job Site/Project |
|----------|------------------|
| Quantum labs<br>2050 Gateway Place<br>MS-100<br>San Jose, CA 95110 | Quantum labs<br>2108 Bering Or Ste B<br>San Jose, CA |

| Project | Terms | P.O. No. |
|---------|-------|----------|
| 21032-Quantum ... | Net 30 | SFP2102241472-01 |

| Description | Prior% | Curr% | Total% | Amount |
|-------------|--------|-------|--------|--------|
| Contract Amount | | 40.00% | 40.00% | 2,400.00 |

Thank you for your business.  Prompt payment is appreciated!

| | |
|---|---|
| **Total** | $2,400.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $2,400.00 |

Sure Fire Protection Company, Inc.
4141 Pestana Place
Fremont CA 94538

Ph 510 490-7873
Fx 510 490-1233

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/18/2021 | 21032-02 |

| Customer |
|----------|
| Quantum Labs
2050 Gateway Place
MS-100
San Jose, CA 95110 |

| Job Site/Project |
|------------------|
| Quantum Labs
2108 Bering Dr Ste B
San Jose, CA |

| Project | Terms | P.O. No. |
|---------|-------|----------|
| 21032-Quantum... | Net 30 | SFP2102241472-01 |

| Description | Prior% | Curr% | Total% | Amount |
|-------------|--------|-------|--------|--------|
| Contract Amount | 40.00% | 60.00% | 100.00% | 3,600.00 |

Thank you for your business.  Prompt payment is appreciated!

| | |
|--|--|
| **Total** | $3,600.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $3,600.00 |

EXHIBIT 8

1  MICHAEL J. IOANNOU (SBN 95208)
    michael.ioannou@ropers.com
2  DANIEL P. MCKINNON (SBN 234749)
    daniel.mckinnon@ropers.com
3  KEVIN W. ISAACSON (SBN 281067)
    kevin.isaacson@ropers.com
4  ROPERS MAJESKI PC
   333 W. Santa Clara St., Suite 910
5  San Jose, CA  95113
   Telephone:  408.287.6262
6  Facsimile:  408.918.4501

7  Attorneys for Defendant and Counter-Claimant
   MAXIM INTEGRATED PRODUCTS, INC.

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12

13  QUANTUM LABS, INC.,                  Case No. 5:18-cv-07598-BLF

14            Plaintiff,                 **SECOND STIPULATION AND
                                         [PROPOSED] ORDER TO
15  v.                                   IMPLEMENT REMOVAL AND
                                         CLEANING MOU, STAY DISCOVERY,
16  MAXIM INTEGRATED PRODUCTS, INC.,     AND CONTINUE DATES AND
                                         DEADLINES**
17            Defendant.
                                          Courtroom 3, Fifth Floor
18  _____     Judge:  Hon. Beth Labson Freeman

19  AND RELATED COUNTER-CLAIM.           Trial Date:  September 26, 2022

20

21        WHEREAS, all parties in this Action (Hyperion Group, Inc. ("Hyperion"), Quantum

22  Labs, Inc. ("Quantum Labs") and Simon Planck a/k/a Serban Porumbescu (Hyperion, Quantum

23  Labs, and Mr. Planck are referred to collectively as the "Quantum Parties") and Maxim Integrated

24  Products, Inc. ("Maxim") participated in a first mediation session with Justice James Lambden

25  (Ret.) of ADR Services, Inc., on February 19, 2021, and participated in a second mediation

26  session with Justice Lambden on June 30, 2021;

27        WHEREAS, at the second mediation session on June 30, 2021, the Parties agreed to a

28  Memorandum of Understanding (the "MOU") concerning the removal and decontamination of

A Professional Corporation
San Jose

ROPERS
MAJESKI

1  equipment from the facility at issue in this Action, located at 2108 Bering Drive, Suite B, San

2  Jose, CA 95131 ("Suite B"), as well as the decontamination of Suite B that will involve two

3  contracted service providers, Belfor Environmental, Inc. and Advanced Chemical Transport Inc.

4  dba ACTenviro;

5       WHEREAS, following the execution of the MOU at the June 30th mediation, the parties

6  submitted a Stipulation and Order to Implement Removal and Cleaning MOU, Stay Discovery,

7  and Continue Dates and Deadlines on July 1, 2021 (Dkt. No. 119);

8       WHEREAS, on July 1, 2021, the Court issued an Order Granting Stipulation Implement

9  Removal and Cleaning MOU, Stay Discovery, and Continue Dates and Deadlines (Dkt. No. 119);

10      WHEREAS, since entering into the MOU, the parties have been working with their

11  contractors to plan for all aspects of the equipment removal and cleaning project, including

12  reaching an agreement on a cleaning standard that would be used for the project, adjusting the

13  services to be provided by each contractor, changing which contractor would be disposing of

14  waste, and adjusting the list of equipment that would be removed from the facility, all of which

15  has required multiple revisions to the contractors' scope of work and proposals and also required

16  bringing in an additional contractor, Aero-Environmental Consulting, to provide industrial

17  hygiene services;

18      WHEREAS, with these many changes to the plan for the equipment removal and cleaning

19  project, the parties have entered into an amendment to the MOU (the "Amended MOU") which is

20  attached hereto as Exhibit A;

21      WHEREAS, the parties' contractors have informed the parties that the work under the

22  Amended MOU cannot commence until November 29, 2021, with a targeted completion date of

23  December 22, 2021, and that any additional work can commence only in January 2022;

24      WHEREAS, per the terms of the Amended MOU, the parties will be involving the Santa

25  Clara County and/or San Jose Fire Department ("SJFD") prior to the implementation of the

26  removal and decontamination efforts;

27      WHEREAS, since the parties entered into the MOU, the SJFD has threatened to issue

28  fines to Quantum Labs related to violations identified by SJFD during an inspection of the facility

ROPERS
MAJESKI
A Professional Corporation
San Jose

1    at issue in this Action;

2           WHEREAS, Quantum Labs has engaged a contractor, Sure Fire Protection Co. Inc. ("Sure

3    Fire"), to address all violations identified by the SJFD;

4           WHEREAS, Sure Fire has already addressed all violations identified by SJFD, except for

5    one violation;

6           WHEREAS, Sure Fire has communicated that it will not be able to complete its work until

7    the parties' equipment removal and cleaning project has been completed due to the equipment in

8    the space and the unknown condition of the site prior to cleaning;

9           WHEREAS, the SJFD has already issued a fine of $500 to Quantum Labs on September

10   29, 2021, and has threatened to issue fines of $750 and $1,000 in the coming weeks if the one

11   remaining violation is not addressed, and then will send the matter to the San Jose City Attorney's

12   Office for the City of San Jose to start charging $2,500 per day;

13          WHEREAS, the parties have provided the SJFP with information about the parties'

14   current cleanup project, including the Court's Order concerning the MOU and cleanup project

15   (Dkt. No. 120), but the SJFD has continued to threaten and actually issue a fine against Quantum

16   Labs;

17          WHEREAS, the parties request that the Court, pursuant to its inherent authority and its

18   authority under the Resource Conservation and Recovery Act, to order that the parties move

19   forward with the Amended MOU and their plan for the equipment removal and decontamination

20   of Quantum Labs' facility, including that Quantum Labs shall not have Sure Fire or any other

21   contractor enter its facility to address the SJFD violations until the work under the Amended

22   MOU has been completed and to order a temporary cessation of the issuance or enforcement of

23   any fines by the SJFD against Quantum Labs until the completion of the work by Sure Fire;

24          WHEREAS, the Parties have provided a complete copy of this Stipulation to the SJFD

25   immediately prior to its filing;

26          WHEREAS, per the terms of the Amended MOU, the parties are reserving all rights as

27   part of the present implementation of the removal and decontamination efforts;

28          WHEREAS, the Amended MOU is contingent upon receiving approval from the Court to

ROPERS
MAJESKI

A Professional Corporation
San Jose

1    proceed with the implementation of the removal and decontamination efforts of Suite B;

2        WHEREAS, the parties have agreed to conduct a further mediation session on January 5,

3    2022 with Justice Lambden after the implementation of the removal and decontamination efforts

4    has been substantially completed, meaning that the contractors involved have provided reasonable

5    assurance to the parties that there will be no additional expenses or material changes in scope to

6    complete the work under the Amended MOU;

7        WHEREAS, the parties have agreed to include in the further mediation session on January

8    5, 2022 the claims raised in the proceeding in the Superior Court for the State of California,

9    County of Santa Clara, Case No. 21CV387496 (the "State Action"); which include claims against

10   Maxim for Strict Liability for Ultrahazardous Activity, Negligence, Intentional Infliction of

11   Emotional Distress and for Loss of Consortium;

12       WHEREAS, the parties have agreed to stay discovery pending the next session of

13   mediation on January 5, 2022 and request that the Court approve a corresponding continuance of

14   the dates and deadlines in this Action as described below;

15       WHEREAS, the parties agree that a six-month continuance of the current deadlines set in

16   this Action will allow the parties to focus their efforts on mediation and the anticipated

17   implementation of the removal of Maxim's equipment from and cleaning of Suite B;

18       WHEREAS, the parties agree that the interests of the parties and judicial economy is best

19   served by a six-month continuance of the current deadlines set in this Action;

20       THEREFORE, the parties stipulate and respectfully request that the Court: (1) approve of

21   the parties' Amended MOU to implement the removal and decontamination efforts, (2) order the

22   parties to not have Sure Fire or any other contractor enter its facility to address the SJFD

23   violations until the work under the Amended MOU has been completed, (3) order a temporary

24   cessation of the issuance or enforcement of any fines by the SJFD against Quantum Labs until the

25   completion of work by Sure Fire, (4) stay discovery in this Action pending the parties' third

26   mediation session on January 5, 2022 with Justice Lambden, and (5) modify the current schedule

27   and deadlines set in this Action as listed below:

28

ROPERS
MAJESKI
A Professional Corporation
San Jose

| Deadline | Current Date | Proposed Date |
|---|---|---|
| Mediation Completion Deadline | October 15, 2021 | February 15, 2022 |
| Non-expert Discovery | January 28, 2022 | July 1, 2022 |
| Expert Witness Disclosure | January 28, 2022 | July 1, 2022 |
| Rebuttal Expert Disclosure | February 18, 2022 | July 22, 2022 |
| Expert Witness Discovery Cut-off | March 11, 2022 | August 12, 2022 |
| Dispositive Motions | March 24, 2022 | August 25, 2022 |
| Hearing on Motion for Summary Judgment | April 28, 2022 | September 29, 2022 |
| Pre-trial Conference | August 4, 2022 at 1:30 PM | December 15, 2022 at 1:30 PM |
| Trial Date | September 26, 2022 | February 7, 2023 |

IT IS SO STIPULATED.

Dated:  November 5, 2021                          LEX OMNI Law Office


By: _____
     MICHELLE PORUMBESCU
     Attorneys for Plaintiff and Counter-
     Defendant QUANTUM LABS, INC.


Dated:  November 5, 2021                          ROPERS MAJESKI PC


By: _____
     MICHAEL J. IOANNOU
     KEVIN W. ISAACSON
     Attorneys for Defendant and Counter-
     Claimant MAXIM INTEGRATED
     PRODUCTS, INC.

4861-1344-1026.1

- 5 -

Second Stipulation and [Proposed] Order to
Implement MOU, Stay Discovery, and Continue
Dates - Case No. 5:18-CV-07598-BLF

1    I, Kevin W. Isaacson, hereby attest that concurrence in the filing of this document has

2   been obtained from each of the other signatories to this document.

3   Dated: November 5, 2021                    ROPERS MAJESKI PC

4

5                                             By: _____
                                                 KEVIN W. ISAACSON
6                                                Attorneys for Defendant and Counter-
                                                 Claimant MAXIM INTEGRATED
7                                                PRODUCTS, INC.

8

9                              **[PROPOSED] ORDER**

10       IT IS HEREBY ORDERED that the parties' stipulation is GRANTED.

11   Dated:_____

12

13                                             _____
                                               BETH LABSON FREEMAN
14                                             JUDGE, UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT C**

**BELFOR ( )**

**ENVIRONMENTAL**

December 11, 2021

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 001 for additional Tool and equipment removal above the original tool list of 15.

Dear Mr. Planck,

The below pricing line items address the additional tools added after contract execution. The original tool list included 15 tools. This amount was increased to 26 tools on 10/28/21 and is captured in Pricing Line item #1. Once onsite, BELFOR found an additional 8 cabinets/shelving units that had been identified by others as belonging to Maxim. This addition is captured in Pricing Line item #2.

**<u>Pricing</u>**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1. Tool #16 through 26 Relocation and decontamination:    $ 3,500.00
2. Transfer to ACT of 8 cabinets/shelving units :        $   360.00

                         TOTAL:    $ 3,860.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



December 15, 2021

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 002 Temescal exhaust fan removal from roof deck.

Dear Mr. Planck,

The below pricing line item addresses the recommended removal of the Temescal exhaust fan from the roof deck. Belfor will disconnect the fan housing from the drive shaft/motor. The exhaust stack and fan housing will be lowered from the roof utilizing a pulley system that we will install on the scaffolding deck. The fan housing/stack will be disposed in the ATC 20 yard roll-off we have onsite for Cobalt contaminated lab debris. The drive motor for the fan will be left in place on the roof.

Note: The scaffold stairwell currently in place to access the roof is covered under the original scope of work until January 3rd, 2021. If it is still in place after that, we will be charged a daily extension of use rate of $789.00 per day.

**Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Fan removal:    $ 3,400.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



December 27, 2021

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 003 Cobalt station and stainless steel table removal from warehouse.

Dear Mr. Planck,

The below pricing line item addresses the removal of the electrical connection of the Cobalt station and stainless steel table it sits on. BELFOR will have an electrician disconnect and safe off the outlet panel that is connected inside the station. We will then remove the station and table and place them in the ACT 20 yd roll-off for disposal as cobalt waste.

**Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Cobalt station/table removal:     $ 2,790.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager

**BELFOR** (●)

**E N V I R O N M E N T A L**

January 13, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131

 Re:  Change Order 004 Lab M re-clean.

Dear Mr. Planck,

The below pricing line item addresses the second cleaning for cobalt contamination of the Lab M, aisle way area, mezzanine and Lapper room as recommended by Peak in their email dated 1/12/22. BELFOR will re-clean the entire area including all infrastructure and tools, tables, chairs and all other remaining contents. The stainless steel table that remains in the Temescal area will be removed and disposed as Cobalt contaminated waste.

**Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Re-clean and table removal:        $ 26,900.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



January 17, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 005 Daily Containment monitoring over Holiday break.

Dear Mr. Planck,

The below pricing line item addresses standby time as referenced in section 2.2, paragraph 4 of the contract, (excerpt below) and the daily cost for a BELFOR technician to monitor and repair the containment of the Lab M area over the Holiday break and into the 3rd week of January (December 23rd thru January 17th). Also included is the project manager stand by time from January 2 thru January 17th. Two additional technicians were flown in on January 11th in anticipation of project restart.

 "In addition, Owner agrees to pay Contractor a standby charge of $55.00 per man-hour ("Standby Charge") for any stand-by time incurred by Contractor relating to or in connection with a Change Order or a revised scope of work, including, without limitation, any action, approval, or payment required by Owner or any third party. In addition, Owner agrees to pay Contractor any additional expenses incurred by Contractor during any stand-by period ("Standby Expenses"), which will be passed through to Owner at cost. Contractor will notify Owner via email or other written notice when any standby period begins. The Standby Charges and Standby Expenses will be invoiced to Owner as the charges are incurred, and payment will be due by Owner upon receipt of Contractor's invoice".

**<u>Pricing</u>**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Technician Daily cost, $55/hour x4 hours:          $ 220.00
    Standby Expenses per day (hotel, per diem, car):   <u>$ 275.00</u>
    Total for 1 Tech (12/23/21 – 1/17/22)              $12,870.00
    Total for 2 additional Techs (1/11/22 – 1/17/22):  $ 6,930.00

2.  Project Manager Daily cost, $55/hour x4 hours:     $ 220.00
    Stand by Expenses per day (hotel, per diem, car):  <u>$ 275.00</u>
    Total (1/2/22 – 1/17/22)                           $7,920.00

Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



February 1, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131

 Re:  Change Order 005-1 Daily Containment monitoring and Stand by time.

Dear Mr. Planck,

The below pricing line item addresses standby time as referenced in section 2.2, paragraph 4 of the contract, (excerpt below) and the daily cost for three BELFOR technicians Standby time and to monitor and repair the containment of the Lab M area from January 21st thru January 30th. Also included is the project manager stand by time for the same time period. January 26th and 27th are not included in this change order because Belfor was actively re-cleaning Lab M on those two days.

 "In addition, Owner agrees to pay Contractor a standby charge of $55.00 per man-hour ("Standby Charge") for any stand-by time incurred by Contractor relating to or in connection with a Change Order or a revised scope of work, including, without limitation, any action, approval, or payment required by Owner or any third party. In addition, Owner agrees to pay Contractor any additional expenses incurred by Contractor during any stand-by period ("Standby Expenses"), which will be passed through to Owner at cost. Contractor will notify Owner via email or other written notice when any standby period begins. The Standby Charges and Standby Expenses will be invoiced to Owner as the charges are incurred, and payment will be due by Owner upon receipt of Contractor's invoice".

## **Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1. Technician Daily cost, $55/hour x4 hours:        $   220.00
   Standby Expenses per day (hotel, per diem, car):   $    275.00
   Total for 3 Techs (1/21/22 – 1/30/22) (8 days):    $ 11,880.00


2. Project Manager Daily cost, $55/hour x4 hours:     $   220.00
   Stand by Expenses per day (hotel, per diem, car):  $   275.00
   Total (1/21/22 – 1/30/22) (8 days):                $ 3,960.00

Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager

**BELFOR**  (●)

**ENVIRONMENTAL**

January 30, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 006 for contents pack out/return and carpet/tile removal.

Dear Mr. Planck,

The below pricing line item addresses sealing the carpet in the reception area to allow access over the New Year holiday (already completed), the contents pack out and off site storage of ALL items from the office, reception area, conference room and Suite A office in order to provide access to remove the cobalt contaminated carpet, tile and mastic. A monthly storage cost of the contents is also included in a separate line item. Once all contents are removed, BELFOR will remove all carpet, floor tile and mastic from the above referenced areas. All debris will be bagged and placed into the ACT 20 yd roll-off bin and disposed as Cobalt contaminated waste. Once debris has been removed BELFOR will perform a final clean of the area for review and clearance testing by Peak Consulting. Once the area is cleared by Peak, carpet replacement can be addressed in a separate change order. The return and unpacking of contents is included in this change order in a line item 4 below.

**Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

|   |   |   |
|---|---|---|
| 1. | Suite B Contents pack out: | $ 45,320.00 |
| 2. | Suite B Contents Storage per month: | $  2,565.00 |
| 3. | Carpet/tile removal: | $ 60,700.00 |
| 4. | Suite B Contents return & unpack: | $ 30,150.00 |
| 5. | Suite A Contents pack out: | $ 11,850.00 |
| 6. | Suite A Contents Storage per month: | $     855.00 |
| 7. | Suite A Contents return & unpack: | $  2,640.00 |
|   |   | $ 154,080.00 |

Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



January 25, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 007 Lab M floor, Mezzanine & Lapper room floor re-clean.

Dear Mr. Planck,

The below pricing line item addresses the third cleaning for cobalt contamination of the Lab M floor, Lapper room floor & Mezzanine area as recommended by Peak in their email dated 1/24/22. BELFOR will re-clean the targeted areas as identified in the email communication.

**Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Re-clean and table removal:      $ 14,200.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



January 30, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131

 Re:  Change Order 008 Lapper room floor re-clean #3.

Dear Mr. Planck,

The below pricing line item addresses the construction of a critical barrier/decon chamber and the third cleaning for cobalt contamination of the Lapper room floor area which will include the removal of approximately 10 ft$^2$ of floor tile as recommended by Peak in their email dated 1/29/22. BELFOR will re-clean the targeted areas as identified in the email communication and verbal communication between Peak and BELFOR.

**<u>Pricing</u>**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Re-clean and table removal:      $ 7,350.00

Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



February 4, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 009 Floor tile replacement in Lab M and Lapper room.

Dear Mr. Planck,

The below pricing line item addresses the replacement of select floor tiles in Lab M & Lapper Room at
the request of Quantum in an email dated 1/31/22. BELFOR removed 50 floor tiles during the cleaning
process to achieve the clearance standard of 2ug. BELFOR will apply MAPEI Ultrabond ECO 373
flooring adhesive and floor tile provided by Quantum to the affected areas (50 square feet).

**Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel
subsistence, equipment and materials to complete all work.

1.  Select Floor tile replacement:     $ 5,500.00

**Exclusions**

- BELFOR is unable to guarantee or warranty any future condition of the floor.
- The old floor tiles had gaps in between them in some places. The new tiles will have these same
  gaps.
- No concrete floor preparation will be performed.


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



February 14, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131

 Re:  Change Order 010 Carpet installation in Office, Common Area & Suite A office.

Dear Mr. Planck,

The below pricing line item addresses the replacement of the carpet & cove base in the Suite B office, Suite A office, Common Area and Conference room (~1850 ft$^2$). The replacement carpet chosen by Quantum is Shaw Industries, Dateline Today, 7a7f1 12 – Headlines 12405. A dark gray rubber cove base will also be installed as part of this quote. Belfor estimates the project will take 2 days to complete.

## Pricing

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Carpet replacement:        $ 27,500.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



February 16, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 011 Provide manlift/operator for Peak roof access.

Dear Mr. Planck,

The below pricing line item addresses Belfor providing a certified equipment operator and an articulating manlift to provide access for Peak Consulting to assess the HVAC system on the roof.

**<u>Pricing</u>**

The pricing quoted below includes costs associated with labor, all tools, PPE, PFP, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Manlift & Operator:     $ 5,660.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



February 24, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131


 Re:  Change Order 012 Provide HVAC cleaning of system #3 return duct and AHU.

Dear Mr. Planck,

The below pricing line item addresses Belfor cleaning the return duct per Peak Consulting's recommendations in an email dated 3/23/22. Belfor will provide the following:

- Manlift to install critical barriers on the return and build a small negative pressure containment around the return duct inside the fab.
- Articulating manlift for roof access to clean the AHU.
- Remove filters and insulation from upper portion of return air side. Replace with new filters/ insulation after clearance samples are collected and approved by Peak.
- Remove and clean return grills. Replace grills after approval from Peak.
- Wet wipe all interior/exterior surfaces of duct with IPA.
- Wet wipe the floor and all tools inside the containment.

Belfor estimates that it will take four (4) days to complete this task (3 days- setup and cleaning), (1 day for filter/insulation/return grill install).

## **Pricing**

The pricing quoted below includes costs associated with labor, all tools, PPE, PFP, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  HVAC Cleaning:        $ 21,200.00


Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager



March 9, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131

Re:  Change Order 013 Daily Containment monitoring and Stand by time for 2/2/22 through 3/6/22.

Dear Mr. Planck,

The below pricing line item addresses standby time as referenced in section 2.2, paragraph 4 of the contract, (excerpt below) and the daily cost for two (2) BELFOR technicians Standby time and to monitor and repair the containment of the Lab M and or the office area from February 2nd thru March 6th 2022 (33 days). Also included is the project manager stand by time for the same time period. There are a total of 15 days of standby time accounted for during this time period. Belfor was actively working for 18 days during this time period.

 "In addition, Owner agrees to pay Contractor a standby charge of $55.00 per man-hour ("Standby Charge") for any stand-by time incurred by Contractor relating to or in connection with a Change Order or a revised scope of work, including, without limitation, any action, approval, or payment required by Owner or any third party. In addition, Owner agrees to pay Contractor any additional expenses incurred by Contractor during any stand-by period ("Standby Expenses"), which will be passed through to Owner at cost. Contractor will notify Owner via email or other written notice when any standby period begins. The Standby Charges and Standby Expenses will be invoiced to Owner as the charges are incurred, and payment will be due by Owner upon receipt of Contractor's invoice".

## Pricing

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1.  Technician Daily cost, $55/hour x4 hours:          $   220.00
    Standby Expenses per day (hotel, per diem, car):    $   275.00
    Total for 2 Techs (2/2/22 – 3/6/22) (15 days):      $ 14,850.00


2.  Project Manager Daily cost, $55/hour x4 hours:     $   220.00
    Stand by Expenses per day (hotel, per diem, car):   $   275.00
    Total (2/2/22 – 3/6/22) (15 days):                  $ 7,425.00

Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager

**BELFOR** ⬤
**ENVIRONMENTAL**

March 23, 2022

Simon Planck
Quantum Labs
2108 Bering Dr., Unit B
San Jose, CA 95131

 Re:  Change Order 014: CO2 system removal and re-clean of exit path to dock door.

Dear Mr. Planck,

The below pricing line item addresses the removal of the CO2 fire suppression system that serviced the solvent sink. BELFOR will remove the Plexiglas clean room panel and will have an electrician disconnect and safe off the system. ACE Fire Equipment will then disconnect and safe off the CO2 cylinder and associated equipment. BELFOR will then remove the CO2 system and solvent sink and transfer it to ACT at the warehouse overhead door for transport to ACT's facility. BELFOR will replace the Plexiglas clean room panel and then re-clean the exit pathway of the equipment from Lab M, down the center aisle and out to the overhead door in the warehouse. BELFOR estimates this tasking will take 2-3 days to complete.

<u>Pricing</u>

The pricing quoted below includes costs associated with labor, all tools, PPE, site vehicles, travel subsistence, equipment and materials to complete all work.

1. CO2 System removal:   $ 12,810.00
2. Re-clean of exit path:   <u>$   5,585.00</u>
                    Total:   $ 18,395.00

Thank you and please do not hesitate to call with questions.

Sincerely,

*Greg Henke*

Greg Henke
National Project Manager

Area:    Fire Sprinklers                                                    SI:                        Count: 2

## FIRE PREVENTION INSPECTION SLIP

Engineering - Sprinklers

Permit: **22-667170 FE**                                              LI:

Confirmation#: 2106840

Received: 06/06/2022

By: Internet            Scheduled: 06/07/22        Preferred: 06/07/2022        Tract: 7777        Lot:

Address: 2108   BERING DR SAN JOSE UNIT(s) B

Contact: Mike Oram                    Phone: (650) 387-4211

Owner: PORUMBESCU SERBAN AND MICHELLE M D TRUST

Contractor: ACE FIRE EQUIPMENT & SERVICE  KYLE LANDES                        6506002191

Folder Name: VOL REMOVAL FIRE SUPPRESSION SYSTEM  Subtype: Other Fire Engineering or Insp Work Proposed: Tenant Improvement

Comments:

Related Permits:

Inspection Time Taken:    1:0    (HH:MM)                                Num Of Units Inspected:        0

Inspected by: _VTRUONG                    Date Inspected: 06/07/2022        Video Inspection: Off

Call the field  coordinator if needed at:

**Code : Description**

719: Fire Sprinkler and Suppression Permit Final*        Complete Pass ☒    Partial Pass: ☐    Failed: ☐    Cancelled: ☐    Not Necessary: ☐

Equipment/hood removed

REMARKS:

**EXHIBIT D**

Proposal for:

# Quantum Labs



115 Rishell Drive
Oakland, CA 94619
(855) 5 D - PEAK [7325]

| CLIENT INFO: | |
|---|---|
| Company: | Quantum Labs |
| Contact: | Simon Planck |
| Address: | 2108 Bering Dr, Building B |
| | San Jose, CA 95131 |
| Office: | 408.634.2108 |
| Cell: | |
| Fax: | |
| e-Mail: | sp@q11aot11mlabs.co |

**PROJECT NAME/ LOCATION:**

Industrial Hygiene Services
Sampling for Cobalt & Restoration Consultation
@ 2108 Bering Dr - San Jose, CA

| PROPOSAL INFORMATION: | |
|---|---|
| Proposal Date: | 1/5/22 |
| Prepared by: | B. Weisbrod<br>CIH, CSP, CAC, CDPH I/A |
| Payment Terms: | Net 30 |

## PROJECT UNDERSTANDING/ SUMMARY:

Peak has been requested to develop a proposal for providing industrial hygiene (IH) consulting services; specifically to (1) quantitatively assess cobalt concentrations on surfaces and in ambient air and (2) provide consultation pertaining to restoration of the above-referenced property; limited to review/ development of acceptance criteria and/or restoration work plan. All work will be performed by or under the direction of a Certified Industrial Hygienist (CIH).

## ITEMIZED SCOPE OF WORK & COST ESTIMATE:

| | |
|---|---|
| **INITIAL ASSESSMENT:**<br>Peak will conduct one (1) site visit to collect surface wipe and ambient air samples in order to determine extent of potential cobalt contamination in the following areas, as shown in the floor plan provided to Peak:<br>1. Common Lobby<br>2. Office A<br>3. Conference Room<br>4. Office B<br>5. Restrooms<br>6. Lunch Room<br>7. Test Room<br>8. Lap per Room<br>9. Warehouse<br>10. Mezzanine space above Lab M.<br>At least 2 surface wipe samples (i.e., 1 wall & 1 floor) will be collected within each of the defined areas above. An estimated 10 ambient air samples will be collected; one from the center of each defined area. Air samples will be run for sufficient durations to reach the acceptance criteria concentration. Peak estimates collecting 40 surface wipe and 11 air samples during this effort. This cost includes preparation, supplies, travel, and labor to conduct one (1) site visit for the Initial Assessment. | $ 1,965.00 |
| **RESTORATION WORK PLAN:**<br>Peak will develop a written Work Plan detailing the recommended restoration procedures under Phases 1 and 3. The Work Plan will be developed and signed by a CIH. | $ 1,405.00 |
| **PHASE 2 POST-RESTORATION VERIFICATION ASSESSMENT:**<br>Peak will conduct one (1) site visit to collect surface wipe and ambient air samples in order to determine whether restoration efforts performed during Phase 1 were successful in reducing concentrations of cobalt on surfaces and in air to below acceptance criteria in Lab M (i.e., the area currently within containment).<br><br>At least 1 surface wipe sample will be collected for every 100 square feet (ft2) of the area being assessed. One ambient air sample will be collected from the center of each defined area. Air samples will be run for sufficient durations to reach the acceptance criteria concentration. Peak estimates collecting 30 surface wipe and 5 ambient samples during this effort. This cost includes preparation, supplies, travel, and labor to conduct one (1) site visit during Phase 2. It doesn't include costs associated with returning to the site for resampling; Peak will obtain approval for expenditures associated with follow-up site visits. | $ 1,815.00 |

| | | |
|---|---|---|
| PHASE 4 POST-RESTORATION VERIFICATION ASSESSMENT:<br><br>Peak will conduct one (1) site visit to collect surface wipe and ambient air samples in order to determine whether restoration efforts performed during Phase 3 were successful in reducing concentrations of cobalt on surfaces and in air to below acceptance criteria. The extent of Phase 3 will not be known until the Initial Assessment is conducted.<br><br>At least 1 surface wipe sample will be collected for each 100 square feet (ft2) of the areas being assessed. One ambient air sample will be collected from the center of each defined area. Air samples will be run for sufficient durations to reach the acceptance criteria concentration. Peak cannot estimate the number of surface wipe or ambient air samples until the Initial Assessment is completed. This cost includes preparation, supplies, travel, and labor to conduct one (1) site visit during Phase 4. It doesn't include costs associated for returning to the site for resampling; Peak will obtain approval for expenditures associated with follow-up site visits. | $ | 1,815.00 |
| REPORT:<br><br>Results will be communicated via email or phone conversation upon receipt. Interim clearance and/or modifications to restoration procedures will be communicated by email. Upon obtaining sample results meeting acceptance criteria, Peak will summarize restoration efforts, methodologies, results, and conclusions into a written report. The report will be developed by and signed by a CIH. | $ | 1,290.00 |
| LABORATORY ANALYSIS: Surface Wipe for Cobalt (Standard TAT; 5-day), Estimate 70 samples@ $60 each | $ | 4,200.00 |
| LABORATORY ANALYSIS: Air for Cobalt (Standard TAT; 5-day), Estimate 20 samples@ $60 each | $ | 1,200.00 |
| Total *ESTIMATED* Project Cost: | $ | **13,690.00** |

**Assumptions & Exclusions:**
- Unless otherwise agreed upon, all fieldwork will be performed during normal business hours (i.e., Mon-Fri, 7am-5pm); a surcharge will be applied to work outside these hours.
- Client will facilitate access to all work areas.
- Client will provide pertinent documentation of previous sampling/ assessment performed in relation to the scope of work herein, if any.
- Client will provide pertinent documentation regarding development/ selection of acceptance (i.e., clearance) criteria, if any.
- Collected samples will be shipped via standard overnight to an accredited laboratory (i.e., AIS Environmental) for standard turn around time analysis.
- NOTE: Analysis can be performed faster, but at a surcharge depending on how soon results are needed.
- The pricing above will be adjusted based on the actual number of site visits made & samples collected.
- Peak included cost of laboratory analysis. Should Client desire to establish an account with the analytical laboratory, Peak will submit samples to the analytical laboratory on behalf of Client and Client will be responsible for payment of analytical costs.
- Peak will use this proposed budget as a not-to-exceed value; if site conditions result in potential overages, Peak will first obtain authorization from Client.
- All project deliverables will be provided in electronic format. Hard copy deliverables can be provided for $.75 per copy.

By signing below, the Client (1) authorizes Peak to begin performing the agreed upon Scope of Work & (2) agrees to reimburse Peak for performance of this work, both in accordance with this Proposal.

| Client Authorization: | Simon Planck | Director | 01/05/2022 |
|---|---|---|---|
| | Signature | Title | Date |

Proposal for:

# Quantum Labs

115 Rishell Drive
Oakland, CA 94619
(855) 510 - PEAK [7325]



| CLIENT INFO: | |
|---|---|
| Company: | Quantum Labs |
| Contact: | Simon Planck |
| Address: | 2108 Bering Dr, Building B |
| | San Jose, CA 95131 |
| Office: | 408.634.2108 |
| Cell: | |
| Fax: | |
| e-Mail: | sp@quantumlabs.co |

| PROJECT NAME / LOCATION: |
|---|
| Industrial Hygiene Services #2 |
| Sampling for Cobalt & Restoration Consultation |
| @ 2108 Bering Dr - San Jose, CA |

| PROPOSAL INFORMATION: | |
|---|---|
| Proposal Date: | 1/24/22 |
| Prepared by: | B. Weisbrod<br>CIH, CSP, CAC, CDPH I/A |
| Payment Terms: | Net 30 |

## PROJECT UNDERSTANDING / SUMMARY:

Peak has been requested to develop a proposal for providing industrial hygiene (IH) consulting services; specifically to (1) quantitatively assess cobalt concentrations on surfaces and in ambient air and (2) provide consultation pertaining to restoration of the above-referenced property. All work will be performed by or under the direction of a Certified Industrial Hygienist (CIH).

## ITEMIZED SCOPE OF WORK & COST ESTIMATE:

| | | |
|---|---|---|
| **MEZZANINE POST-CLEAN VERIFICATION ASSESSMENT #2:**<br>Peak will conduct one (1) site visit to collect surface wipe samples in order to determine whether re-cleaning was effective in reducing cobalt concentrations below the Acceptance Criteria. A total of 5 + 1 blank wipe samples will be collected. This cost includes preparation, supplies, travel, and labor to conduct one (1) site visit. | $ | 2,185.00 |
| **LAB M POST-CLEAN VERIFICATION ASSESSMENT #2:**<br>Peak will conduct one (1) site visit to collect surface wipe samples in order to determine whether re-cleaning was effective in reducing cobalt concentrations below the Acceptance Criteria. A total of 15 + 1 blank wipe samples will be collected. This cost includes preparation, supplies, travel, and labor to conduct one (1) site visit. | $ | 2,185.00 |
| **DAILY OVERSIGHT - COMMON AREA CLEANING:**<br>Peak will conduct daily oversight during carpet removal and cleaning of the Common Area. Oversight will include: (1) Verification of Critical Barriers, (2) Collection of 3 Perimeter Air Samples + 1 Blank each day, (3)Document Conditions during Cleaning, (4) Conducting Visual Inspections of Work Daily, and (5) Collecting Verification Surface Wipe Samples. A total of 20 + 4 blank air samples will be collected. A total of 20 + 2 blank wipe samples will be collected. This cost includes preparation, supplies, travel, and labor to conduct five (5) site visits | $ | 11,160.00 |
| **REPORT:**<br>Results will be communicated via email or phone conversation upon receipt. Interim clearance and/or modifications to restoration procedures will be communicated by email. Upon obtaining sample results meeting acceptance criteria, Peak will summarize restoration efforts, methodologies, results, and conclusions into a written report. The report will be developed by and signed by a CIH. | $ | 1,290.00 |
| LABORATORY ANALYSIS: Surface Wipe for Cobalt (RUSH TAT), Estimate 44 samples @ $143.75 each | $ | 6,325.00 |
| LABORATORY ANALYSIS: Air for Cobalt (Standard TAT; 5-day), Estimate 24 samples @ $143.75 each | $ | 1,440.00 |
| Total *ESTIMATED* Project Cost: | $ | 24,585.00 |

**Assumptions / Exclusions:**

→ Unless otherwise agreed upon, all fieldwork will be performed during normal business hours (i.e., Mon-Fri, 7am-5pm); a surcharge will be applied to work outside these hours.
→ Client will facilitate access to all work areas.
→ Client will provide pertinent documentation of previous sampling / assessment performed in relation to the scope of work herein, if any.
→ Client will provide pertinent documentation regarding development / selection of acceptance (i.e., clearance) criteria, if any.
→ Collected samples will be shipped via FedEx First Delivery Overnight to an accredited laboratory (i.e., ALS Environmental) for Rush analysis.
  → The pricing above will be adjusted based on the actual number of site visits made & samples collected.
→ Peak included cost of laboratory analysis. Should Client desire to establish an account with the analytical laboratory, Peak will submit samples to the analytical laboratory on behalf of Client and Client will be responsible for payment of analytical costs.
→ Peak will use this proposed budget as a not-to-exceed value; if site conditions result in potential overages, Peak will first obtain authorization from Client.
→ All project deliverables will be provided in electronic format. Hard copy deliverables can be provided for $75 per copy.

By signing below, the Client (1) authorizes Peak to begin performing the agreed upon Scope of Work & (2) agrees to reimburse Peak for performance of this work, both in accordance with this Proposal.

**Client Authorization:**

| | | |
|---|---|---|
| Signature | Title | Date |

Proposal for:

# Quantum Labs

115 Rishell Drive
Oakland, CA 94619
(855) 510 - PEAK [7325]



## CLIENT INFO:

| | |
|---|---|
| Company: | Quantum Labs |
| Contact: | Simon Planck |
| Address: | 2108 Bering Dr, Building B |
| | San Jose, CA 95131 |
| Office: | 408.634.2108 |
| Cell: | |
| Fax: | |
| e-Mail: | sp@quantumlabs.co |

## PROJECT NAME / LOCATION:

Industrial Hygiene Services #3

Sampling for Cobalt & Restoration Consultation
@ 2108 Bering Dr - San Jose, CA

## PROPOSAL INFORMATION:

| | |
|---|---|
| Proposal Date: | 2/16/22 |
| Prepared by: | B. Weisbrod<br>CIH, CSP, CAC, CDPH I/A |
| Payment Terms: | Net 30 |

## PROJECT UNDERSTANDING / SUMMARY:

Peak has been requested to develop a proposal for providing industrial hygiene (IH) consulting services; specifically to (1) quantitatively assess cobalt concentrations on surfaces within HVAC systems associated with Building B and (2) provide consultation pertaining to restoration of the above-referenced property. All work will be performed by or under the direction of a Certified Industrial Hygienist (CIH).

## ITEMIZED SCOPE OF WORK & COST ESTIMATE:

| | |
|---|---|
| HVAC SYSTEM(S) ASSESSMENT:<br>Peak will conduct one (1) site visit to determine whether the heating, ventilation, & air-conditioning (HVAC) system(s) servicing Suite B contains cobalt dust in excess of the Acceptance Criteria (i.e., 2μg/100cm2). The assessment will consist of:<br>  1. Reviewing existing schematic drawings of the HVAC system(s) servicing Suite B -OR- developing a rough layout diagram of the system(s).<br>  2. Collecting surface wipe samples from each HVAC system servicing Suite B. Samples will be collected from: (A) 1 return air intake inside the building, (B) inside the AHU on the return side; upstream of the filter, (C) inside the AHU on the supply side; immediately downstream of the filter bank, (D) inside the AHU on the supply side; at the supply out; or as near as possible, and (E) 1 supply duct upstream of the diffuser inside the building.<br>NOTE: Based on aerial figures of the building, it is estimated that 4 HVAC systems may service portions of Suite B. This will be verified during performance of Scope Item 1 above.<br>  3. Documenting conditions using photographs & site sketches.<br><br>This cost includes preparation, supplies, travel, and labor to conduct one (1) site visit & develop an email summary report of findings. | $           2,150.00 |
| LABORATORY ANALYSIS: Surface Wipe for Cobalt (RUSH Analysis), Estimate 22 samples @ $143.75 each<br>   - Assumes 4 systems x 5 samples each + 10% blanks (i.e., 2) | $           3,162.50 |
| Total *ESTIMATED* Project Cost: | $           5,312.50 |

**Assumptions / Exclusions:**

→ It is anticipated that the assessment will be conducted on Saturday, February 19, 2022.
→ Client will facilitate access to all work areas; it is understood that Belfor will be coordinating an articulating manlift to access the roof.
→ Client will provide pertinent documentation (e.g., drawings of HVAC system configuration).
→ Collected samples will be shipped via FedEx First Delivery Overnight to an accredited laboratory (i.e., ALS Environmental) for Rush analysis.
→ The pricing above will be adjusted based on the actual number of site visits made & samples collected.
→ Peak will use this proposed budget as a not-to-exceed value; if site conditions result in potential overages, Peak will first obtain authorization from Client.
→ All project deliverables will be provided in electronic format. Hard copy deliverables can be provided for $75 per copy.

By signing below, the Client (1) authorizes Peak to begin performing the agreed upon Scope of Work & (2) agrees to reimburse Peak for performance of this work, both in accordance with this Proposal.

**Client Authorization:**

| | | |
|---|---|---|
| Signature | Title | Date |

Proposal for:
# Quantum Labs

115 Rishell Drive
Oakland, CA 94619
(855) 510 - PEAK [7325]



## CLIENT INFO:

| | |
|---|---|
| Company: | Quantum Labs |
| Contact: | Simon Planck |
| Address: | 2108 Bering Dr, Building B |
| | San Jose, CA 95131 |
| Office: | 408.634.2108 |
| Cell: | |
| Fax: | |
| e-Mail: | sp@quantumlabs.co |

## PROJECT NAME / LOCATION:

### Industrial Hygiene Services #4

Sampling for Cobalt & Restoration Consultation
@ 2108 Bering Dr - San Jose, CA

## PROPOSAL INFORMATION:

| Proposal Date: | 2/28/22 |
|---|---|
| Prepared by: | B. Weisbrod |
| | CIH, CSP, CAC, CDPH I/A |
| Payment Terms: | Net 30 |

## PROJECT UNDERSTANDING / SUMMARY:

Peak has been requested to develop a proposal for providing industrial hygiene (IH) consulting services; specifically to (1) quantitatively assess cobalt concentrations on surfaces within HVAC system #3 post-cleaning, (2) developing a comprehensive final report, and (3) provide consultation pertaining to restoration of the above-referenced property. All work will be performed by or under the direction of a Certified Industrial Hygienist (CIH).

## ITEMIZED SCOPE OF WORK & COST ESTIMATE:

| | |
|---|---|
| **HVAC SYSTEM #3 POST-CLEAN VERIFICATION ASSESSMENT:**<br>Peak will conduct one (1) site visit to conduct post-cleaning verification surface wipe sampling from the return-side of System 3 to determine whether cobalt dust has been cleaned to below the Acceptance Criteria (i.e., 2µg/100cm2). The assessment will consist of:<br>  1. Visual inspection of the return system of System #3.<br>  2. Collecting five surface wipe samples; 1 from the roof-side portion of the return duct, 1 from the fab-side portion of the return duct, 1 from the return air grilles, & 2 from within the mini enclosure & 1 blank.<br>  3. Documenting conditions using photographs & site sketches.<br><br>This cost includes preparation, supplies, travel, and labor to conduct one (1) site visit & develop an email summary report of findings. | $    1,840.00 |
| **FINAL REPORT:**<br>Peak will develop a comprehensive, written report detailing the methods, results, and conclusions from our involvement with the project. The intent of the report is to articulate that all areas that have been cleaned are below the established Acceptance Criteria. The Report will be developed and signed by a CIH. The report will be issued in pdf. | $    1,860.00 |
| **REMAINING BUDGET:**<br>As of issuance of Peak Invoice 01156, there is money remaining in the budget already authorized. | $    (2,575.00) |
| LABORATORY ANALYSIS: Surface Wipe for Cobalt (RUSH Analysis), Estimate 6 samples @ $143.75 each | $    862.50 |
| Total *ESTIMATED* Project Cost: | $    1,987.50 |

**Assumptions / Exclusions:**
→ It is anticipated that the assessment of HVAC System #3 will be conducted on Tuesday, March 1, 2022.
→ Client will facilitate access to all work areas; it is understood that Belfor will be coordinating an articulating manlift to access the roof.
→ Collected samples will be shipped via FedEx First Delivery Overnight to an accredited laboratory (i.e., ALS Environmental) for Rush analysis.
→ The pricing above will be adjusted based on the actual number of site visits made & samples collected.
→ Peak will use this proposed budget as a not-to-exceed value; if site conditions result in potential overages, Peak will first obtain authorization from Client.
→ All project deliverables will be provided in electronic format. Hard copy deliverables can be provided for $75 per copy.

By signing below, the Client (1) authorizes Peak to begin performing the agreed upon Scope of Work & (2) agrees to reimburse Peak for performance of this work, both in accordance with this Proposal.

*Client Authorization:*

| | | |
|---|---|---|
| Signature | Title | Date |

**EXHIBIT E**

